No. 25-13065-P

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

**CHRISTOPHER BARBOUR, Plaintiff-Appellee,**

v.

**JOHN Q. HAMM, COMMISSIONER ALABAMA DEPARTMENT OF CORRECTIONS, Respondent-Appellant**

*On Appeal from the United States District Court for the
Middle District of Alabama (Case No. 2:01-cv-00612-EMC-CWB)*

# BRIEF OF APPELLANT

Steve Marshall
*Attorney General*

Robert Overing
*Deputy Solicitor General*

Brenton Thompson
*Assistant Attorney General*

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130
Tel: (334) 353-2021
Brenton.Thompson@AlabamaAG.gov

January 23, 2026

1

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case[1]:

1.  Olga Akselrod, NAACP, former counsel for Barbour in the federal habeas proceedings;

2.  Richard Allen, former Commissioner of the Alabama Department of Corrections;

3.  Cameron Ball, Assistant Attorney General in the federal habeas proceedings;

4.  Christopher Barbour, petitioner in federal habeas proceedings;

5.  Vernon Barnett, Commissioner of the Alabama Department of Revenue, former counsel with the Alabama Department of Corrections,

6.  Tatiana Bertsch, Equal Justice Initiative, counsel for Lola Roberts, William Roberts, and Lakeisha Hall;

7.  Ellen Brooks, former district attorney for the Fifteenth Judicial Circuit at trial, on direct appeal, and in postconviction proceedings;

8.  Donald Campbell, former Commissioner of the Alabama Department of Corrections;

9.  David Richard Clark, former Assistant Attorney General;

10. Nicola Cohen, Squire Patton Boggs, counsel for Barbour in the federal habeas proceedings;

---

[1] The circuit judge who presided over Barbour's trial and initial postconviction proceedings, the Honorable William Gordon, is deceased. Likewise, former District Attorney Albert Sim Butler, who was the District Attorney for the Fifteenth District of Alabama when the case was initially at the district attorney's office, is deceased.

11. Santino Coleman, NAACP, counsel for Barbour in the federal habeas proceedings;

12. Clay Crenshaw, Chief Deputy Attorney General, former Assistant Attorney General during state postconviction proceedings and federal habeas proceedings;

13. Laurie Webb Daniel, Holland & Knight, LLP, counsel for Barbour;

14. Tracy Daniel, former Assistant Attorney General in direct appeal proceedings;

15. Jefferson Dunn, former Commissioner of the Alabama Department of Corrections;

16. Joseph C. Espy, former counsel in Barbour's first postconviction Rule 32 proceedings;

17. James H. Evans, former Attorney General of Alabama;

18. Miriam Gohara, Yale Law School, counsel representing Barbour during the successive state postconviction proceedings and the federal habeas proceedings;

19. William Gunter, former Assistant District Attorney that assisted in prosecuting Barbour;

20. Michael Haley, former Commissioner of the Alabama Department of Corrections;

21. Stephen Hanlon, Holland & Knight, LLP, counsel for Barbour in federal civil suit;

22. Clifford Heard, former trial counsel for Barbour

23. James Houts, Assistant Attorney General, counsel for the State of Alabama in the successive postconviction proceedings;

24. Henry M. Johnson, Assistant Attorney General in the federal habeas proceedings;

25. Charlie E. Jones, former Commissioner of the Alabama Department of Corrections;

26. Audrey Jordan, former Assistant Attorney General in the federal habeas proceedings;

27. George Kendall, Squire Patton Boggs, counsel representing Barbour during the successive state postconviction proceedings and the federal habeas proceedings;

28. Polly S. Kenny, Assistant Attorney General in the federal habeas proceedings;

29. Troy King, former Attorney General of Alabama;

30. Jin hee Lee, NAACP, counsel for Barbour in the federal habeas proceedings;

31. Daniel Briggs Loehr, Cuny School of Law, counsel for Barbour in the federal habeas proceedings;

32. Emily C. Marks, Chief United States District Judge in the Middle District of Alabama, presiding over Barbour's federal habeas proceedings;

33. Steve Marshall, Alabama Attorney General;

34. Tracy McCooey, circuit judge during postconviction Rule 32 proceedings;

35. Randall McNeill, prosecutor at Barbour's trial;

36. Peter Neufeld, The Innocence Project, filing of amicus brief in federal habeas proceedings;

37. Kevin C. Newsom, former Solicitor General of the Alabama Attorney General's Office;

38. Michael Nunnelley. former Assistant Attorney General in the federal habeas proceedings;

39. Jenay Aretha Nurse-Guilford, Squire Patton Boggs, counsel for Barbour in the federal habeas proceedings;

40. Robert M. Overing, Deputy Solicitor General in federal appellate proceedings;

41. Jimmy Pool, former Montgomery County Circuit Judge, former counsel for codefendant Christopher Hester;

42. Judge William Pryor, Eleventh Circuit Chief Judge, former Attorney General;

43. Frank Riggs, former trial counsel for Barbour;

44. Theodore Michael Shaw, NAACP, counsel for Barbour in the federal habeas proceedings;

45. Angela Setzer, Equal Justice Initiative, counsel for Barbour in federal civil suit;

46. Samuel Spital, NAACP, counsel for Barbour in the federal habeas proceedings;

47. Bryan A. Stevenson, Equal Justice Initiative, counsel for Barbour in federal civil suit;

48. Holly Thomas, NAACP, former federal habeas counsel for Barbour;

49. Kim Thomas, former Commissioner of the Alabama Department of Corrections;

50. Brenton Thompson, Assistant Attorney General in federal appellate proceedings;

51. Myron H. Thompson, former United States District Court Judge in the habeas proceedings;

52. Susan R. Walker, retired United States Magistrate Judge in the Middle District of Alabama in the habeas proceedings;

53. William Keith Watkins, former Chief United States District Judge in the Middle District of Alabama in the habeas proceedings;Forrester, Nathan A.—former Deputy Attorney General

54. Robert Ward, former assistant district attorney who assisted in prosecuting Barbour;

55. Carine M. Williams, Squire Patton Boggs, counsel for Barbour in the federal habeas proceedings;

56. Gilda Williams, former Assistant Attorney General in direct appeal proceedings; and,

57. Victorien Wu, NAACP, former counsel for Barbour in the federal habeas proceedings.


Undersigned also certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Respectfully submitted,

Steve Marshall
*Attorney General*

**s/ Brenton Thompson**
Brenton Thompson
*Assistant Attorney General*

## STATEMENT REGARDING ORAL ARGUMENT

The State requests oral argument. This is a capital case in which the parties dispute, among other things, whether the prisoner is "actually innocent." The district court stayed its judgment pending appeal because the State had shown a "substantial case on the merits." The appeal also raises novel legal and procedural issues. This Court's resolution of the appeal would be significantly aided by oral argument. Fed. R. App. P. 34(a)(2)(C); 11th Cir. R. 34-3(b)(3).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT .............................................. i

TABLE OF CONTENTS........................................................................... ii

TABLE OF AUTHORITIES ................................................................. iiv

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUES..............................................................1

INTRODUCTION .................................................................................2

STATEMENT OF THE CASE................................................................4

    A.  The Crime.................................................................................4

    B.  Trial and State Direct Appeal....................................................5

    C.  Initial Rule 32 Petition ............................................................7

    D.  Stay of Execution ...................................................................8

    E.  Successive Rule 32 Petition .....................................................9

    F.  Federal Habeas Petition..........................................................10

LEGAL STANDARDS .......................................................................18

ARGUMENT .....................................................................................19

I.    The District Court Erred By Excusing Barbour's Failure to Exhaust Available State-Court Remedies *After* Receiving New DNA Test Results.........19

II.   The District Court Erred in Applying the Innocence Exception to Review Barbour's Time-Barred and Procedurally Defaulted Claims..............................25

III.  The District Court Erred in Granting Habeas Relief on Barbour's *Brady* and *Napue* Claims. ...................................................................................40

A.   The district court wrongly granted relief based on evidence from the *Schlup* hearing in violation of 28 U.S.C. §2254(e)...........................................41

B.   The district court erred by granting Barbour's *Brady* claim......................43

C.   Barbour is not entitled to habeas relief on his *Napue* claim. .....................49

CONCLUSION ....................................................................................................52

# TABLE OF AUTHORITIES

**Cases**

*Apanovitch v. Bobby*,
48 F.3d 434 (6th Cir. 2011) ................................................................43

*Barbour v. Alabama*,
515 U.S. 1020 (1996)...........................................................................7

*Barbour v. State*, (*Barbour I*)
673 So. 2d 461 (Ala. Crim. App. 1994) ......................... 5, 7, 27, 28, 46

*Barbour v. State*, (*Barbour II*)
903 So. 2d 858 (Ala. Crim. App. 2004)........................ 10, 28, 29, 46

*Brady v. Maryland*,
373 U.S. 83 (1963)...................................... 1, 3, 18, 21, 40, 42-45, 47

*Calderon v. Thompson*,
523 U.S. 538 (1998 ...........................................................................36

*Case v. Hatch*,
731 F.3d 1015 (10th Cir. 2013) ........................................................32

*Coleman v. Thompson*,
501 U.S. 722 (1992)............................................................ 19, 22, 25

*Dretke v. Haley*,
541 U.S. 386 (2004)...........................................................................22

*Edwards v. Carpenter*,
529 U.S. 446 (2000)...........................................................................21

*Floyd v. Vannoy*,
894 F.3d 143 (5th Cir. 2018) ............................................................33

*Gary v. Hall*,
558 F.3d 1229 (11th Cir. 2009) ........................................................43

*Giglio v. United States*,
  405 U.S. 150 (1972)............................................................................51

*Glossip v. Oklahoma*,
  604 U.S. 226 (2025)...........................................................................50

*Godschalk v. Montgomery Cnty. Dist. Atty's Off.*,
  177 F. Supp. 2d 366 (E.D. Pa. 2001)................................................38

*Hammond v. Hall*,
  586 F.3d 1289 (11th Cir. 2009) .........................................................50

*House v. Bell*,
  547 U.S. 518 (2006)..................................................................... 25, 26

*Johnson v. Fla. Dep't of Corr.*,
  513 F.3d 1328 (11th Cir. 2008) .........................................................35

*Kuenzel v. Comm'r*,
  690 F.3d 1311 (11th Cir. 2012) .........................................................26

*Kyles v. Whitley*,
  514 U.S. 419 (1995)............................................................................42

*McQuiggin v. Perkins*,
  569 U.S. 383 (2013)..................................................................23, 25, 26

*Michael Williams v. Taylor*,
  529 U.S. 420 (2000)..................................................................... 21, 24

*Moon v. Head*,
  285 F.3d 1301 (11th Cir. 2002) ................................................. 47, 49

*Napue v. Illinois*,
  360 U.S. 264 (1959)..............................................21, 3, 18, 21, 40, 42, 43, 49-52

*O'Sullivan v. Boerckel*,
  526 U.S. 838 (1999)............................................................................22

*Rhines v. Weber*,
    544 U.S. 269 (2005)................................................................ 19, 23, 24

*Rozzelle v. Sec'y, Fla. Dep't Corrs.*,
    672 F. 3d 1000 (11th Cir. 2012) ..................................... 25, 33, 35, 38

*Sawyer v. Whitley*,
    505 U.S. 333 (1992)................................................................36

*Scarlett v. Sec'y, Dep't of Corr.*,
    404 F. App'x 394 (11th Cir. 2010) ....................................26

*Schlup v. Delo*,
    513 U.S. 298 (1995)........................1, 11-13, 17, 19-26, 28, 30-35, 37, 39-42, 45

*Shinn v. Ramirez*,
    596 U.S. 366 (2022)......................................................23-24, 41-42

*Shoop v. Twyford*,
    596 U.S. 811 (2022)......................................................41

*Shuler v. Secretary*,
    610  856 (11th Cir. 2015) ..................................................50

*Smith v. Phillips*,
    455 U.S. 209 (1982)..................................................50

*Stephens v. Hall*,
    407 F.3d 1195 (11th Cir. 2005) ..........................................50

*Stimpson v. Warden*,
    2025 WL 484049 (11th Cir. Feb. 13, 2025) ............................... 33, 36

*United States v. Jordan*,
    316 F.3d 1215 (11th Cir. 2003) ..........................................47

*United States v. McNair*,
    605 F.3d 1152 (11th Cir. 2010) ..........................................51

*United States v. Phillipos,*
  849 F.3d 464 (1st Cir. 2017) ................................................................38

*United States v. Sipe,*
  388 F.3d 471 (5th Cir. 2004) ...............................................................43

*Ventura v. Att'y Gen. of Fla.,*
  419 F.3d 1269 (11th Cir. 2005) ...........................................................51

*Wainwright v. Sykes,*
  433 U.S. 72 (1977) ..............................................................................19

*Wearry v. Cain,*
  577 U.S. 385 (2016) ............................................................................42

*Woodford v. Ngo,*
  548 U.S. 81 (2006) ..............................................................................19

**Statutes**

28 U.S.C. §2244(d)(1)(A) .........................................................................25

28 U.S.C. §2254 .........................................................................................1

28 U.S.C. §2254(b)(1) ..............................................................................23

28 U.S.C. §2254(c) ...................................................................................23

28 U.S.C. §2254(d) ............................................................................ 24, 41

28 U.S.C. §2254(e) .................................................... 1, 4, 28, 39, 41-42

Ala. Code §13A-5-40(a)(2) .........................................................................5

Ala. Code §13A-5-40(a)(3) .........................................................................5

Ala. Codeb§13A-5-40(a)(4) ........................................................................5

**Rules**

Ala. R. Crim. P. 32.1(e) .......................................................................20

Ala. R. Crim. P. 32.2(a)(4)...................................................................10

Ala. R. Crim. P. 32.2(b) ........................................................... 3, 9, 10, 20

Ala. R. Crim. P. 32.2(c) ....................................................................9, 20

**Other Authorities**

Antiterrorism and Effective Death Penalty Act.............. 3, 11, 18, 19, 23, 24, 40, 41

# STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal under 18 U.S.C. §§1291 and 2253 because the appeal is from a final order in a 28 U.S.C. §2254 proceeding.

# STATEMENT OF THE ISSUES

**I.** Whether the district court erred by granting habeas relief on new claims that Barbour procedurally defaulted by declining to exhaust available state-court remedies after he acquired new evidence during his federal habeas proceedings.

**II.** Whether the district court erred when it found that Barbour had presented new and reliable evidence demonstrating actual innocence under *Schlup v. Delo* sufficient to obtain review on the merits of his procedurally defaulted federal claims.

**III.A.** Whether the district court erred by granting habeas relief on Barbour's claims under *Brady v. Maryland* and *Napue v. Illinois* based on evidence outside the state-court record, developed during an evidentiary hearing on his *Schlup* claim, and without satisfying 28 U.S.C. §2254(e)(2).

**III.B.** Whether the district erred by granting relief on Barbour's *Brady* claim.

**III.C.** Whether the district erred by granting relief on Barbour's *Napue* claim.

# INTRODUCTION

Christopher Barbour is guilty of murdering Thelma Roberts in March 1992. In a videotaped confession, Barbour described how he and Michael Mitchell held her down, Christopher Hester raped her, and Barbour himself stabbed her to death and burned her body. His confession was corroborated by physical evidence from the crime scene, including significant nonpublic details of the crime.

Barbour claims he has new DNA evidence that exonerates him. This evidence, he says, proves that Hester was not the source of the semen found inside the victim; the semen was left by another man, Tyrone Jackson. Had the jury known that fact, Barbour concludes, no reasonable juror would have convicted him.

The problem with Barbour's actual-innocence theory is that it doesn't prove that he is actually innocent. It's a *non-sequitur*. Let's assume that a reasonable juror would believe that Jackson, not Hester, had raped Thelma Roberts. Does that mean Barbour did *not* stab her nine times in the chest? That he did *not* hold her down while she was raped? That he did *not* light a fire to cover up the evidence? Does it give him an alibi? Or prove that he wasn't there? No, it proves none of these things. At best, Barbour has impeached *one aspect* of his own confession—an aspect that was critical to neither the prosecution's case, nor to the defense. Indeed, Barbour's trial counsel *knew* that the DNA testing had "very strongly" ruled out Hester as the source

of the semen, and the decision not to pursue that evidence strongly suggests that it would not have been helpful to the defense, let alone somehow exonerating.

Nonetheless, the district court relied on Barbour's "actual innocence" to review and then grant two untimely and defaulted habeas claims, forcing the State to retry or release Barbour. His claims fail on the merits, but they never should have been reviewed on the merits in the first place. For one, he did not prove innocence. Two, whether or not the district court could excuse the failure to raise his claims in state court thirty years ago, there was no reason to let him bypass the state courts today—*after* he discovered the "new" facts that allegedly prove "a miscarriage of justice." Ala. R. Crim. P. 32.2(b). The actual-innocence exception allows federal review as a safety valve when there would otherwise be a manifest injustice. Without trying state-court remedies, Barbour could not prove the necessity of a federal one. Letting Barbour pick his forum, the district court flouted bedrock principles of federal habeas and the purpose of AEDPA.

On the merits, the district court erred in finding a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The allegedly suppressed "bench notes" underlying the 1992 DNA analysis were not material because defense counsel already knew the results "strongly" excluded Hester; there was no effect on the trial strategy. Likewise, there was no *Napue v. Illinois*, 360 U.S. 264 (1959), error in offering Barbour's confession when counsel already knew that they could impeach it with

the DNA evidence. Nor was Barbour's confession "false evidence" even if other evidence tended to undermine an aspect of it. On each of these claims, the district court seemed to rely on new evidence that should not have been considered without Barbour satisfying 28 U.S.C. §2254(e)(2)'s standard for an evidentiary hearing, and the district court discounted state findings presumed to be correct. These rulings reflect a profound misapplication of habeas standards, warranting reversal.

## STATEMENT OF THE CASE

### A.    The Crime

The Alabama Court of Criminal Appeals (ACCA) summarized the gruesome facts of this case on direct appeal:

> The state's evidence tended to show that on March 21, 1992, 16-year-old William Roberts found the naked and partially burned body of his mother, Thelma Bishop Roberts, lying on the floor of her bedroom. There was a white plastic trash bag over her head and a knife protruding from her chest. William Roberts testified that when he saw his mother's body he removed the knife out from her chest and threw it across the room. He also removed the trash bag from her head and called the emergency police telephone number. William Roberts also testified that the jewelry that his mother always wore was missing.
>
> Dr. Alan Stilwell … performed an autopsy on the victim. It was his opinion that Thelma Roberts died as a result of nine stab wounds to her chest, one of which penetrated her left lung and one of which penetrated her heart, causing extensive internal bleeding. Two of the wounds had been inflicted with such force that they pierced her back. Dr. Stilwell further testified that the victim's eyes were swollen from repeated blows to her head.
>
> Barbour confessed and gave a detailed account of the facts surrounding Roberts's murder. Barbour told police that on March 20, 1992, he, Chris

Hester, and Mike Mitchell went to see, "Koon," who was a friend of Hester's and who lived on Manley Drive in Montgomery. Hester talked with someone at the door and discovered that Koon was not home. The three then went across the street to the victim's house. Barbour stated that they entered the house, sat down in the living room, and started drinking beer. Hester and the victim started talking. Later, the victim left the living room and went to the back of the house. A few minutes later, Hester also went to the back of the house. Hester and the victim remained there for several minutes while Mitchell and Barbour stayed in the living room. A short while later, Barbour and Mitchell heard loud noises coming from the back and went to investigate. They entered the bedroom and saw that the victim was naked and that Hester was wearing only his pants. Hester then hit the victim, and Barbour and Mitchell started hitting her about the head. The victim fell to the floor. Barbour and Mitchell got on either side of her and held her down while Hester had sex with her. After Hester got up and pulled on his pants, Barbour told the others that they could not leave because she could identify them. Barbour confessed that he then went to the kitchen, grabbed a knife, and returned to the bedroom. He got on his knees and forcibly stabbed the victim several times. He left the knife in her body, stood up, walked to the closet, threw some things from the closet around her body, and set them on fire. As they fled from the house Barbour grabbed the smoke detector off the wall in the hallway and threw it in the living room.

*Barbour v. State*, 673 So. 2d 461, 463 (Ala. Crim. App. 1994) (*Barbour I*).

## B.  Trial and State Direct Appeal

On July 10, 1992, Barbour was indicted for murder committed during the course of a rape, Ala. Code §13A-5-40(a)(3), murder during the course of an arson, §13A-5-40(a)(9), murder during the course of a burglary, §13A-5-40(a)(4), and murder during the course of a robbery, §13A-5-40(a)(2). DE484-1:11-14.

Barbour filed pretrial suppression motions challenging his confessions as involuntarily and unknowingly made, arguing that law enforcement used coercive

5

tactics. *Id.* at 25, 59-57, 62-63. The trial court denied the motions, finding that Barbour's expert's opinion was entitled to "little weight" and that "Barbour's confession was not the result of … abuse." *Id.* at 64-65.

During its case-in-chief, the prosecution called Larry Huys to testify as an expert in forensic serology. Huys testified that the kind of DNA testing performed in this case (HLA DQ alpha testing) did not produce the types of specific genetic identifiers that other forms of DNA testing could; Barbour's trial counsel objected, and the court held an *in camera* discussion with all counsel and Huys. During that discussion, Huys explained the conclusions in his expert report based on the testing performed on the anal and vaginal swabs from Ms. Roberts's rape kit. He stated (still *in camera*) that the DNA testing indicated that Barbour "could be the source of the semen" and that it spoke "very strongly against Mr. Hester being the source." DE484-4:167. The trial court ruled that the evidence was admissible, but the prosecution ultimately never asked Huys on the stand about his report or the DNA testing. Barbour's counsel declined to cross examine Huys. *Id.* at 171.

The jury convicted Barbour on counts I-III, and voted 10-2 for death. DE484:156, 174. The judge accepted the jury's recommendation, noting Barbour's accurate description of the cause and manner of death and fire. *Id.* at 170-72.

Barbour filed two post-trial motions for a new trial. DE484-2:6-7, 28-30. Both challenged the trial court's decision to deny Barbour's motions to suppress. *Id.* The motions were denied, and Barbour's direct appeal followed.

On appeal, Barbour challenged, among other issues, the voluntariness of his videotaped confession. *Barbour I*, 673 So. 2d at 464. The ACCA affirmed. *Id.* at 472. His petition for rehearing was denied on October 20, 1995, and a certificate of judgment issued. *Id.* The United States Supreme Court denied Barbour's petition for certiorari on June 24, 1996. *Barbour v. Alabama*, 515 U.S. 1020 (1996).

### C.    Initial Rule 32 Petition

Barbour filed a timely petition for postconviction relief under Rule 32 of the Alabama Rules of Criminal Procedure. DE484-12:2-56. He alleged, among other things, that his videotaped confession was coerced and that trial counsel provided ineffective assistance. Barbour was deposed. DE7-7. He acknowledged that he had discussed the guilt and penalty phases of his trial with trial counsel and that trial counsel advised him that he could present a defense, including witness testimony, during the guilt phase. *Id.* at 7. Barbour stated, "We went over that, and there really wasn't anybody I could think of to—to call. I—you know, there just wasn't anybody." *Id.* Trial counsel provided live testimony at an evidentiary hearing on Barbour's *Strickland* claim. DE7-2:8. Judge Gordon denied Barbour's petition on

April 21, 1998, finding the claims raised were precluded, insufficiently pleaded, and without merit. DE7-2:57. Barbour did not appeal. DE349, ¶9(d).

**D.     Stay of Execution**

On September 8, 2000, after Barbour's first postconviction proceeding was complete, but before he filed his successive petition, the State requested the Alabama Supreme Court (ASC) set an execution date, noting that Barbour had not appealed the dismissal of his Rule 32 petition or filed a habeas petition, and that his time for filing both had lapsed. The ASC granted the State's motion on April 20, 2001, and ordered Barbour's execution set for May 25, 2001. DE484-15:170. On May 18, 2001, Barbour filed a motion for stay of execution in the ASC.

Three days later, he filed a federal habeas petition, DE1, and motion for stay of execution, DE3, in the federal district court. He moved the same day for an order to preserve DNA evidence, arguing that new DNA testing showing that he did not rape Ms. Roberts, "considered with the HLA DQ alpha testing which already excludes Hester, w[oul]d seriously undermine Barbour's confession and the prosecution's version of the crime" and "bolster his claim that his confession was coerced and patently false." DE4:6.

On May 23, 2001, the district court granted a stay of execution, finding that in light of "the limited record and time available, the court could not conclude that Barbour's petition is patently meritless or barred." DE9:27.

### E.    Successive Rule 32 Petition

Meanwhile, on April 4, 2001, Barbour had filed a "motion to reopen" his Rule 32 proceeding and a "motion for preservation of DNA evidence" in circuit court. DE484-14:126. He sought updated DNA testing of the anal and vaginal swabs from Ms. Roberts's rape kit, which, he argued, would "show beyond doubt that neither he nor [Christopher Hester] sexually assaulted the victim and that a third person unknown to them—the real killer—did so." *Id.* The State moved to summarily dismiss Barbour's motion to reopen, arguing that the motion was a successive Rule 32 petition and time-barred. *Id.* at 112-51. Barbour moved to defer a ruling on the State's motion, asserting that modern DNA testing might "thoroughly impeach" his confession, "a statement [he] argue[d] elsewhere was coerced and unreliable." DE484-15:149-52. Barbour submitted his own affidavit and the affidavits of Melvin, William, and Lola Roberts, which he offered as "proof of his initial pleading [Lt.] Davis and [Det.] Carmichael abusing suspects during interrogation" and to "corroborate [his] assertion that his confession was" coerced. *Id.*

The circuit court denied the motion as a successive petition barred under Alabama Rule of Criminal Procedure 32.2(b) and (c), and the ACCA affirmed, finding:

> There was no evidence presented at trial pointing to Barbour as the person who raped Thelma Roberts. Instead, all of the evidence—including his own confessions—established that Barbour's participation in the rape was limited to holding Roberts on the floor

while Hester raped her. Accordingly, there is no need for postconviction DNA testing in this case; such testing would have no relevance. Barbour now seeks to recant his previous confessions. However, because he is procedurally barred from collaterally attacking those confessions, Barbour's attempt to obtain DNA testing appears to be his rather ingenuous way of attempting to circumvent the procedural bar of Rules 32.2(a)(4) and 32.2(b), which would prohibit further review of the admissibility of his confessions. The purpose of DNA testing is to exonerate a wrongfully convicted defendant. It should not be used as a method to circumvent procedural bars whose purpose is to prohibit a petitioner from relitigating claims over and over again.

*Barbour v. State*, 903 So. 2d 858, 867 (Ala. Crim. App. 2004) (*Barbour II*). The Alabama Supreme Court subsequently denied Barbour's petition certiorari, and a certificate of judgment issued on January 1, 2005.

## F.     Federal Habeas Petition

On May 23, 2001, the district court had ordered the parties to show cause why the court should not hold all proceedings in abeyance so long as Barbour's successive Rule 32 petition remained pending. DE9. The magistrate judge recommended that the case be held in abeyance and to "inform the court promptly when the state court resolves this matter." DE21. On January 14, 2004, Barbour filed a notice of state court exhaustion along with a motion to amend his initial petition. DE49. The State moved to dismiss the petition as untimely. DE51. On March 1, 2007, the magistrate judge recommended that Barbour's federal habeas petition be dismissed as untimely. DE98. Little happened for over ten years.

In August 2018, Barbour's case was reassigned to District Judge Emily C. Marks. DE151. Barbour then moved to supplement the record and requested a status conference. DE152. In his motion, Barbour requested to supplement the record "with new evidence that [came] to light since Magistrate Judge Walker issued [her] Report and Recommendation … that strongly supports his motion for DNA testing[] and his [claim] of actual innocence under *Schlup* [*v. Delo*, 513 U.S. 298 (1995)]." DE153:1. Barbour's "new evidence" included the following:

- Affidavit testimony from Peter Neufeld of the Innocence Project opining that "Mr. Huys's [pre-trial DNA] testing definitively excluded [] Hester as the source of the semen."

- An expert report from Dr. Richard Leo concluding that Barbour's confession was false based on certain factual inaccuracies and based on the interrogation tactics, which, he opined, "fell below the professional norms prevailing in 1992."

- "Christopher Hester's plea agreement made two months after [] Barbour's confession."

- "Evidence that Michael Mitchell … was never charged with any offense related to Mrs. Roberts's murder[.]"

- "Affidavits pointing to an alternative suspect who attended a sleepover with the Roberts children the night their mother was murdered."

DE165:7-9. Barbour also asserted that "AEDPA's restrictions on evidentiary hearings [we]re inapplicable, when, as [alleged] here, the Petitioner did not fail to develop the evidence in state court" and "diligently sought discovery to present and develop evidence of his innocence." DE165:6 n.2. Barbour argued that "[h]e ha[d] amassed a substantial record of his innocence, and the possibility of identifying a

third-party suspect as the actual perpetrator" and sought "the means to access the evidence necessary to prove it." DE165:16.

The district court on March 30, 2021, issued a Memorandum Opinion and Order finding that Barbour had shown good cause for further DNA testing and denied without prejudice the State's motion to dismiss as untimely Barbour's second amended federal petition. The district court found persuasive the "affidavits from the victim's children, which state that an alternative suspect (1) had threatened their mother prior to her death, (2) was in close proximity to her the night of her murder, (3) had access to keys to her home, and (4) was seen shaking, upset, and apologizing in the hours after the murder." DE168:12.

On October 7, 2021, Acadiana Criminalistics Laboratory issued a report noting that on September 28, 2021, "a CODIS match was obtained between the major contributor DNA profile from the sperm fraction of vaginal swab and Alabama database sample" belonging to Jerry Tyrone Jackson. DE187-1. Three months later, Alan Keel submitted a report finding that Mr. Jackson was a match for the major male contributor of the mixed DNA sample for the vaginal swab. DE213-1.

Over the State's objection, the district court ordered discovery and briefing on Barbour's *Schlup* claim. In July 22, 2022 supplemental briefing, Barbour attached a declaration from an expert—Gary Harmor, a forensic analyst at the Serological Research Institute—hired to review Alabama Department of Forensic Science

(ADFS) DNA files produced during *Schlup* discovery. DE295-4:2. Specifically, Harmor had been hired to review the HLA DQ alpha test strips from the 1992 testing of Ms. Roberts' rape kit to "determine whether … Barbour could have been excluded as a source of" the semen found on the swabs "based on what qualified DNA analysts in the field knew about HLADQA1 testing in 1992." *Id.* He opined that the 1992 testing should have excluded Barbour as a potential source of the semen, contrary to the conclusion reached by the State's trial expert Mr. Huys that Barbour was a "possible but unlikely" contributor. DE295-4 at 4.

The State sought to depose Mr. Harmor and sought discovery of any DNA testing performed on Barbour's behalf. Barbour's response, filed on November 29, 2022, referenced for the first time DQ alpha testing performed by Mr. Harmor on Barbour's behalf in 2010 and 2017. DE313.

After Barbour amended his petition on April 17, 2023, the district court set an evidentiary hearing on Barbour's *Schlup* claim. DE333. The testimony included:

***Alan Keel.*** Barbour proffered Mr. Keel, a DNA analyst with the California-based Forensic Analytical Crime Laboratory (FACL), as an expert in forensic serology and DNA analysis. DE473 at 70. Mr. Keel testified that he was first contacted in 2021. DE436:50-52. He personally tested evidence collected in 1992 and determined that Mr. Jackson was a source of the semen on the vaginal and anal swabs collected from Ms. Roberts. *Id.* at 42-43. His testing also eliminated Barbour,

Hester, and Mr. Melvin Roberts as potential contributors. *Id.* at 44, 48-49, 51-52. He also opined about the 1992 DNA testing performed by ADFS. In his view, based on the same test strips Mr. Harmor and Mr. Huys reviewed, Barbour should have been excluded as a contributor of the semen in 1992. *Id.* at 22.

***Gary Harmor.*** Barbour proffered Mr. Harmor, DNA analyst for the Serological Research Institute, as an expert in DQ alpha testing. *Id.* at 135-36, 143. Mr. Harmor testified that he was first contacted about Barbour's case in 2010 when Barbour's counsel requested that he perform DNA testing on what counsel claimed was Tyrone Jackson's saliva. *Id.* at 152-53. Mr. Harmor testified that he received a sealed "white business envelope" "noted to be from Jerry Tyrone Jackson" that "had an address for a prison on the front." *Id.* at 153. He was "told" the envelope "was sealed by Mr. Jackson." *Id.* He determined that the saliva present on the envelope was DQ alpha type 1.2, 4. *Id.* Mr. Harmor testified that he had previously recommended that Barbour perform modern DNA testing. *Id.* at 157. The district court would later find that deficiencies in Mr. Harmor's testing methodology and credibility "seriously undermined [his] representation that he is an expert who conducts trustworthy DNA testing and obtains reliable results." DE473:67-68.

***ADFS Director Angel Della Manna.*** The State called the director of ADFS, Mr. Angelo Della Manna, and qualified him as an expert in DNA. DE440:185, 190. He testified that he had been employed in various capacities with ADFS for

approximately thirty years. *Id.* at 185. He testified that ADFS was an independent state agency that receives forensic evidence from over 450 law enforcement agencies throughout Alabama. *Id.* at 191. He testified ADFS's processes are shaped by industry best practices, regulations, and guidelines issued by the FBI. *Id.* at 191-94. He testified about ADFS's DNA testing practices generally and about the testing that would have been performed on the rape kit evidence in 1992. *Id.*

He also testified about his own review of the DQ Alpha test strips. *Id.* at 219-24. He disagreed with Mr. Keel's and Mr. Harmor's interpretations of the test strips, *id.*, stating that they relied on assumptions about "how many people were in the mixture," which "was not something that was done with DQ alpha testing, especially on deceased victims," in 1992. *Id.* at 224. He also criticized Mr. Keel's and Mr. Harmor's choice to review DNA reference samples before interpreting any evidentiary results, against best practices and allowing interpretational bias. *Id.* at 225. He agreed with the conclusions included in Mr. Huys's 1992 expert report, deposition testimony, and trial testimony. *Id.*

**Dr. Richard Leo**. Barbour called Dr. Richard Leo and proffered him as an expert in false confessions and the risk factors attendant to false confessions. DE438:79. He testified in general terms about the history of coercive interrogation and risk factors. He testified that he had reviewed Barbour's case and had interviewed Barbour in July 2021. He testified, largely based on Barbour's own

representations, that Barbour's confession was false and coerced. Dr. Leo admitted on cross-examination that his research held little predictive value in individual cases. *Id.* at 142-43. He also admitted that another court had found his testimony "nothing more than guesswork," and that he had no knowledge of the training methods used by the Montgomery Fire or Police Departments in 1992. *Id.* at 153-54.

**Dr. Glen King.** The State called Dr. Glen King and qualified him as an expert in clinical and forensic psychology. DE439:51. Dr. King testified that "Barbour gave an account of the circumstances surrounding the offense that was fairly complete." *Id.* at 53. The questions asked by Lt. Davis were "in a nondirective fashion, meaning he didn't provide information in advance" to Barbour. *Id.* He noted that he had also watched Barbour's videotaped confession. *Id.* at 55. Dr. King opined that he found "no evidence that [] Barbour has any intellectual disability" and saw no evidence that he "has any mental illness." *Id.* at 56. He noted that he saw no evidence that Barbour had "any anxiety or depression. He never seemed agitated ... [and] didn't have any difficulty understanding the questions and responding to them." *Id.*

**The Roberts Family.** The Roberts family testified about meeting with members of Barbour's legal team starting in 2001. *E.g.*, DE440:85, 89, 115.

Each member of the Roberts family testified about the substance of their 2001 affidavits submitted in support of Barbour's initial federal petition and various requests for DNA testing, and their 2018 unsworn declarations submitted in support

of Barbour's *Schlup* claim. They identified numerous factual errors in them. *E.g.*, *id.* at 84-88, 95-101. They each testified that they *never wrote or even read* the 2001 affidavits or the 2018 declarations submitted in their names. When asked why he signed without reading them, William testified that he trusted the attorneys and thought they were acting in the best interest of their mother. *Id.* William and Lola recounted interactions with a man named Richard Reyna, a non-lawyer member of Barbour's team, who, like Barbour's counsel, never disclosed his affiliation with Barbour. *Id.* at 93, 129. Both testified that between 2018 and 2023, Reyna often gave them cash and wire payments. *Id.* at 93-96, 140.

On August 16, 2024, the district court found that Barbour had made a sufficient showing of actual innocence under *Schlup* such that the court could review the new and procedurally defaulted claims in Barbour's amended federal petition. DE473. In its summary conclusion, the court recounted Barbour's confession, his knowledge of nonpublic details of the murder, his inculpatory statements to a cellmate, and statements from two witnesses implicating him. DE473:97. But the court ultimately endorsed Barbour's theory implicating Tyrone Jackson—that he had made vague "threats" about Ms. Roberts, seemed "jittery" at a party the night of the murder, and was later convicted for stabbing another woman to death. DE473:97-98. The court concluded it is "more likely than not that no reasonable jury would convict Barbour based on the new DNA evidence." DE473:99 n.55.

The district court then granted relief on Barbour's claims raised under *Brady v. Maryland* and *Napue v. Illinois*. DE527. As to *Brady*, the court ruled that the prosecution withheld the lab notes underlying Mr. Huys's DNA report, which, according to Barbour's expert, would have led defense counsel to hire another expert who would exclude Hester and Barbour as the source of the DNA and to impeach Barbour's confession. DE527:102-19. As to *Napue*, the court ruled that the prosecution knowingly used false evidence by offering Barbour's confession, which named Hester as the rapist. DE527:119-29. The State timely appealed. DE529.

## LEGAL STANDARDS

This Court reviews "the district court's conclusions on legal questions and mixed questions of fact and law de novo and its factual findings for clear error." *Mason v. Allen*, 605 F.3d 1114, 1118 (11th Cir. 2010). Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), "federal habeas courts [] presume the correctness of state courts' factual findings unless applicants rebut this presumption with clear and convincing evidence." *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) (citation modified). "This presumption applies to fact findings made by both state trial courts and state appellate courts." *Hannon v. Sec'y, Dep't of Corr.*, 562 F.3d 1146, 1150 (11th Cir. 2009).

**ARGUMENT**

## I. The District Court Erred By Excusing Barbour's Failure to Exhaust Available State-Court Remedies *After* Receiving New DNA Test Results.

Ordinarily, a state prisoner's failure to exhaust state-court remedies would mean his "federal habeas petition should be dismissed" as a matter of "comity" because "States should have the first opportunity to address and correct alleged violations of a state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1992). And in sections 2254(b) and (c) of AEDPA, Congress embraced this "total exhaustion requirement." *Rhines v. Weber*, 544 U.S. 269, 264 (2005). Only when state-court remedies for a claim are "no longer available" can a prisoner "assert[] those claims in a federal habeas proceeding." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). If they are no longer available "because the prisoner failed to comply" with proper rules "for seeking state-court review," his claims are "barred" in federal habeas even if he "technically exhausted." *Id.* This doctrine has an exception for cases where the prisoner had good "cause" for not following a state procedural rule and was "prejudice[d]" by not having done so. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). It also has an "exception for fundamental miscarriages of justice," which excuses the procedural default of a "probably" innocent petitioner in favor of "the overriding individual interest in doing justice in the 'extraordinary case.'" *Schlup v. Delo*, 513 U.S. 298, 321-22 (1995).

Barbour sought habeas relief on claims that were never raised in state court. He argued that the ordinary procedural bar should not apply because he brought "new reliable evidence" that would prevent any reasonable juror from convicting him. *Id.* at 324. The State generally agrees that under existing precedent, if Barbour could satisfy *Schlup* and its progeny, discovering "new" evidence of innocence would unlock federal review of his previously defaulted claims—*i.e.*, those for which state-court remedies were "no longer available."

The trouble for Barbour is that when he discovered allegedly "new" evidence supporting new claims, state-court remedies *were* available. Under Alabama Rule of Criminal Procedure 32.1(e), a prisoner may seek relief based on "[n]ewly discovered material facts" that "establish that the prisoner is innocent." And under Rule 32.2(b), he may bring a successive petition on new grounds when "good cause exists" and "failure to entertain the petition will result in a miscarriage of justice." After "the discovery of the newly discovered material facts," Barbour had six months to file a new petition. Ala. R. Crim. P. 32.2(c).

Why should that *second* procedural default be excused? Barbour argued below only that "*Schlup* itself creates no restrictions, temporal or otherwise, regarding the constitutional claims that a court may review." DE515:8. But *Schlup* did not involve a procedural bar arising from failure to exhaust available state-court remedies; it involved the federal habeas statute's bar on "successive or abusive uses

of the writ." *Schlup v. Delo*, 11 F.3d 738, 739 (8th Cir. 1993). Barbour thus required the court below to *expand* the *Schlup* exception to excuse not only his failure to seek state-court remedies two decades ago, when he filed his Rule 32 petitions, but also his failure to do so as recently as 2022 when the new DNA testing, he argued, "now firmly establish[ed] that [his] confession—as a whole—is simply irreconcilable with the crime-scene evidence and the State's theory of the case." DE214:3. There is no explanation why Barbour could not have raised his new *Brady* and *Napue* claims—first added in *2023*—in a state petition for post-conviction relief.

In effect, the district court held that if a federal prisoner satisfies the *Schlup* standard, he can bypass *then-available* state-court review to raise *any* new constitutional claims in federal court. DE527:99-101. There is no good reason for the system to work this way, and there are many strong reasons for this Court to hold that it does not.

First, the *Schlup* exception is supposed to *balance* the "societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest." 513 U.S. at 324. To that end, it applies in the rare "circumstance in which the habeas petitioner can demonstrate a sufficient probability that *our failure to review* his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (emphasis added). But this case is not that circumstance. If Barbour had available state-court remedies, there would be

no "miscarriage of justice" from staying *federal* review. For "the actual innocence exception [to] remain[] only a 'safety valve' for the 'extraordinary case,'" *Schlup*, 513 U.S. at 333, there cannot be *another* safety valve the prisoner left untried. For similar reasons, the Supreme Court held that "a federal court faced with allegations of actual innocence … must first address … other grounds for cause to excuse the procedural default." *Dretke v. Haley*, 541 U.S. 386, 393-94 (2004). And because these exceptions are "judge-made rules," courts "must exercise restraint, adding to or expanding them *only when necessary*." *Id.* at 394 (emphasis added). The district court's expansion of the *Schlup* exception was not necessary to protect Barbour's "interest in justice," 513 U.S. at 324, because he had alternative state remedies, and he could have no legitimate interest in avoiding them.

Second, the justifications for the doctrines of exhaustion and procedural default apply in full force. Federal "intrusions" into state criminal justice "frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Coleman*, 501 U.S. at 748. "State courts, like federal courts, are obliged to enforce federal law. Comity thus dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

Neither the state trial nor its appellate process should be treated as "merely a 'tryout on the road' to federal habeas relief." *Shinn v. Ramirez*, 596 U.S. 366, 377 (2022).

Third, the district court's expansion of *Schlup* brought the doctrine further from the plain text and design of AEDPA. A federal habeas petition "shall not be granted unless … the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. §2254(b)(1). And a petitioner has not "exhausted the [state] remedies available" if he "has the right … to raise, by any available procedure, the question presented." 28 U.S.C. §2254(c). This is the kind of mandatory language that federal courts generally "have no authority to amend." *Ramirez*, 596 U.S. at 385. While procedural default is a corollary to those requirements—an equitable doctrine subject to judicial discretion—courts should still seek "appropriate 'means of channeling' that discretion." *Cf. McQuiggin v. Perkins*, 569 U.S. 383, 405 (2013) (Scalia, J., dissenting). A rule that needlessly betrays Congress's desire to channel post-conviction litigation to state courts is an abuse of equitable discretion. *Cf. Rhines*, 544 U.S. at 277 (citing AEDPA's goal to create an "incentive to exhaust all [one's] claims in state court" as a factor guiding equitable discretion).

Barbour's rule would abuse AEDPA in another way by allowing prisoners to choose their forum for new constitutional claims. "State prisoners already have a strong incentive to save claims for federal habeas proceedings in order to avoid the highly deferential standard of review that applies to claims properly raised in state

court." *Ramirez*, 596 U.S. at 391. Because Barbour prevented the state courts from adjudicating his claims on the merits, he avoided AEDPA's demanding standards of review. 28 U.S.C. §2254(d). This approach will "encourage[] prisoners to sandbag state courts by selecting a few promising claims for airing on state postconviction review, while reserving others for federal habeas review should state proceedings come up short." *Ramirez*, 596 U.S. at 391 (citation modified).

Thus, the district court's expansion of *Schlup* not only gave him decades to craft new claims but also the benefit of *de novo* review. That result flies in the face of the bedrock tenet that federal habeas "is not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Michael Williams v. Taylor*, 529 U.S. 420, 437 (2000). The district court hewed to these values when it stayed federal proceedings while Barbour's second Rule 32 petition was still pending, but it abandoned them twenty years later when, if anything, its duty and power to stay the case was even stronger. *See Rhines*, 544 U.S. at 277 (permitting "stay and abeyance" for "good cause"). The Court should reverse because Barbour's new federal constitutional claims were procedurally defaulted.

## II. The District Court Erred in Applying the Innocence Exception to Review Barbour's Time-Barred and Procedurally Defaulted Claims.

Barbour filed his habeas petition more than one year after his direct appeal concluded, 28 U.S.C. §2244(d)(1)(A), and the two claims on which he ultimately received relief were never presented to the state courts, 28 U.S.C. §2254(b)-(c). Barbour sought to prove that federal review was nonetheless necessary to avoid a "fundamental miscarriage of justice." *McQuiggin*, 569 U.S. at 386, 392; *Coleman*, 501 U.S. at 748-50. If this exception applies, *see supra* §I—he nonetheless failed to prove that his is a "truly 'extraordinary'" case under *Schlup*, 513 U.S. at 327.

The petitioner must make a "credible" assertion of innocence with "new reliable evidence" establishing "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 324, 327. "This 'new' evidence must do more than counterbalance the evidence that sustained the petitioner's conviction," *Rozzelle v. Sec'y*, 672 F. 3d 1000, 1016-17 (11th Cir. 2012), or raise "reasonable doubt," *Schlup*, 513 U.S. at 329. It must be even "stronger" than the showing "needed to establish prejudice." *Id.* at 327. Rather, the evidence of innocence must "undermine confidence in the result of the trial" to such a degree that excusing the petitioner's default is necessary to "avoid a manifest injustice." *House v. Bell*, 547 U.S. 518, 537 (2006). This "standard is demanding," *id.* at 538, in part because a "substantial claim of actual innocence"

is "extremely rare." *Schlup*, 513 U.S. at 321. "A strong presumption of guilt is present[.]" *Kuenzel v. Comm'r*, 690 F.3d 1311, 1318 (11th Cir. 2012).

A viable claim of actual innocence requires a petitioner to "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. The determination is based on an assessment of "the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Id.* at 332; *see, e.g.*, *Scarlett v. Sec'y*, 404 F. App'x 394, 401 (11th Cir. 2010) (finding DNA evidence "not exculpatory or inconsistent with the other overwhelming evidence"). Courts must also consider any "unjustifiable delay" by the petitioner "as a factor in determining whether actual innocence has been reliably shown." *McQuiggin*, 569 U.S. at 387. Barbour has not established "more likely than not" that "*any reasonable juror* would have reasonable doubt" if presented with his allegedly new evidence. *House*, 547 U.S. at 538.

The crux of Barbour's position was that any inconsistency between his identification of Hester as Ms. Roberts's rapist and the DNA evidence thoroughly impeaches his confession, which, the argument goes, undermines the State's case against Barbour. The main problem for Barbour is that his "new" evidence, at most, undermines only part of his confession—his identification of Ms. Roberts's rapist.

It does not and cannot establish: (1) that he was not there; (2) that he did not beat Ms. Roberts; (3) that he did not hold down Ms. Roberts to facilitate her brutal rape; (4) that he did not kill Ms. Roberts; (5) that he did not burn her body to cover his tracks; or any other proposition that directly bears on his guilt for capital murder.

The district court reasoned that there could be only two explanations for the alleged discrepancy between the DNA evidence (potentially implicating Jackson) and Barbour's confession (asserting Hester raped Ms. Roberts). On its view, either Barbour was the real rapist—so he lied in his confession to conceal that fact from investigators—or Barbour's confession was coerced. DE527:115. But those aren't the only inferences a reasonable juror could draw from the record.

***First***, a reasonable juror could still believe the confession—in its entirety or in relevant part. Barbour twice voluntarily confessed, giving "a detailed account of the facts surrounding [Ms.] Roberts's murder." *Barbour I*, 673 So. 2d at 463. He confessed that he and two confederates entered Ms. Roberts's home on the night of the murder; that he and one of his confederates held Ms. Roberts down while the second raped her; that he decided to stab Ms. Roberts repeatedly with a kitchen knife "because she could identify them"; that he left the knife inside Ms. Roberts; that he set a fire near Ms. Roberts's lifeless body to cover their tracks and evidence of the crime; and that he removed the hallway smoke detector and threw it into the living room as he and his confederates left the house. *Id.* The ACCA determined that "[t]he

information provided by Barbour in his statements was corroborated by the physical evidence presented at trial." *Barbour II*, 903 So. 2d at 866. The ACCA also had the "rare opportunity" to observe Barbour's demeanor during his confession because it was videotaped and the tape was part of the record on appeal. *Barbour I*, 673 So. 2d at 467. It concluded that "Barbour was extremely cooperative, calm, and articulate" during the confession and that "he did not appear despondent at any time during the hour-long confession." *Id.* He was so cooperative, in fact, that he "even drew diagrams of the interior of [Ms. Roberts's] house" on the night of the murder. *Id.* These findings are "presumed correct." 28 U.S.C. §2254(e)(1).

The district court's *Schlup* decision could not explain that degree of corroboration between the confession and the crime. It focused on inconsistencies (DE473:98) between Barbour's confession and the evidence at trial—completely ignoring the *consistencies* and failing to consider how a reasonable juror would have weighed both. For instance, the district court made much of the fact that: (1) Barbour's confession stated that he, Mitchell, and Hester spent some amount of time drinking beer with Ms. Roberts in her home but no beer cans were recovered at the scene and no alcohol was detected in Ms. Roberts's blood; and (2) Barbour did not mention the plastic bag found covering Ms. Roberts's head. DE473:90-91. If those are inconsistencies, they are minutiae compared to the shocking detail with which Barbour described, calmly and accurately, nonpublic details about the murder

and the crime scene, including: the layout of the Roberts home, the location of the victim's body, her orientation in that room, the cause of death, and setting the fire. A reasonable juror would not discount all that simply because Barbour did not remember that Ms. Roberts was not drinking or simply did not disclose every detail to law enforcement.

The district court also had to displace the state-court determination, entitled to deference, that further DNA testing "would not establish that his confessions were unreliable" or that he is innocent. 903 So. 2d. at 865-66. The district court responded that identifying "Jackson as the sole source of male DNA fundamentally undermines Barbour's confession in a way that the earlier DNA testing excluding Hester did not." DE473:78. But there is nothing in the record to support a jury assigning more than impeachment weight to Jackson being the source that it would not also if Hester were instead.

***Second***, a reasonable juror could discount the impeachment value of Jackson's identification. As noted above, the district court's actual innocence determination flowed from the assumption that the only reason Barbour would have lied of his own volition was if he, and not Hester, had actually raped Ms. Roberts. DE527:115 (determining that evidence excluding Barbour as the source of the recovered semen "would eliminate the possible inference that Barbour lied when he identified Hester as the rapist ... but that his confession was otherwise true"). That assumption strains

credulity—it assumes that a reasonable juror would find that Barbour did not want to tell investigators he had raped Ms. Roberts, but had no problem telling them that he brutally assaulted her, held her down to facilitate her being raped, repeatedly stabbed her, and then burned her and her home.

It's also contradicted by the record, which shows that even if Barbour lied or was mistaken about Hester's involvement, there are plenty of other explanations for the misidentification. The most obvious of the reasonable alternatives is that Barbour was afraid of Jackson. Barbour's *Schlup* evidence and arguments go to great lengths to paint Ms. Roberts's rape and murder as the sort of crime consistent with Jackson's violent criminal history. *See* DE473:67. Hester's statements at his plea hearing lend support to the idea that any fears Barbour may have had about pointing the finger at Jackson were not misplaced: Hester and Barbour both point the finger at each other, omitting any discussion of Jackson's involvement.

The specifics of Hester's plea-hearing statements highlight a further flaw: the evidence is not actually exculpatory. Hester's plea-hearing statements arguably cast Barbour in a less favorable light than Barbour's own confession. As Hester tells it, Barbour was the only one to go into the back part of the house where the room where Ms. Roberts was raped and murdered was located. DE211-3:6. A reasonable interpretation of Hester's version of events is that Barbour was, contrary to his trial defense strategy, the primary and sometimes sole bad actor. Properly understood,

Hester's plea-hearing statements were not evidence of Barbour's innocence; they were just a different version of the murder—one that still supported the jury's verdict convicting Barbour of capital murder. Inculpatory evidence cannot establish actual innocence. At the very least, a reasonable juror could interpret Barbour's presence in the Roberts's home the night of the murder and a 20 minute span in which, by his own alleged admission, "he had some trouble in the [back part of the] house" as evidence that he murdered Ms. Roberts. DE211-3:6. Similarly, no reasonable juror would find that Barbour's misidentification of Hester as the rapist was motivated by a desire to avoid incriminating himself as Ms. Roberts's rapist if he were willing to admit to facilitating that rape and murdering her. And when faced with potential inconsistency between DNA evidence and Barbour's identification of Hester as the rapist, a reasonable juror would credit other explanations beyond the two offered by the district court.

**Third**, while *Schlup* emphasized that scientific evidence is generally reliable, the DNA evidence Barbour now brings to bear is, at most, being used as impeachment evidence. In considering the probative value of the new DNA testing, the district court looked no further than the fact that it was DNA testing. DE473:80. That was error because whether Jackson or Hester was the source of the semen is not directly relevant to whether Barbour facilitated Ms. Roberts's rape and committed her murder. It is at best only indirectly related to those things, and only

after several levels of inference. So in that way, the district court misapplied *Schlup* when it concluded that the evidence in this case was "stronger" than the evidence in *Schlup* or other federal cases finding a sufficient showing of actual innocence. DE473:100. Most notably, the district court determined that Barbour's new evidence was "stronger" than the evidence presented in *Schlup* or *Fontenot v. Crow*, 4 F.4th 982 (10th Cir. 2021), because the new evidence in *Schlup* "was solely affidavits" and the new evidence in *Fontenot* was "based largely on new witness statements and a recantation from the prosecution's eyewitness at trial." DE473:79. The 2022 DNA testing evidence in this case might have been more reliable than the affidavits in *Schlup* or recantations in *Fontenot* in the abstract, but it is erroneous to conflate reliability with evidentiary value. *Schlup* draws a clear distinction between its first analytical step—determining whether the new evidence is reliable—and its second—determining the "probative force" of that evidence for a reasonable juror in the context of the other evidence in the case. 513 U.S. at 327-28. Whatever solicitude scientific evidence holds in the *Schlup* inquiry, it does so only at the first step and only because in nearly all cases, nearly all "new" evidence is "notoriously unreliable": "easy to find but difficult to confirm or refute." *See, e.g.*, *Case v. Hatch*, 731 F.3d 1015, 1044 (10th Cir. 2013). Scientific evidence is "less susceptible to manipulation" and therefore usually reliable despite any time lapse. *Floyd v. Vannoy*,

894 F.3d 143, 156 (5th Cir. 2018). New evidence enjoys no additional weight at step two, however, just because it's scientific.

The district court thus erred by assigning substantial weight to the 2022 DNA testing evidence simply by virtue of it being "scientific." DE473:97-100. The district court acknowledged that in light of the state's rebuttal evidence, a "jury may well have unresolved questions about what happened." *Id.* at 99-100. But any questions, the court continued, would, in the minds of every reasonable juror, be resolved in Barbour's favor by the DNA evidence in this case. That is because, according to the court, the DNA evidence is "objective, reliable, and undisputed" (none of those descriptions is undisputed) and "unlike people, 'DNA doesn't lie.'" *Id.*[2]

But the 2022 DNA testing evidence takes on the scientific quality contemplated by *Schlup* only as to the question of the source of the semen on the vaginal and anal test swabs. *See Rozzelle*, 672 F.3d at 1019-20 (rejecting *Schlup* claim based on medical records that were merely cumulative of other evidence relevant to impeaching trial witness); *see also Stimpson v. Warden*, 2025 WL 484049, at *5 (11th Cir. Feb. 13, 2025) (classifying medical report as impeachment for *Schlup* purposes). For all other issues, including coercion, it is mere impeachment designed

---

[2] In the district court's view, the new DNA evidence placed Barbour's case in a new light because it "further excludes [Barbour] from the crime scene" and "links a new third party … to the scene." DE473:98-99. But the DNA evidence does neither. Barbour's connection to the crime scene was never based on DNA, and the State's theory was consistent with multiple accomplices at the scene.

to contradict Barbour's confession. And on that front, its probative value is limited to its tendency to show that Barbour's confession mistakenly identified Hester as the rapist. The relevance of the DNA evidence in this case is purely contextual. Barbour's conviction did not require a finding that Hester or Jackson or anyone else in particular raped Ms. Roberts. All it required was a finding that Ms. Roberts was raped on the night she was murdered and that Barbour actively facilitated that rape such that accomplice liability could attach. The specific identity of the source of the semen becomes relevant only in light of Barbour identifying Hester as the rapist in his confession. But even any relevance the 2022 DNA testing evidence has in this case is that it *excludes* Hester as the source of the semen, which tends to undermine one part of Barbour's confession. But it has no relevance to what inferences a reasonable juror could then make about the credibility of *the rest* of Barbour's confession, which the fact that Jackson *was* the source would not directly undermine.

Further, as to whether Hester was the source of the semen, the 2022 DNA testing evidence is cumulative of Larry Huys's initial DNA report, which Barbour has consistently described as "conclusively excluding" Hester as the source of the semen. *See*, *e.g.*, DE1, ¶59; DE3; DE4:6; DE12:2; DE1-9:2. That cumulativeness undermines the district court's determination that the 2022 DNA testing evidence places Barbour's case in a new light sufficient to satisfy *Schlup* because it "further excludes [Barbour] from the crime scene" and "links a new third party ... to the

scene." DE473:98-99. The DNA evidence does neither of those things. Barbour's connection to the crime scene—as Barbour has repeatedly emphasized—has never been based on DNA evidence. And based on the state's theory (and Barbour's, for that matter) of the case at trial, as well as the version of events described in Barbour's confession, the jury would expect there to be DNA evidence linking someone other than Barbour to the scene. Identifying Jackson as the source of that third party's DNA does nothing to undermine that expectation.

That meaningfully distinguishes Barbour's case from the other federal decisions that finding actual innocence in light of new DNA evidence and despite a prior confession by the petitioner. DE473 at 78-80, 99-101. For instance, *Godschalk v. Montgomery Cnty. D.A.'s Off.*, is inapposite because the petitioner sought modern DNA testing to demonstrate that he was not the source of material collected from rape victims and to prove that he did not commit those same rapes. 177 F. Supp. 2d 366, 369-70 (E.D. Pa. 2001).

The district court's mischaracterization of the DNA evidence takes on further significance in light of this Court's recognition that "actual innocence" means "factual innocence." *Johnson v. Fla. Dep't of Corr.*, 513 F.3d 1328, 1334 (11th Cir. 2008). *Schlup* requires more than offering evidence to "counterbalance the evidence that sustained the petitioner's conviction." *Rozzelle*, 672 F.3d at 1016-17. And while a petitioner can, in theory, satisfy *Schlup* with a challenge to the sufficiency of the

evidence presented against him at trial, the Supreme Court has been clear that impeachment evidence will "seldom, if ever," be sufficient to do so. *See Sawyer v. Whitley*, 505 U.S. 333, 340 (1992); *see also Calderon v. Thompson*, 523 U.S. 538, 563 (1998) (holding that impeachment evidence provided no basis for finding a miscarriage of justice); *accord Stimpson*, 2025 WL 484049, at *4.

**Fourth,** The district court wrongly credited Barbour's expert's testimony that Barbour's confession was false and involuntary over the state's expert's rebuttal testimony reaching the opposite conclusion. In doing so, the district court determined "reasonable jurors would more likely credit Dr. Leo's testimony over Dr. King's testimony" because Dr. Leo's credentials – an expert in "false confessions and the risk factors attendant to false confessions" – were more specific to the issue of coercion and false confessions than Dr. King's – an expert in clinical and forensic psychology. DE473 at 95-96. The district court offered no other basis for that determination. Nor could it. Dr. King gave his expert opinion that Barbour's videotaped confession gave no indication of contamination or that Barbour was under any duress, stating that Barbour looked "quite comfortable throughout the whole interview process," all of which led Dr. King to the ultimate conclusion that Barbour's confession was voluntary and not coerced. *Id.* at 62-76, 95-96.

Dr. Leo's testimony, by contrast, was far more general than Dr. King's. Dr. Leo spent the bulk of his testimony describing the inherent risk factors associated

with false confessions. DE438 at 101. He testified that Barbour had several factors of being a highly suggestible interviewee. But to the extent his testimony related to the interviews and confessions at issue in Barbour's case, it was largely based on Barbour's own statements about the interviews and Lt. Davis and Det. Carmichael. *Id.* at 111-13, 130-31. He also made several key concessions: he admitted that risk factors present in interviewees and certain interrogation techniques were poor predictors of coercion or involuntariness in individual cases, acknowledging that one court found his research and area of expertise to be "nothing more than guesswork." *Id.* at 142-46. He also admitted to a lack of knowledge about MPD's or MFD's interview methods or guidelines in place in 1992. *Id.* at 153-54.

Dr. Leo's conclusion that Barbour's confession was coerced is inconsistent with not only the testimony given by Lt. Davis and Det. Carmichael at various points in this case's history, but also testimony of Michael Braswell at the *Schlup* hearing. Braswell testified that on April 22, 1992, he and Barbour were taken into the MPD station together for questioning. They were in different rooms but close enough for Braswell to hear the tone used by Lt. Davis and Det. Carmichael during Barbour's interview, and he never heard any yelling. *Id.* at 157. Braswell's impression was that Barbour never seemed fearful, and he described Lt. Davis and Det. Carmichael as authoritative but professional. *Id.* at 150. In addition to corroborating Lt. Davis's and Det. Carmichael's version of events, Braswell's testimony is particularly

probative because he and Barbour were interviewed on April 22, 1992, which, according to Barbour, is the only date Lt. Davis and Det. Carmichael physically accosted him in any way. DE438 at 122-23; DE440 at 268.

But even if a jury were to weigh the testimonies more evenly or even "more likely [to] credit Dr. Leo's testimony over Dr. King's testimony," that would mean that Barbour's "new" evidence could do nothing more than "counterbalance the evidence that sustained [Barbour's] conviction." *See Rozzelle*, 672 F.3d at 1016-17. The jury had the chance to observe Barbour's demeanor during his confession (the videotaped confession was admitted as trial evidence) and, like the ACCA, make corresponding credibility determinations. At most, even if it were not contradicted by Dr. King's rebuttal testimony, Dr. Leo's testimony offers nothing more than one way to contextualize the jury's credibility determinations made from its personal observations of the videotaped confession. Reasonable jurors also would take into account the various evidentiary weaknesses that infected Dr. Leo's testimony—for example, other federal courts' on-record criticisms of his methods specifically and research field generally, *E.g.*, *United States v. Phillipos*, 849 F.3d 464, 471-72 (1st Cir. 2017) (affirming as reasonable the district court's exclusion of Dr. Leo's testimony as unreliable "faux science")—weaknesses the district court did not consider.

Distilled to its essence, the district court's *Schlup* determination of actual innocence is really a roundabout determination that Barbour's confession was coerced and involuntary. That's because any actual innocence showing necessarily depends on the confession being coerced. It cannot be overemphasized that Barbour presented no affirmative evidence that he (Barbour) did not murder Ms. Roberts – e.g., in the form of an alibi for the night of the murder or a third party's fingerprints on the murder weapon – or that Ms. Roberts was murdered in some way other than the version of events laid out in his confession – his argument is not a challenge to his own veracity or memory, for instance. The only part of Barbour's confession that even arguably conflicts with the 2022 DNA testing is his identification of Hester as the rapist. All of which, in turn, means there was no basis for an actual innocence determination that did not also find that Barbour's confession was clearly and convincingly coerced.

It's worth re-emphasizing the district court's false dichotomy of explanations for any potential inconsistencies between the 2022 DNA testing and Barbour's confession. Contrary to the finding of the ACCA and without applying § 2254(e)'s clearly erroneous standard, the district court determined that the 2022 DNA testing had evidentiary relevance as a way to exclude Barbour as a source of the semen. The ACCA expressly made the opposite finding, and yet the district court did not apply § 2254(e)'s presumption of correctness. It instead contradicted the state court by

gerrymandering the substantive relevance of the 2022 testing: it painted the issue of whether Barbour raped Ms. Roberts as outcome determinative of whether Barbour was coerced by presenting those as the only two explanations for Barbour's mistaken identification of Hester as the rapist. If he did not rape Ms. Roberts, coercion was the only possible alternative explanation, or so the argument goes. So not only was the district court's *Schlup* determination based on factual and logical errors, those errors were a necessary feature, not a bug.

The Court can stop there. Barbour does not dispute that his federal petition was untimely. Because he did not satisfy *Schlup*'s actual-innocence standard for excusing his untimeliness, his petition should have been dismissed.[3]

### III. The District Court Erred in Granting Habeas Relief on Barbour's *Brady* and *Napue* Claims.

The district court's merits decision granting habeas relief on Barbour's *Brady* and *Napue* claims was also reversible error. Both claims fail because they relied on new evidence from the *Schlup* proceedings that could not properly be considered under AEDPA, and both claims fail on the merits.

---

[3] In a footnote, the district court gestured at another possible rationale for excusing default as to the *Brady* claim only: cause and prejudice, DE527:119 n.36. But the court did not find that the allegedly suppressed evidence was unavailable through discovery in state post-conviction proceedings, nor that Barbour relied on any representation that there were no "bench notes" to be discovered. This rationale would also seem to excuse procedural default for any *Brady* claim, a sweeping theory that proves too much.

### A.    The district court wrongly granted relief based on evidence from the *Schlup* hearing in violation of 28 U.S.C. §2254(e).

The district court decided that 28 U.S.C. §2254(e) did not "prohibit[]" the court from ordering discovery and ultimately conducting "an evidentiary hearing *before it determines* that §2254(d) has been satisfied." DE230:9; *see id.* at 10 (acknowledging that "the same evidence may also support his substantive constitutional claims"); *id.* at 11 (declining to "cabin discovery" to "innocence"). The court believed that "[n]either AEDPA, nor the Supreme Court" addressed the issue. *Id.*; *see also* DE527:94-95. But by the time the court ordered and held an evidentiary hearing in 2023, *Shinn v. Ramirez* had decided that when a prisoner has failed to develop the state-court record, "a federal court may order an evidentiary hearing or otherwise expand the state-court record *only* if the prisoner can satisfy §2254(e)(2)'s stringent requirements." 596 U.S. at 384 (emphasis added); *Shoop v. Twyford*, 596 U.S. 811, 820 (2022) (no considering "new evidence" without petitioner satisfying §2254(e)(2)).

Under §2254(e)(2), Barbour was required to show "a factual predicate that could not have been previously discovered through the exercise of due diligence" and that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found [him] guilty." "[Barbour] never argued that he could clear the bar …, or that the bar was somehow inapplicable." *Twyford*, 596 U.S. at 823. His motion for

an evidentiary hearing, DE332, did not attempt to satisfy §2254(e)(2). Although the court suggested in the "standards of review" section of its merits opinion that a petitioner bringing a *Brady* claim might be exempted, DE527:94-95, the court never applied that exception to Barbour's case—never made a finding about what could be found with due diligence or about Barbour's innocence by a "clear and convincing" standard. Using evidence admitted to satisfy the actual-innocence standard, like "evidence admitted for cause and prejudice," to evaluate the merits of the underlying [constitutional] claim" would work "an end-run around the statute." *Ramirez*, 596 U.S. at 388-89. Accordingly, it was an abuse of discretion to hold an evidentiary hearing, and it was error to consider evidence not properly admitted.

Even if it were proper to use evidence from the *Schlup* hearing to evaluate the merits of Barbour's constitutional claims, it was error *on the merits* to do so because *Brady* and *Napue* claims ask about the effect the allegedly suppressed or false evidence would have had at the original trial—not a hypothetical trial with evidence developed decades later. To evaluate materiality under *Brady*, courts must consider the effect of all "wrongfully withheld evidence" in light of the evidence presented at trial. *Wearry v. Cain*, 577 U.S. 385, 394 (2016). The failure to turn over exculpatory turns on the result if *that* "evidence been disclosed to the defense," *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). So too under *Napue*: a petitioner is entitled to relief only if there is a "reasonable likelihood that *the false testimony* could have affected

the judgment of the jury." *United States v. Augrs*, 427 U.S. 97, 103 (1976) (emphasis added). Thus, the materiality of both *Brady* and *Napue* evidence depends on the context provided by other evidence *actually mustered at trial*. *See Gary v. Hall*, 558 F.3d 1229, 1257 (11th Cir. 2009) (requiring consideration of the alleged *Brady* material "in conjunction with all other [unsuppressed] exculpatory evidence"); *accord United States v. Sipe*, 388 F.3d 471, 491 (5th Cir. 2004); *Apanovitch v. Bobby*, 648 F.3d 434, 437 (6th Cir. 2011).

## B. The district court erred by granting Barbour's *Brady* claim.

A *Brady* claim requires the petitioner prove "that the prosecution withheld favorable evidence and that he was prejudiced as a result." *United States v. Brester*, 786 F.3d 1335, 1339 (11th Cir. 2015). To establish prejudice, a defendant must "prove that there is 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* Barbour cannot demonstrate suppression or materiality.

### 1. The allegedly suppressed bench notes were not material.

The district court granted relief on Barbour's *Brady* claim that the non-disclosure of the bench notes and accompanying test strips violated *Brady*, a merits determination that rests on several errors, each of which is reversible.

The first is the district court's determination that had the bench notes been disclosed before trial, "Barbour's trial counsel could have secured and presented expert testimony to the jury that Barbour and Hester were conclusively excluded as sources of the semen." DE527:114. The problem with that determination is that the non-disclosure of the bench notes did not alter, in any way, Barbour's ability at trial to factually impeach the credibility of his confession.

*Brady* materiality often requires a difficult counterfactual analysis of how the undisclosed evidence would have affected the trial. But not here. There is no need to speculate about what Barbour's trial counsel would have done with the information contained in the bench notes because we know what he did with the conclusions in Huys's report: *absolutely nothing*. Barbour's trial counsel had the opportunity to put on the exact "unknown third party" defense this Court and Barbour claim the bench notes would have enabled. Indeed, the record suggests he considered and rejected that very approach: In a colloquy with the trial court about the substance of Huys's testimony, Barbour's counsel made the point that the DNA test results don't "exclude the third person at the scene" as a potential contributor of the recovered semen. DE527:58. Trial counsel had everything he needed to take the strategy that the district court speculates he would have with the bench notes. He knew or had reason to know that Barbour was allegedly mistaken or lying or misremembering when he told investigators that Hester raped Ms. Roberts. And all he had to do to undermine

the confession was introduce the report into evidence or cross-examine Huys. But he did not. He took an opposite strategy—objecting to any testimony about the DNA testing and declining to cross-examine Huys at all.

Barbour's early federal filings suggest that it was already known that Hester was excluded and known that this could potentially impeach Barbour's confession. Since 2001, Barbour has described Huys's disclosed DNA report as "conclusively excluding" Hester as the source of the semen. *See, e.g.*, DE1 ¶59 (describing Huys's report as "impeachment" of Barbour's confession because it confirmed a lack of "scientific evidence linking Mr. Barbour or Mr. Hester"); DE3 (similar); DE4:6 (similar); DE12:2 (similar); DE1-9:2 (similar). And that view of Huys's 1992 DNA testing and report was expressly endorsed by the district court's *Schlup* decision. DE473:95 ("Indeed, the 1992 DNA evidence established the confession's falsity to the extent Barbour claimed Hester raped Mrs. Roberts."). It is difficult to see, then, how knowing this same fact—to a marginally greater degree of certainty—could have been material for the defense strategy.

Consider too what Barbour's proposed reading of *Brady* would require of prosecutors in this case and others. Barbour contends that prosecutors had a duty to disclose the bench notes because, in Barbour's expert's opinion, given 30 years after trial, the bench notes "conclusively excluded Hester ... as a source of the semen." DE527:102. ADFS Director Della Manna's *Schlup* testimony flatly disagreed with

Barbour's experts, testifying that Barbour and Hester could not be "'positively eliminated' as a contributor" with DQ Alpha testing available in 1992. DE527:108. Barbour would require the prosecutors in this case to have the foresight and scientific acumen to think that *their expert was mistaken* about a still debatable scientific question regarding the DNA conclusions reached in his disclosed report. In 1993. There is no constitutional standard requiring such skepticism.

Even if prosecutors were constitutionally required to disbelieve their own DNA experts, there would be no materiality here. As noted above, *supra* §II, the district court's merits decision follows from the belief that the credibility of Barbour's entire confession turns on whether that confession accurately identified Ms. Roberts's rapist. But again, that requires the assumption that the *only reason* Barbour would have named Hester would be if he, not Hester, actually raped Ms. Roberts. DE527:115. And it contradicts the ample record support for the veracity Barbour's confession, including its great detail, the manner in which he delivered it, and the corroborating physical evidence. *See supra* §II; *Barbour I*, 673 So. 2d at 467 *Barbour II*, 903 So. 2d at 866.

In contrast, the district court's materiality finding rests on a series of speculative assumptions. First, one must assume that the bench notes would have led Barbour's counsel to hire his own DNA expert to testify at trial. Second, one must assume that the hypothetical expert would have testified that the 1992 testing

"conclusively excluded" Barbour and Hester as the contributors. Third, one must assume that trial counsel would choose to use and then make effective use of that testimony to undermine Barbour's confession. Fourth, one must assume that as a result, the jury would reject the "possible inference that Barbour lied ... to conceal that *Barbour* was the rapist." DE527:115. Four levels of inferences will not support a finding of materiality. *See United States v. Jordan*, 316 F.3d 1215, 1252 n.81 (11th Cir. 2003) (reiterating that "mere speculation" is not enough to establish materiality); *Maharaj v. Sec'y*, 432 F.3d 1292, 1314-16 (11th Cir. 2005) ("highly speculative chain" of inferences insufficient to support *Brady* claim).

### 2. The district court erred in determining that the prosecution possessed the bench notes.

The district court erred when it determined that ADFS was part of the prosecution team such that ADFS's possession of the bench notes could be imputed to the prosecution for purposes of Barbour's *Brady* claim. DE527:110-13. This Court has never held that a state crime lab that performs DNA analysis in a criminal case is presumptively part of the prosecution team. Courts must conduct a "case-by-case analysis" of the relationship between the particular lab and prosecution team at issue. *Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002). *Moon* trains a court's attention on the agency relationship between the prosecution and the crime lab: it is not enough that a third party acts at a prosecutor's request; a prosecutor is deemed to possess what a third party does only when the prosecutor has the authority to direct

the conduct of the third party regarding the allegedly exculpatory evidence at issue. *Id.* at 1309 (defining "prosecution team" to mean "the prosecutor or anyone over whom he has authority"); *see also id.* at 1310 (highlighting the fact that the investigator did not act under the "direction or supervision of the prosecutor").

ADFS was not part of the Barbour prosecution team because prosecutors lacked any authority over the creation or production of ADFS report and bench notes.

First, as a general matter, this Court heard testimony from Dr. Jason Kokoszka about ADFS's status as an independent state agency and its role in "providing scientific services in criminal matters within the state of Alabama." DE436:195. It heard similar testimony from the current ADFS director, who testified that ADFS employees are not compensated for their testimony, including here, and that ADFS is funded from sources independent of state prosecutors' offices. DE440:191.

Second, Director Della Manna testified about ADFS's DNA testing and reporting procedures that would have been in place at the time of the Barbour investigation. *Id.* at 193-198. He testified that ADFS was operating pursuant to its own procedures, federal guidelines, industry standards, or some combination of the three. *Id.* at 194, 208. He did not list prosecutors as a source of agency guidance or control. ADFS tested the DNA, created reports, and shared its findings with the Barbour prosecution team in exactly the same way it would have handled a request from any other of the hundreds of Alabama law enforcement agencies.

ADFS's independence from the Barbour prosecution team extends to the bench notes at issue here. Director Della Manna specifically testified that, pursuant to the ADFS's uniform procedures, any DNA testing report would have been "authored, technically reviewed, administratively reviewed, and only then issued to the applicable parties." *Id.* at 209. All of which removes any doubt that ADFS's knowledge of the bench notes cannot be imputed to the Barbour prosecutors. The Director's testimony establishes that there was no role for the prosecutors in ADFS's work in this case once they made the initial request for DNA testing and that it would have been their standard practice to release only the report of the DNA testing, not any of the underlying work product. As a result, ADFS's possession and knowledge of the bench notes cannot be imputed to the prosecutors. *Moon*, 285 F.3d at 1310.[4]

## C. Barbour is not entitled to habeas relief on his *Napue* claim.

The district court granted relief on the ground that prosecutors violated *Napue* by presenting Barbour's confession to the jury knowing that parts of it were false. (Doc. 527 at 119-29.) That was reversible error.

"To establish a *Napue* violation," Barbour had to prove that the prosecution knowingly used false evidence or "knowingly allowed it 'to go uncorrected when it

---

[4] The district court noted the Attorney General's statutory authority to appoint the ADFS director, indicating that authority might suggest collaboration between the two. DE527:111-12. But that doesn't prove anything about the relationship between ADFS and the Barbour prosecutors sufficient for *Brady* imputation.

appear[ed]'"; and that such use was material, *i.e.*, the false evidence "may have had an effect on the outcome of the trial." *Glossip v. Oklahoma*, 604 U.S. 226, 244-45 (2025). The "touchstone" of this analysis "is the fairness of the trial." *Smith v. Phillips*, 455 U.S. 209, 219-20 n.10 (1982) ("Even in cases of egregious prosecutorial misconduct," courts grant relief "only when the tainted evidence was material to the case."). To that end, this Court has repeatedly recognized that there is no due-process violation "resulting from prosecutorial non-disclosure of false testimony if defense counsel is aware of it and fails to object." *E.g.*, *Stephens v. Hall*, 407 F.3d 1195, 1206 (11th Cir. 2005); *Hammond v. Hall*, 586 F.3d 1289, 1308-09 (11th Cir. 2009); *Shuler v. Secretary*, 610 F. App'x 856, 858 (11th Cir. 2015).

The district court ran afoul of this Court's well-established authority. In its merits order, the court expressly found that trial counsel "knew at trial that [Barbour's] confession was inaccurate to the extent he claimed that Hester raped Mrs. Roberts" but concluded that knowledge was irrelevant to the *Napue* inquiry. DE527:123. In the district court's view, the only "relevant questions are whether Barbour's statement ... was false, and whether the prosecutor knew the statement was false." *Id.* That is legally deficient as a general matter, and it is especially so on these facts, and those deficiencies will entitle the State to relief on appeal.

The prosecution could have believed Barbour's confession, despite the existence of potentially conflicting DNA test results. This Court has been clear that

prosecutors do not violate *Napue* simply by eliciting testimony that is not completely uncontradicted by other evidence. *See, e.g.*, *United States v. McNair*, 605 F.3d 1152, 1208 (11th Cir. 2010) ("[A] prior statement that is merely inconsistent with a government witness's testimony is insufficient to establish prosecutorial misconduct."). Despite some apparent conflict in Huys's report and Barbour's confession, the prosecution was entitled to cite the defendant's own statements, and that conflict does not render the statements false, much less make the prosecutor guilty of misconduct.[5] And any lingering doubts about a *Napue* violation are resolved in the State's favor in light of the fact that the prosecution timely disclosed the very evidence now being used to impeach Barbour's confession. *See Ventura v. Att'y Gen.*, 419 F.3d 1269, 1276 (11th Cir. 2005) (explaining that *Napue/Giglio* error occurs only when "undisclosed evidence demonstrates that the prosecution's case included perjured testimony").

What's more, as noted above, the central concern of *Napue* is fairness. As the State has consistently argued, DE514:24; *contra* DE527:126, those concerns simply are not present in this case. The prosecutor's allegedly false statements were little more than a recounting of Barbour's own pre-trial confession. At worst, Barbour and

---

[5] The same is true of any inconsistencies between Barbour's confession and any statements made by Hester during the colloquy at his plea hearing. *See* DE527:86 (noting differences between the confession and Hester's plea-hearing statements). So too with any potential inconsistencies between Barbour's confession and the crime scene evidence. *E.g.*, *id.* at 115 (highlighting that "no beer cans were found").

his trial counsel knew at least as much about the truth or falsity of that confession as the prosecutors did. Trial counsel could have leveraged that knowledge to impeach the confession on cross examination of Huys, or even through Barbour's own testimony. But Barbour and his counsel made a strategic decision to object to the introduction of the DNA testing results, not to cross examine Huys, not to have Barbour testify, and to decline to present an affirmative case.[6] So even if the district court was correct (and it was not) that there "is a reasonable likelihood that the jury would have discredited Barbour's confession and would not have convicted" had it heard evidence about the unlikelihood that Hester was the source of the semen, Barbour and his trial counsel intentionally declined to put that evidence in front of the jury. He sat on his hands at trial, allowing the chance that the jury would believe something he now swears is false. Because his *Napue* claim directly contradicts his actual trial strategy, he cannot prove materiality. The claim fails.

## CONCLUSION

The Court should reverse.

---

[6] During postconviction proceedings, Barbour's trial counsel testified: "[W]e felt that [Barbour's] best chance was to try to keep his confession from coming into evidence." DE484-16:81. Counsel described their choices related to the confession and Barbour's lack of trial testimony as "strategic" and a calculated "risk." *Id.*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limits set forth in Fed. R. App. P. 32(a)(7)(D). This brief contains 12,999 words including all headings, footnotes, and quotations and excluding the parts of the brief exempted under Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Respectfully submitted,

Steve Marshall
*Attorney General*

***s/ Brenton Thompson***
Brenton Thompson
*Assistant Attorney General*