# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

**Christopher Barbour,**

*Petitioner-Appellee,*

v.

**John Q. Hamm, Commissioner, Alabama Department of Corrections,**

*Respondent-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
(Case No. 2:01-cv-00612-ECM-CWB)

**BRIEF OF APPELLEE**

George H. Kendall
Carine M. Williams
Nicola Cohen
Alexandra Daniels
SQUIRE PATTON BOGGS (US) LLP
1120 Avenue of the Americas, 13th Floor
New York, NY 10036
(212) 872-9800
George.Kendall@squirepb.com
Carine.Williams@squirepb.com
Nicola.Cohen@squirepb.com
Ally.Daniels@squirepb.com

Miriam Gohara
CRIMINAL JUSTICE ADVOCACY CLINIC
127 Wall Street
New Haven, CT 06511
(203) 436-9167
Miriam.Gohara@ylsclinics.org

Daniel Loehr
CUNY SCHOOL OF LAW
2 Court Square West
Queens, NY 11101
(603) 454-6696
daniel.loehr@law.cuny.edu
*Admitted Pro Hac Vice*

Samuel Spital
NAACP LEGAL DEFENSE & EDUCATIONAL FUND
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
SSpital@naacpldf.org

Santino Coleman
NAACP LEGAL DEFENSE & EDUCATIONAL FUND
700 14th Street, Suite 600
Washington, D.C. 20005
(202) 682-1300
SColeman@naacpldf.org

# AMENDED CERTIFICATE OF INTERESTED PERSONS[1]

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:[2]

1. Akselrod, Olga, NAACP Legal Defense & Educational Fund, former counsel for Mr. Barbour in the federal habeas proceedings;

2. Allen, Richard, former Commissioner of the Alabama Department of Corrections;

3. Ball, Cameron, Assistant Attorney General in the federal habeas proceedings;

4. Barbour, Christopher, petitioner in federal habeas proceedings;

5. Barnett, Vernon, Commissioner of the Alabama Department of Revenue, former counsel with the Alabama Department of Corrections;

6. Bertsch, Tatiana, Equal Justice Initiative, counsel for Lola Roberts, William Roberts, and Lakeisha Hall;

7. Brasher, Andrew L., Eleventh Circuit Judge, former Alabama Solicitor General and Deputy Solicitor General during the pendency of Mr. Barbour's federal habeas proceedings;

8. Brooks, Ellen, former district attorney for the Fifteenth Judicial Circuit at trial, on direct appeal, and in postconviction proceedings;

---

[1] Asterisks are used to identify persons that have been added to the CIP.

[2] The circuit judge who presided over Mr. Barbour's trial and initial postconviction proceedings, the Honorable William Gordon, is deceased. Likewise, former District Attorney Albert Sim Butler, who was the District Attorney for the Fifteenth District of Alabama when the case was initially at the District Attorney's office, is deceased. Robert Ward, a former assistant district attorney who assisted in prosecuting Mr. Barbour, and Frank Riggs, former trial counsel for Mr. Barbour, are deceased.

9. Campbell, Donald, former Commissioner of the Alabama Department of Corrections;

10. Clark, David Richard, former Assistant Attorney General;

11. Cohen, Nicola, Squire Patton Boggs, counsel for Mr. Barbour in the federal habeas proceedings;

12. Coleman, Santino, NAACP Legal Defense & Educational Fund, counsel for Mr. Barbour in the federal habeas proceedings;

13. Crenshaw, Clay, Chief Deputy Attorney General, former Assistant Attorney General during state postconviction and federal habeas proceedings;

14. Daniel, Laurie Webb, Holland & Knight LLP, counsel for Mr. Barbour in federal civil suit;

15. Daniel, Tracy, former Assistant Attorney General in direct appeal proceedings;

16. *Daniels, Alexandra, Squire Patton Boggs, counsel for Mr. Barbour in the federal habeas proceedings;

17. Dunn, Jefferson, former Commissioner of the Alabama Department of Corrections;

18. Espy, Joseph C., former counsel in Mr. Barbour's first postconviction Rule 32 proceedings;

19. Evans, James H., former Attorney General of Alabama;

20. Forrester, Nathan A., former Deputy Attorney General;

21. Gohara, Miriam, Yale Law School, counsel representing Mr. Barbour during successive state postconviction and federal habeas proceedings;

22. Gunter, William, former Assistant District Attorney that assisted in prosecuting Mr. Barbour;

23. Haley, Michael, former Commissioner of the Alabama Department of Corrections;

24. Hanlon, Stephen, Holland & Knight LLP, counsel for Mr. Barbour in federal civil suit;

25. Heard, Clifford, former trial counsel for Mr. Barbour;

26. Houts, James, Assistant Attorney General, counsel for the State of Alabama in the successive postconviction proceedings;

27. Johnson, Henry M., Assistant Attorney General in the federal habeas proceedings;

28. Jones, Charlie E., former Commissioner of the Alabama Department of Corrections;

29. Jordan, Audrey, former Assistant Attorney General in the federal habeas proceedings;

30. Kendall, George H., Squire Patton Boggs, counsel representing Mr. Barbour during successive state postconviction and federal habeas proceedings;

31. Kenny, Polly S., Assistant Attorney General in the federal habeas proceedings;

32. King, Troy, former Attorney General of Alabama;

33. Lee, Jin Hee, NAACP Legal Defense & Educational Fund, counsel for Mr. Barbour in the federal habeas proceedings;

34. Loehr, Daniel Briggs, CUNY School of Law, counsel for Mr. Barbour in the federal habeas proceedings;

35. Marks, Emily C., United States District Judge for the Middle District of Alabama, presiding over federal habeas proceedings;

36. Marshall, Steve, Alabama Attorney General;

37. McCooey, Tracy, circuit judge during postconviction Rule 32 proceedings;

38. McNeill, Randall, prosecutor at Mr. Barbour's trial;

39. Neufeld, Peter, The Innocence Project, filed amicus brief in federal habeas proceedings;

40. Newsome, Kevin C., Eleventh Circuit Judge, former Solicitor General of the Alabama Attorney General's Office;

41. Nunnelley, Michael, former Assistant Attorney General in the federal habeas proceedings;

42. Nurse-Guilford, Jenay Aretha, Squire Patton Boggs, former counsel for Mr. Barbour in the federal habeas proceedings;

43. *Overing, Robert M., Deputy Solicitor General in federal appellate proceedings;

44. Pool, Jimmy, former Montgomery County Circuit Judge, former counsel for co-defendant Christopher Hester;

45. Pryor, William H., Eleventh Circuit Judge, former Attorney General;

46. Roberts, Lola, daughter of victim Mrs. Thelma Roberts;

47. Roberts, Melvin, husband of victim Mrs. Thelma Roberts;

48. Roberts, William, son of victim Mrs. Thelma Roberts;

49. Setzer, Angela, Equal Justice Initiative, counsel for Mr. Barbour in federal civil suit;

50. Shaw, Theodore Michael, NAACP Legal Defense & Educational Fund, former counsel for Mr. Barbour in the federal habeas proceedings;

51. Spital, Samuel, NAACP Legal Defense & Educational Fund, counsel for Mr. Barbour in the federal habeas proceedings;

52. Stevenson, Bryan A., Equal Justice Initiative, counsel for Mr. Barbour in federal civil suit;

53. *Taylor, Jon Carlton, District Court-appointed counsel for Jerry Tyrone Jackson;

54. Thomas, Holly, NAACP Legal Defense & Educational Fund, former counsel for Mr. Barbour in the federal habeas proceedings;

55. Thomas, Kim, former Commissioner of the Alabama Department of Corrections;

56. *Thompson, Brenton, Assistant Attorney General in federal appellate proceedings;

57. Thompson, Myron H., former United States District Court Judge for the Middle District of Alabama in the habeas proceedings;

58. Walker, Susan R., retired United States Magistrate Judge for the Middle District of Alabama in the habeas proceedings;

59. Watkins, William Keith, former Chief United States District Judge in the Middle District of Alabama in the habeas proceedings;

60. Williams, Carine M., Squire Patton Boggs, counsel for Mr. Barbour in the federal habeas proceedings;

61. Williams, Gilda, former Assistant Attorney General in direct appeal proceedings;

62. Wu, Victorien, NAACP Legal Defense & Educational Fund, former counsel for Mr. Barbour in the federal habeas proceedings.

Undersigned also certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner-Appellee Christopher Barbour respectfully requests oral argument. After a careful application of governing law, and an assiduous assessment of a voluminous record, the United States District Court for the Middle District of Alabama determined that the State violated Barbour's constitutional rights by knowingly presenting false evidence at his trial and wrongfully suppressing favorable and material evidence. The State now challenges the District Court's order directing the State to fairly retry or release Barbour. Barbour respectfully submits, in agreement with the State, that oral argument would aid this Court's review.

# TABLE OF CONTENTS

**Page**

AMENDED CERTIFICATE OF INTERESTED PERSONS ............................. C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES .................................................................................... iv

JURISDICTIONAL STATEMENT .........................................................................1

STATEMENT OF ISSUES ........................................................................................1

I.    STATEMENT OF THE CASE ....................................................................2

    A.  Proceedings & Disposition ......................................................................3

    B.  Factual Background & Procedural History.............................................4

        1.    Pretrial Investigation ..................................................................4

        2.    State Court Procedural History .................................................9

            a.    Pretrial proceedings........................................................9

            b.    Trial ..................................................................................10

            c.    Sentencings......................................................................14

            d.    Direct appeal...................................................................15

            e.    Repeat state postconviction review attempts .........15

        3.    Additional Evidentiary Developments Postconviction.................17

            a.    Modern DNA testing............................................................17

            b.    Belated disclosures of favorable evidence .....................18

            c.    Further third-party suspect evidence ......................................21

    C.  Standard of Review....................................................................................23

II.   SUMMARY OF ARGUMENT ...................................................................23

III.  ARGUMENT ...............................................................................................25

    A.  Merits Review Was Proper ......................................................................25

        1.    Barbour Easily Satisfies *Schlup* .................................................25

            a.    The State mischaracterizes *Schlup* .............................25

            b.    Barbour's case is "truly extraordinary".................................26

               i.    Exculpating DNA evidence ............................................26

|  | | ii. | Ample corroboration of innocence ................................33 |
|  | | iii. | Barbour's *Schlup* showing exceeds others ....................36 |
|  | 2. | *Schlup* Excuses Any Procedural Default .......................37 |
|  | | a. | *Schlup* applies to all procedural defaults.............................38 |
|  | | b. | Barbour was neither required, nor able, to return to state court ....................................................................................40 |
|  | 3. | Cause and Prejudice Also Applies................................44 |
| B. | *Napue & Brady* Relief Should Be Affirmed.........................45 |
|  | 1. | Section 2254(e)(2) Poses No Bar in This Case...............45 |
|  | 2. | The State Violated *Napue* .........................................46 |
|  | | a. | Due Process imposes non-delegable duties on the State........47 |
|  | | b. | The State's challenge to *Napue* elements fails.....................49 |
|  | 3. | The State Violated *Brady* .........................................53 |
|  | | a. | ADFS imputation was proper.................................54 |
|  | | b. | The District Court correctly determined materiality.............58 |
| C. | Alternative Ground for Relief.................................................65 |
|  | 1. | Ineffective Assistance of Counsel................................65 |

CONCLUSION ......................................................................................71

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. Youngblood*,
    488 U.S. 51 (1988)............................................................................64

*Banks v. Dretke*,
    540 U.S. 668 (2004).........................................................................45

*\* Brady v. Maryland*,
    373 U.S. 83 (1963)...........................................................................53

*Bravo v. United States*,
    532 F.3d 1154 (11th Cir. 2008) .......................................................49

*Brown v. Hooks*,
    176 F. App'x 949 (11th Cir. 2006)...................................................38

*Buck v. Davis*,
    580 U.S. 100 (2017).........................................................................66

*Cone v. Bell*,
    556 U.S. 449 (2009).........................................................................23

*Coquina Invs. v. TD Bank, N.A.*,
    760 F.3d 1300 (11th Cir. 2014) .......................................................34

*Davis v. Sellers*,
    940 F.3d 1175 (11th Cir. 2019) .......................................................60

*In re Davis*,
    565 F.3d 810 (11th Cir. 2009) .........................................................38

*\* DeMarco v. United States*,
    928 F.2d 1074 (11th Cir. 1991) .......................................................48

*Drake v. Portuondo*,
    321 F.3d 338 (2d Cir. 2003) ............................................................32

*Driscoll v. Delo*,
    71 F.3d 701 (8th Cir. 1995) .............................................................69

*Edwards v. U.S. Att'y Gen.*,
97 F.4th 725 (11th Cir. 2024) ...................................................49

*Fisher v. Univ. of Tex. at Austin*,
169 F.3d 295 (5th Cir. 1999) ...................................................44

\* *Floyd v. Vannoy*,
894 F.3d 143 (5th Cir. 2018) ...................................27, 52, 60

*Fontenot v. Crow*,
4 F.4th 982 (10th Cir. 2021) ...........................................32, 37

*G.E.G. v. State*,
54 So. 3d 949 (Ala. 2010)...........................................................35

*Gary v. Hall*,
558 F.3d 1229 (11th Cir. 2009) ...........................................61

*Giglio v. United States*,
405 U.S. 150 (1972)...................................................................47

\* *Glossip v. Oklahoma*,
604 U.S. 226 (2025)................................. 47-51, 53, 64, 65

*Godschalk v. Montgomery Cnty. Dist. Att'y Off.*,
177 F. Supp. 2d 366 (E.D. Pa. 2001)...................................36

*Gray v. Netherland*,
518 U.S. 152 (1996)...................................................................38

*Guzman v. Secretary*,
663 F.3d 1336 (11th Cir. 2011) ...........................................59

*Harridge v. State*,
534 S.E.2d 113 (Ga. Ct. App. 2000)...................................57

*Hays v. Alabama*,
85 F.3d 1492 (11th Cir. 1996) ...............................................57

*Herrera v. Collins*,
506 U.S. 390 (1993)...................................................................37

v

*Higgins v. Renico*,
    470 F.3d 624 (6th Cir. 2006) ........................................................66, 69

*Horn v. Stephenson*,
    11 F.4th 163 (2d Cir. 2021) ...............................................................57

**\* House v. Bell**,
    547 U.S. 518 (2006)................................................. 17, 25-27, 32, 33, 35, 39, 42

*House v. Bell*,
    No. 3:96-CV-883, 2007 WL 4568444 (E.D. Tenn. Dec. 20, 2007) ..................45

*Jackson v. State*,
    800 S.E.2d 356 (Ga. 2017) ...............................................................57

*Jennings v. Stephens*,
    574 U.S. 271 (2015)...........................................................................65

**\* Kyles v. Whitley**,
    514 U.S. 419 (1995).................................................... 54, 60-62, 64, 65

*Lund v. United States*,
    913 F.3d 665 (7th Cir. 2019) .............................................................26

*Magill v. Dugger*,
    824 F.2d 879 (11th Cir. 1987) ..........................................................66

*Martin v. State*,
    839 So. 2d 665 (Ala. Crim. App. 2001)...........................................30

*McCormick v. Parker*,
    821 F.3d 1240 (10th Cir. 2016) .......................................................57

*McQuiggin v. Perkins*,
    569 U.S. 383 (2013)...........................................................................39

**\* Moon v. Head**,
    285 F.3d 1301 (11th Cir. 2002) .......................................... 54, 56-58

*Munchinski v. Wilson*,
    694 F.3d 308 (3d Cir. 2012) ........................................................26, 33

*Murray v. Carrier*,
477 U.S. 478 (1986)....................................................................41, 68

**\* *Napue v. Illinois*,**
360 U.S. 264 (1959)...................................................30, 46, 52, 53

*Nicks v. State*,
783 So. 2d 895 (Ala. Crim. App. 1999).............................................30

*O'Sullivan v. Boerckel*,
526 U.S. 838 (1999).........................................................................43

*Owens v. Wainwright*,
698 F.2d 1111 (11th Cir. 1983) .......................................................36

*Parker v. Allen*,
565 F.3d 1258 (11th Cir. 2009) .......................................................56

*In re Payne*,
129 A.3d 546 (Pa. Super. Ct. 2015).................................................36

*Phillips v. Valentine*,
826 F. App'x 447 (6th Cir. 2020) .....................................................61

*Rozzelle v. Secretary*,
672 F.3d 1000 (11th Cir. 2012) .......................................................30

*Scarlett v. Secretary*,
404 F. App'x 394 (11th Cir. 2010) ...................................................36

**\* *Schlup v. Delo*,**
513 U.S. 298 (1995)....................................... 3, 25, 26, 33, 34, 37, 39

*Serendipity at Sea, LLC v. Underwriters at Lloyd's of London*,
56 F.4th 1280 (11th Cir. 2023) .............................................31, 44, 53

*Shoop v. Twyford*,
596 U.S. 811 (2022)...................................................................45, 46

*Smith v. Cain*,
565 U.S. 73 (2012)...........................................................................52

*Smith v. United States*,
348 U.S. 147 (1954)..................................................................31, 51

*Smith v. Wainwright*,
799 F.2d 1442 (11th Cir. 1986) ............................................67, 69, 70

*Stano v. Butterworth*,
51 F.3d 942 (11th Cir. 1995) ...............................................................55

*Stimpson v. Warden*,
No. 22-10190, 2025 WL 484049 (11th Cir. Feb. 13, 2025)..............30

* *Strickland v. Washington*,
466 U.S. 668 (1984)......................................................................65, 70

*Strickler v. Greene*,
527 U.S. 263 (1999)......................................................................44, 54

*Tanzi v. Secretary*,
772 F.3d 644 (11th Cir. 2014) .............................................................32

*United States v. Antone*,
603 F.2d 566 (5th Cir. 1979) ........................................................ 55-57

*United States v. Bagley*,
473 U.S. 667 (1985)......................................................................30, 58

*United States v. Deblasi*,
No. 22-10020, 2024 WL 4212693 (11th Cir. Sept. 17, 2024)...........53

*United States v. Meros*,
866 F.2d 1304 (11th Cir. 1989) ...........................................................54

*United States v. Naranjo*,
634 F.3d 1198 (11th Cir. 2011) ...........................................................57

*United States v. Sanfilippo*,
564 F.2d 176 (5th Cir. 1977) ...............................................................52

*United States v. Stein*,
846 F.3d 1135 (11th Cir. 2017) .....................................................48, 49

*United States v. Torniero,*
　735 F.2d 275 (2d Cir. 1984) .............................................32

*Vasquez v. Hillery,*
　474 U.S. 254 (1986)...........................................................43

*Ward v. State,*
　382 So. 3d 574 (Ala. Crim. App. 2020).............................40

*Watkins v. Miller,*
　92 F. Supp. 2d 824 (S.D. Ind. 2000)..................................28

*Wearry v. Cain,*
　577 U.S. 385 (2016)...........................................................63

*Wiggins v. Smith,*
　539 U.S. 510 (2003)...........................................................68

*Williams v. Allen,*
　542 F.3d 1326 (11th Cir. 2008) .........................................23

*Williams v. Brown,*
　208 F. Supp. 3d 713 (E.D. Va. 2016) ................................28

*Williams v. Taylor,*
　529 U.S. 420 (2000)...........................................................46

*Wolfe v. Johnson,*
　940 F. Supp. 2d 280 (E.D. Va. 2010) ................................42

*Woods v. Interstate Realty Co.,*
　337 U.S. 535 (1949)...........................................................49

**Statutes**

28 U.S.C. § 1291 ....................................................................1

28 U.S.C. § 1294(1) ...............................................................1

28 U.S.C. § 2241 ....................................................................1

28 U.S.C. § 2253 ....................................................................1

28 U.S.C. § 2254................................................1, 23, 32, 43, 45, 46

Tenn. Code § 40-30-102(b)(2) ..................................................................42

Va. Code § 19.2-327.11 ..........................................................................42

**Other Authority**

Ala. R. Crim. P. 32.1(e) .....................................................................38, 44

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over the State's timely appeal from a final order by the United States District Court for the Middle District of Alabama under 28 U.S.C. §§ 1291, 1294(1), and 2253. The District Court's jurisdiction was proper under 28 U.S.C. §§ 2241 and 2254.

## STATEMENT OF ISSUES

1.    Did the District Court properly find a Due Process violation where the State knowingly allowed untrue and misleading evidence—a factually false confession—to stand uncorrected, urging jurors to rely on the confession as an unimpeached, true account of the crime?

2.    Did the District Court, recognizing that suppressed laboratory bench notes demonstrated that Christopher Barbour and co-defendant Christopher Hester were both excluded as sources of semen found on the victim, properly find the verdict and sentence against Barbour unworthy of confidence?

3.    Should relief be affirmed alternatively on Barbour's ineffective assistance of counsel claim?

## I.  STATEMENT OF THE CASE

New DNA evidence proves beyond doubt that the case prosecuted at Christopher Barbour's capital trial, predicated as it was on demonstrably untrue inculpating statements, was false. Neither Barbour nor the two other men the State told jurors were involved in the rape and murder of Mrs. Thelma Roberts was the source of semen recovered from her. Instead, Jerry Tyrone Jackson was the source. Jackson was the victim's neighbor. He had earlier been charged with breaking into another neighbor's home and raping her, was later convicted of murdering yet another woman under similar circumstances, and was unknown to Barbour.

In nevertheless continuing to defend Barbour's capital conviction, the State for the first time claims that the false case presented to jurors is "obvious[ly]" explained by Barbour being too scared to admit Jackson's involvement but, beyond this "*one aspect*," the rest of Barbour's confession is trustworthy. State Br. 2, 30 (emphasis in original). However, the State cannot defend a capital conviction based on a wholly different theory of the crime than the one used to convict. Moreover, the record forecloses this new theory. Jackson was deposed and repeatedly invoked his Fifth Amendment right against self-incrimination. However, he confirmed unequivocally he does not know and never met Barbour. No evidence whatsoever has been presented to the contrary.

Recognizing that people lie, but DNA does not, and considering ample additional corroboration of the falsity of the case jurors relied on to convict Barbour, the District Court correctly concluded that *Schlup v. Delo*, 513 U.S. 298 (1995), excuses any procedural bars because, more likely than not, any reasonable juror hearing this evidence would have reasonable doubt. On the merits, the District Court properly granted relief because evidence available to the State at trial established that Barbour's statements were false. The State (i) urged jurors to convict based on Barbour's inculpating statements, despite knowing their falsity, and (ii) suppressed laboratory bench notes that would have exculpated him. This Court should affirm.

### A.    Proceedings & Disposition

On May 21, 2001, Barbour sought habeas relief in the United States District Court for the Middle District of Alabama. A24_3-86. The State sought dismissal on timeliness grounds. District Court Judge Emily C. Marks granted limited discovery on actual innocence in 2021, and held a *Schlup* evidentiary hearing in 2023. Following that hearing, the District Court found actual innocence adequately substantiated to overcome any timeliness defense, A35_3-107, and, subsequently, that two Due Process violations warrant merits relief, A37_3-160 (concluding the

State may retry or release Barbour, who remains incarcerated on Alabama's death row).[3]

## B. Factual Background & Procedural History

### 1. Pretrial Investigation

One month into investigating Mrs. Thelma Roberts's March 20 or 21, 1992 rape and murder, police remained at a loss. "After great screaming, crying, and gnashing of teeth," lead investigator Detective Danny Carmichael chronicled on April 22, "we still were no further along in this investigation than we were to start with." A37_16.

Police first suspected the victim's estranged husband (Melvin Roberts) and teenage son (William Roberts).[4] A37_12-13. Mrs. Roberts—a "very religious" and "strict" woman who did not drink or smoke—was last seen alive by her family on March 20.[5] A35_9; SuppA7_56:22-57:7; A32_90:15-16. Melvin visited that

---

[3] References abbreviated herein include: State Brief ("State Br. [Page#]"); State Appendix ("A[Volume#]_[Page#]"); and Barbour's Supplemental Appendix ("SuppA[Volume#]_[Page#]"). Page citations to the State Appendix and Barbour's Supplemental Appendix reference .pdf pagination; page citations to the State's Brief reference internal pagination.

[4] Because they share a surname, Roberts family members are referenced herein by first name where doing so aids in clarity and avoids confusion.

[5] The State addresses at length 2001 and 2018 affidavits from Roberts family members and a neighbor, Cedric Evans. State Br. 16-17. However, the District Court expressly declined to rely on these materials in reaching her *Schlup* and merits decisions. *See* A35_70 n.41; A37_74 n.21 (citing reliability concerns given testimony, *inter alia*, about Barbour's former investigator providing them money);

evening but reported leaving around 8:15 p.m. A37_12; SuppA1_33. William and his sister Lola Roberts also left around 8:15 p.m. to visit neighbors, siblings Lakeisha and Darrius Hall. A37_10; SuppA1_24. After spending the night, mid-morning, William and Lola walked home with the Halls and a different neighbor, Jerry Tyrone Jackson. A37_11. William used his key to enter. *Id.*; SuppA1_24. He discovered his mother, removed a butcher knife protruding from her chest, took a plastic bag off her head, and called police. A35_11-12; SuppA1_43.

Melvin and William were taken to the police station repeatedly and roughly interrogated. As Melvin recalled, while handcuffed, Carmichael kicked him in the chest. SuppA7_167:18-168:17. Six or seven other officers slapped, beat, and called him names. A35_14; SuppA7_169:9-170:22.

On April 4, focus on Melvin and William shifted. Crime lab staff recovered a purportedly Caucasian pubic hair from a trace sheet used to cover Mrs. Roberts, prompting intense discussions between lab staff and investigators. Because Melvin and William were African-American, investigators were "confounded." SuppA1_50.

They had no further leads.

---

*see also* SuppA3_145 (documenting counsel's lack of knowledge as to payments). Given these concerns, the undersigned rely only on these witnesses' sworn depositions or *Schlup* hearing testimony.

Police had questioned the Halls. A37_11; SuppA1_44-45. They attempted to question Jackson but were told he left for work. A37_11; SuppA1_45. An area canvas yielded only a report about seeing Melvin's vehicle. SuppA1_24-25. No one reported unfamiliar vehicles or white men in the predominantly Black neighborhood. SuppA1_23.

Faced with a stalled investigation, Carmichael and the second lead investigator, Montgomery Fire Department Lieutenant William Davis, began "rounding up" local youth believed to have gang affiliations. SuppA1_78. During these custodial interrogations, police telegraphed what they wanted to elicit. *See, e.g.*, A30_80:25-81:3 (James Mann, State's *Schlup* hearing witness, testifying, "I felt like I wasn't going to be able to leave until I told [Davis] what he wanted to hear"). One group brought in for questioning on April 21 maintained they knew nothing, but "probably Christopher Barber [sic] knew something." SuppA1_69.

The next day, Carmichael and Davis tracked down Barbour (who was then 22 years old and homeless), took him to headquarters, and "question[ed] him intently." A37_17-18; A6_198:10-22 (age); A35_15 (homelessness). Again, on April 28, they located Barbour and subjected him to further questioning. A37_20. Barbour provided no useful information. Yet, Carmichael noted he was "a whimpie little thing, and scares real easy." A37_18; SuppA1_78. During these interrogations, Barbour had been questioned about certain small, shoplifting-related grocery store

fires, and he agreed to a May 1 polygraph. A8_175:9-19. Davis threatened to beat him "within an inch of [his] life" if Barbour failed to remain in contact before the test. A8_170:11-21.

While authorities told Barbour the polygraph would concern the shop-lifting fires, questioning pivoted to Mrs. Roberts. After being misinformed that he failed, and at least seven hours of police custody, Barbour gave a recorded inculpating statement and, two hours later, a videotaped statement.[6] A8_111:6-16 (officer testifying he picked Barbour up around lunch, before the 1:00 p.m. polygraph); A8_142:20-22 (audio-recorded statement starting at 7:51 p.m.); SuppA3_16-47 (video statement starting at 9:30 p.m.).

Barbour falsely confessed, implicating Christopher Hester and Michael Mitchell, and recounted these already-known-to-police facts: Mrs. Roberts was raped and murdered; a fire was set; a knife was used; the location of her body; a rough approximation of the home's layout; various items were pulled from a closet; and a smoke detector was pulled off a wall. Even as to these "consistencies," Barbour was wrong on details. For example, at least three fires were set, not one. A35_93. Barbour claimed he threw the smoke detector into the living room; it was found in the kitchen. *Compare* A37_24, *with* A37_50.

_____

[6] As expert Dr. Charles Honts explained at the *Schlup* hearing, the polygraph was incorrectly scored. Barbour had not failed. A29_114:10-115:21, 121:17-23.

As the District Court found, numerous further details about the crime scene were demonstrably false. A35_93, 100. Particularly glaring, despite several questions seeking to elicit information about suffocation and strangulation, Barbour never referenced the bag over Mrs. Roberts's head or her being choked. SuppA3_32-33, 45. The true assailant would have known these facts, but someone whose familiarity was a function of a crime-scene photo would not. A4_199:6-13 (William Roberts removed the bag before police arrived).[7] Likewise, Barbour stated Mrs. Roberts drank beer, but she had no alcohol in her blood, was devoutly religious, and was known to not drink. A35_93 (also finding "[t]hese inconsistencies would likely cause reasonable jurors to view Barbour's confession even more skeptically"). *See also* A37_88, 118 (same, and finding it notable Barbour could say the knife was eight inches, but could not gesture to show size).

---

[7] Although the District Court did not rely on it, the record below includes ample, credited evidence as to the phenomenon of contamination—whereby investigators, unintentionally or otherwise, disclose non-public facts to a suspect, who may then use those facts to craft a story that creates the false impression of firsthand knowledge. *See, e.g.,* A35_52-53 (summarizing the expert testimony of Dr. Richard Leo on contamination); SuppA3_207:16-22 (Assistant District Attorney Randy McNeill agreeing with studies estimating that in 90% of false confession cases, "the suspect learned of certain facts about the crime scene from the police."). The vast majority of Barbour's interactions with investigators were unrecorded, but even the recorded statements show contamination. *See, e.g.*, SuppA3_27 (Barbour being directed where to diagram Mrs. Roberts's bed: "Q. Where was the bed? A. If I'm not mistaken, the bed was over here. Q. Take a, just another spot. A. Okay. Q. Up here, just draw the . . . A. I want to say that this is, okay [. . .].").

## 2. State Court Procedural History

### a. Pretrial proceedings

On June 5, 1992, more than a year before Barbour's trial, during a preliminary hearing in Hester's case, Assistant District Attorney ("ADA") William Gunter (prosecutor on the separate prosecutions of Barbour and Hester) agreed unequivocally that forensics did not implicate Hester "at all." A37_34; SuppA3_70:21-71:13. On June 16, 1992, the State dismissed charges against juvenile Mitchell entirely. SuppA2_174.

In Barbour's case, defense counsel argued that Alabama's statutory cap—$1,000 for pretrial work and $1,000 for trial—made them "less able to provide quality legal service" and abrogated Barbour's "rights to adequate counsel and a fair trial." SuppA3_50; A37_35. They sought excusal or reasonable attorney fees. A2_21-23. The court denied that motion, as did appellate courts on pretrial mandamus review. A37_35; A2_82.

In a pretrial suppression motion, defense counsel argued the polygraph pressured Barbour into inculpating himself, and that his interrogators' abuse and intimidation overcame his will. A37_38-39. In support, Barbour testified that during one interrogation, Carmichael hit him four to five times. A37_44; A8_169:22-25, 175:2-8; *see also* A8_170:5-7 (Barbour testifying to "ha[ving] a bad fear that if I didn't tell them what they wanted or, you know, didn't tell them something, that he

was going to hit me more"). Barbour's grandfather testified that his grandson told him specifically about Carmichael's abuse, while others told him more generally about Carmichael's excessive force; he also testified about Barbour being left reeling from his mother's suicide. A37_38; A8_200:3-16, 201:1-11.

The court admitted Barbour's statements after denying discovery on Carmichael's other abusive conduct. [8] A37_47; A2_69-70. Barbour's other discovery motions, including for all investigation-related physical evidence, were granted with the State's consent. A2_32-33, 36, 40; A8_22:12-18, 23:6-16.

Gunter subsequently left the District Attorney's office, and in April 1993, Randy McNeill inherited Hester and Barbour's cases. SuppA4_26; SuppA4_30:10-15.

### b. Trial

On June 22, 1993, Barbour's three-day capital trial began. A37_49. McNeill told jurors Mrs. Roberts was raped and murdered contemporaneously, and that Barbour identified Hester and Mitchell when he confessed. *Id*. Barbour's statements linchpinned the prosecution's case. McNeill and co-counsel, ADA Robert Ward, repeatedly urged jurors to accept them as accurate. That Hester raped Mrs. Roberts

---

[8] Contemporaneous to Barbour's interrogations, the FBI was investigating the Montgomery Police Department for using physical abuse to induce confessions. A8_96:12-97:10.

before she was killed was core to this account. A37_49-50. *See also, e.g.*, A4_167:8-13 (McNeill asking jurors to believe Barbour's statements that he and Mitchell held Mrs. Roberts down while Hester raped her); A4_169:9-19 (McNeill urging "[t]he confession is consistent with what happened"); A5_181:18-182:3 (playing videotape of confession); A5_185:2-186:6 (Carmichael bolstering Barbour's inculpating statements by detailing the non-public facts included therein); A6_32:20-37:25 (Ward closing on how "the video testimony" represented an accurate account); A6_34:25-35:1 (Ward telling jurors, "[Barbour, Hester, and Mitchell] went in to commit the acts as they have been described"); A6_40:5-11 (Ward urging "there is no reasonable doubt" because they each "performed the acts as they have been told to you and described to you and shown to you, not only through witnesses but through [Barbour's] own mouth and his statements and confession").

The prosecution further urged jurors to believe that semen recovered from Mrs. Roberts corroborated Barbour's confession. A37_51-52; A4_160:22-25 (opening on how "Ms. Roberts was raped" before Barbour stabbed her); A4_165:4-6 (opening by promising jurors "you are going to hear all that testimony" regarding semen found in Mrs. Roberts's vaginal and anal cavities).

The prosecution presented this case to jurors notwithstanding their expert's determination over a year earlier—based on DQalpha testing, a less-sophisticated

DNA testing then available[9]—that Hester did not match the semen recovered from Mrs. Roberts. In a June 3, 1992 report (hereinafter, the "1992 Report" or "Report"), Alabama Department of Forensic Sciences ("ADFS") serologist Larry Huys found "the following genetic traits" on the vaginal swabs: 1.1, 3, 4 (1.2). SuppA5_5. Hester (type 2,4) had a "2" allele that was not detected. As the 1992 Report acknowledged, there was thus "strong reason to believe" Hester was not the source. *Id.* The Report also stated that Barbour's traits (1.1,4) were present, but that one-third of all white people had these same genetic traits. *Id.*

ADFS sent prosecutors the 1992 Report a year before Barbour's trial. SuppA5_3. The prosecution's June 8, 1993 notes reference it, establishing prosecutors were aware, just as Gunter had advised at Hester's preliminary hearing, that Hester was "not the source of semen."



_____

[9] DQalpha testing, an early form of DNA typing, analyzed variation at the HLA DQalpha gene, which exists in "different allelic forms that one can inherent [sic] from your parents." A28_20:24-21:1. "[B]ecause there are a variety of alleles [in] this one particular gene," it was "very valuable" in excluding contributors, or "eliminating potential sources of . . . biology." A28_21:1-5, 165:10-15. Unlike modern DNA testing, however, DQalpha cannot generate a DNA profile statistically unique to a particular (non-identical twin) individual.

SuppA8_78; *accord* SuppA4_44:15:22 (McNeill deposition confirming he knew "the semen could not have belonged to Hester" before Barbour's trial).

Jurors were told the semen had been scientifically tested. Medical examiner Alan Stilwell testified about recovering semen via a "rape kit." A37_52; A5_117:9-12. ADFS serologist William Landrum elaborated on the "sexual assault kit" evidence that showed the presence of spermatozoa, testing for blood type, and transferring the swabs to Huys for DNA testing. A37_52; A5_139:1-3, 143:2-11. Huys was called to testify about DQalpha testing. He explained that, in addition to the swabs containing semen, he had comparison samples of DNA from Melvin Roberts, Barbour, and Hester. A37_53. Before Huys broached the test results, however, defense counsel objected to questioning about why a more discriminating DNA test had not been used. A37_54; A5_160:2-3, 162:1-5.

During the subsequent *in-camera* conference, Huys stated "it is highly unlikely [Hester] could have been a contributor to that semen." A37_57; A5_165:19-20. When McNeill, still *in-camera*, suggested everyone look at the 1992 Report, defense counsel admitted they never read it and did not understand the results. A5_164:7-16 (also stating, "and I wouldn't have known what [the 1992 Report] was if I looked at it"); A5_166:5-6 (admitting, "I don't understand all the scientific end of it"); A5_170:24-171:1 ("There is something wrong with this testing. And I don't know enough about it to know what it is.").

13

Back before the jury, McNeill abandoned questioning Huys, and defense counsel asked no questions. Thus, jurors—who were told DNA testing was conducted and comparisons were made against Barbour and Hester—were never informed that the testing did not inculpate either of them and that it was "highly unlikely" Hester was a contributor. A5_165:19-20.

Defense counsel presented no witnesses.

On June 24, 1993, the jury returned guilty verdicts on capital murder during the commission of rape, burglary, and arson. A2_157.

###    c.    Sentencings

On January 31, 1994, the trial court adopted jurors' 10-2 recommendation, sentencing Barbour to death. A3_10-27. The trial court found especially heinous, atrocious, or cruel aggravation based on the prosecution's trial theory. A3_18 (recounting the victim "was then raped by Hester as she lay helpless").

On April 14, 1994, Hester pleaded guilty to a reduced felony murder charge. SuppA2_113-20. Hester's alleged factual basis presented a dramatically different story: there was no rape; the participants included a teen named Angela Stikes instead of Michael Mitchell; and they forcibly broke into the home with an intent to burglarize (Hester claimed he stole liquor from the kitchen).[10] SuppA2_117:17-

_____

[10] If Hester's allocution were true, Stikes would have been an eyewitness to the crime. Yet, the prosecution declined to call her at either Barbour's trial or the *Schlup* hearing. Those decisions are understandable. Her statements are at odds with the

118:9. Hester was sentenced to 10-years-to-life, to run concurrent with the 10-years-to-life he was already serving for bad checks and statutory rape. SuppA3_148.

### d.    Direct appeal

Barbour appealed his conviction and sentence. The Alabama Court of Criminal Appeals ("ACCA") affirmed, accepting the trial theory that the murder was "made capital because murder was committed during the commission of a rape." A11_13. The Alabama Supreme Court also affirmed. A11_241-43.

### e.    Repeat state postconviction review attempts

Barbour timely sought Rule 32 relief. Initially pro se, Barbour was appointed postconviction counsel who barely amended his ghostwritten petition. A37_66-67; A13_3-58. After a short evidentiary hearing on narrow ineffectiveness claims, postconviction counsel abandoned Barbour. A16_158-59, ¶ 6. On April 21, 1998, the petition was denied. A13_244. Postconviction counsel never informed Barbour

---

very confession the State vociferously urges as true (Barbour never places Stikes on the scene). Also, Stikes's statements were profoundly inconsistent with (i) the crime-scene evidence—this is especially so now, as Stikes, in all her various statements, never references Jackson—and (ii) with her own prior statements. A26_147-55 (discussing the infirmities of Stikes-related evidence). At times, Stikes's statements were even inconsistent with the laws of physics. SuppA2_132 (Stikes claiming she walked through the closed door of Mrs. Roberts's home). During his deposition, McNeill explained he would have to "put a pencil in front of her face to get her to focus." SuppA4_49:24-50:2; SuppA4_49:9-13 (calling Stikes "flighty"); *see also* A35_72 n.45 ("[T]he Court questions the reliability of Stikes' interview with Detective Carmichael [. . .] because it appears that Stikes was in a hypnotic state.").

of the need to file a notice of appeal (nor filed one), nor provided Barbour with file or record copies. A16_159, ¶ 7.

On September 8, 2000, Alabama moved for an execution date. A18_3-13.

Two of the undersigned were engaged to represent Barbour pro bono in January 2001 and, on April 4, filed a Motion to Reopen Rule 32 Proceedings, A15_6-7, and a Motion for Preservation of DNA Evidence, A14_10-20. Barbour argued DNA testing would exclude him and Hester and demonstrate that the perpetrator was a "third person unknown to them." A14_150. The State opposed both the Motion to Reopen and Barbour's subsequent appeal of the Rule 32 court's summary denial. *See, e.g.*, A15_113-201; A16_4-147; A20_133-81.

On April 20, 2001, Barbour's execution was set for May 25, 2001. A18_53.

On May 21, 2001, undersigned counsel filed the underlying habeas petition, successfully moving to stay his execution and preserve DNA evidence. A19_72-77, 83. Barbour then sought to stay federal proceedings to pursue DNA-related innocence remedies in state court, as his Motion to Reopen remained pending before the ACCA. SuppA1_108-10.

The State today lauds the District Court for heeding that stay request, but the State then vehemently opposed it, arguing Alabama's successive petition bar left no available remedies to exhaust. *Compare* State Br. 24, *with* SuppA1_114-16. In state and federal courts, the State argued that DNA testing would be irrelevant to

Barbour's culpability "because the prosecutor did not argue that Barbour raped the victim." SuppA1_116.

Describing Barbour's attempt to obtain DNA testing as an effort to "circumvent[] procedural bars," the ACCA adopted the State's position that DNA testing "would have no relevance." A21_117 (*reh'g denied* on Aug. 13, 2004, SuppA9_3; *cert. denied* on Jan. 7, 2005, SuppA9_5).

From 2001 until 2021, Barbour moved for DNA testing in state and federal courts on more than 10 occasions; the State unequivocally opposed every effort, in every forum. A15_6; A20_129; A24_38-45; A25_54-61; SuppA1_131-86, 188-207, 209-18; SuppA2_58-69, 92-94, 96-98, 100-08.

### 3. Additional Evidentiary Developments Postconviction

#### a. Modern DNA testing

On January 14, 2005, Barbour returned to federal court with a notice of exhaustion. SuppA1_123-29. On June 22, 2006, he filed a supplemental brief on equitable tolling due to actual innocence under *House v. Bell*, 547 U.S. 518 (2006). SuppA1_209-18. While Barbour pressed with further supplemental filings, *see, e.g.*, SuppA2_96-98, 100-08, the District Court took no substantive action for over a decade, until it granted a November 2018 status conference, A1_34. In March 2021, the District Court found good cause to grant modern DNA testing on the crime-scene evidence. A26_50.

Alan Keel, then Director of the Forensic Analytical Crime Lab, one of the nation's leading private DNA testing laboratories, conducted the testing. SuppA2_110-11. The results, submitted to the District Court in January 2022, conclusively confirmed Barbour and Hester's exclusion as the source of the semen. The semen matched Jackson in the Combined DNA Index System ("CODIS") database. SuppA5_41.

The reliability of these results is undisputed. The State's brief omits mention that after Keel's testing (and without apprising Barbour or the District Court), the State directed ADFS to further test the semen. A35_43; *see also* SuppA2_181-82; A33_82. Laura Wendell, the ADFS analyst who conducted the testing on the State's behalf, testified at the *Schlup* hearing that she found **_no_** indication of any male contributor besides Jackson. A30_134:14-23, 138:22-139:2. The State's DNA expert, Dr. Jason Kokoszka, concurred. A35_47. The District Court correctly concluded that the DNA testing implicating Jackson alone "is objective, reliable, and undisputed." A35_101-02.

### b. Belated disclosures of favorable evidence

In March 2022, following receipt of the exculpating DNA results, the District Court found good cause to grant both parties' requests for supplemental discovery on actual innocence. A26_168-87. Through that discovery, in April 2022, the State first produced the bench notes underlying the DQalpha testing on the vaginal and

anal swabs. A37_107. The notes included a black-and-white image of the DQalpha test strips—photographic documentation of the evidence underlying the 1992 Report. SuppA5_27. The photo of the test strips, which have specific probes recognizing the six common alleles detected (1.1, 1.2, 1.3, 2, 3, 4), reflects (i) which dots turn blue (indicative of positive allelic results, here 1.1, 3, 4, 1.2), and (ii) the intensity of the dots (reflective of the ratio of DNA in a mixture). A37_107-08 (detailing the DQalpha testing process).



*See* SuppA5_27.

Keel and Gary Harmor, the chief forensic DNA analyst at the Serological Research Institute, reviewed the test strips and concluded that, contrary to the 1992 Report, the semen genetic traits were clearly 1.2,4, which definitively excluded both Barbour (1.1,4) and Hester (2,4). A37_108. This conclusion was one any qualified

analyst in 1992 would have reached. A37_109; *see also* A27_44 (Harmor); A28_163:21-23 (Harmor); SuppA5_9-11, ¶ 6-8 (Keel).

Keel and Harmor attributed ADFS's failure to identify the semen source as a 1.2,4 to an inexplicable failure to consider dot intensity, which can be used to "sort out the potential allelic types of the various contributors" to a DNA sample, A28_25:21-23, despite dot-intensity consideration being "standard" practice and mandated in both ADFS's and the test manufacturer's manuals. A37_109, 120 n.35; *see also* A28_24:5-7 (Keel); A28_149:6-9 (Harmor); SuppA6_72:22-25 (Huys); SuppA4_117-20 (manufacturer manual); SuppA4_179 (ADFS manual). As Keel explained, "the proper—and only—*interpretation* of this result in light of the dot intensities is a **type 1.2,4 major sperm DNA contributor** together with a weak type 1.1,3 contributor compatible with . . . DNA carryover from Mrs. Roberts." SuppA5_10 (emphases in original). Thus, "at the time of trial," Barbour and Hester should have been "eliminated . . . as potential contributors." SuppA5_11.

At the *Schlup* hearing, the State called Angelo Della Manna, the Director of ADFS, to testify about these test strips. Della Manna did not work at ADFS in 1992 and did not conduct DNA casework on his own until about 1995. A32_170:22-171:6, 172:8-11, 173:2-5. His experience conducting DQalpha testing at ADFS was limited and, before being retained in this matter, he had not interpreted a DQalpha test strip since the early 2000s. A32_174:14-24. Della Manna conceded ADFS had not

20

considered dot intensity, but defended the failure by citing a purported exception—that ADFS did not evaluate dot intensity in cases involving a deceased victim—not found in the ADFS manual (or elsewhere), A37_109-11; A32_162:12-24, or mentioned by Huys in his deposition, SuppA6_69:22-25. Indeed, Della Manna's deposition testimony, that "looking at dot intensity and comparing it was a typical part of the DQalpha testing," directly contradicted his hearing testimony and reliance on this purported exception. SuppA5_169:10-13. He further ***agreed*** that the test strips excluded Barbour and Hester assuming—as the modern DNA testing establishes—two contributors to the mixture. A32_186:15-187:4.

### c. Further third-party suspect evidence

Apart from decisive modern DNA evidence, and the suppressed test strips from trial-stage DNA testing, the *Schlup* discovery and hearing adduced highly inculpating evidence of Jackson's motive and opportunity.

Jackson was aware tax-refund cash might be found in the Roberts's home. SuppA7_53:15-54:1. Jackson also repeatedly told William that he was "going to get" Mrs. Roberts. SuppA7_60:4-20. Those statements were consistent with ample evidence that Jackson has repeatedly harmed women. For example, Lakeisha Hall reported that her mother forbade Jackson in their home, based on her belief he previously raped a neighbor. SuppA6_174:23-175:12. Jackson had been charged with breaking in and raping a neighbor four months prior to Mrs. Roberts's rape and

murder. A35_65; SuppA2_163. Additionally, a note to Jackson from his girlfriend, asking that he stop beating her, was found at the crime scene (in William Roberts's room). SuppA1_54. Further, at the Hall's home on the night of Mrs. Roberts's rape and murder, Jackson exposed himself to a not-older-than-twelve-year-old girl. SuppA6_153:13-20, 154:11-20. Finally, in 2001, Jackson stabbed another woman to death in her home after she "rebuffed his sexual advances," for which he is now serving life without parole. A35_27.

Jackson, who resided across the street from Mrs. Roberts, also had uncontested opportunity. He was familiar to her, and his family sometimes stored food in her refrigerator, so Mrs. Roberts would have had reason to permit him entry. A32_19:1-17; SuppA3_124_21:9-11; SuppA7_57:20-58:9. The night Mrs. Roberts was murdered, Jackson left the Hall home and only returned in the morning, shaking and repeatedly telling William, "I'm sorry, I'm sorry." A35_11.

Lastly, when Jackson was deposed for the *Schlup* hearing, he invoked the Fifth Amendment over 40 times as to questions regarding Mrs. Roberts's rape and murder and whether he knew Mrs. Roberts's children. SuppA3_125_28:19-21 (invoking the Fifth when asked, "[d]id you rape and kill Thelma Roberts?"); *see also* SuppA3_124_23:6-126_30:5. By contrast, Jackson testified unequivocally that he did not know and had never met Barbour. SuppA3_121_10:19-22, 123_18:16-21.

## C.    Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") limits federal review of state court decisions as to any claim "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). By contrast, if not otherwise procedurally barred, federal courts review de novo claims the state court never considered on the merits. *Cone v. Bell*, 556 U.S. 449, 472 (2009).

With respect to this Court's review of the District Court, questions of law and mixed law and fact are reviewed de novo. *Williams v. Allen*, 542 F.3d 1326, 1336 (11th Cir. 2008) (citation omitted). But where the District Court reaches a purely factual determination, that finding is reviewed for clear error. *Id.*

## II.    SUMMARY OF ARGUMENT

The District Court found that modern DNA testing, which conclusively excludes Barbour and Hester as the source of semen recovered from the victim and identifies Jackson as the sole contributor, as well as other reliable new evidence implicating Jackson, reveal Barbour's inculpating statements as false and decisively discredit the prosecution's case at trial. The District Court correctly determined that Barbour passes *Schlup*'s actual-innocence gateway and, on the merits, that Due Process violations require the State to retry or release him.

The State dedicates much of its brief to challenging the District Court's decision to review Barbour's constitutional claims. But a proper application of the

law to this case's extraordinary facts—including exonerating, undisputed DNA evidence—makes plain that Barbour satisfies *Schlup*. The State's alternative argument that, regardless of innocence, *Schlup* cannot excuse procedural default here, easily fails. Even if Barbour defaulted his claims after a state remedy became available as the State asserts (he did not), *Schlup* applies to any currently procedurally-barred claim.

The State's challenges on the merits are similarly unavailing. Due Process imposes core, non-delegable duties on prosecutors to ensure jurors are not misled and to disclose favorable evidence to the defense. Here, the record is clear: the State secured Barbour's conviction and sentence only by breaching these duties. Prosecutors violated *Napue* by presenting and capitalizing on a confession they knew to be materially false based on pretrial DNA testing. The prosecution also violated *Brady* by suppressing bench notes that could have further discredited Barbour's confession (and the State's case).

Because these violations undermine confidence in Barbour's conviction and sentence, the District Court correctly granted relief. And while this Court should affirm on either of those bases alone, the ineffective assistance of Barbour's trial counsel—who were wholly unprepared to use the pretrial DNA evidence, thus leaving important evidence of the falsity of Barbour's confession undisclosed to jurors—provides a compelling alternative ground for relief.

## III.  ARGUMENT

### A.  Merits Review Was Proper

#### 1.  Barbour Easily Satisfies *Schlup*

The State predominantly challenges the District Court's threshold determination that Barbour's evidence of innocence satisfies *Schlup*'s miscarriage-of-justice exception, excusing procedural barriers to merits review. This challenge fails because the State (i) misapprehends the *Schlup* standard, and (ii) significantly underplays the "truly extraordinary" evidentiary showing here, including DNA evidence showing Barbour's confession was false and other persuasive evidence of innocence that, *inter alia*, identifies a third-party perpetrator.

##### a.  The State mischaracterizes *Schlup*

The State misstates the *Schlup* standard two-fold. First, the State wrongly asserts that *Schlup* requires Barbour to show that "no reasonable juror" presented with the new evidence would convict. State Br. 2, 31. In so doing, it seeks to impose a heavier burden than *Schlup*'s "more likely than not" inquiry. 513 U.S. at 327 (a petitioner must show it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt"); *see also House*, 547 U.S. at 538 (a *Schlup* petitioner is not required to establish innocence with "absolute certainty").

Second, the State fundamentally misconstrues *Schlup* by ignoring that the inquiry's touchstone is the prosecution's trial case. *Schlup* requires district courts to "assess the probative force of the newly presented evidence in connection with ***the***

25

***evidence of guilt adduced at trial***." 513 U.S. at 332 (emphasis added). Applying this standard in *House*, the Supreme Court used the prosecution's trial theory as the baseline from which to assess the impact of the new evidence. 547 U.S. at 540 (rejecting government's "insist[ence] this new [DNA] evidence [wa]s immaterial" because it had "introduced the [now-discredited semen] evidence and relied on it in the final guilt-phase closing argument"); *see also Munchinski v. Wilson*, 694 F.3d 308, 335-37 (3d Cir. 2012) ("[The new evidence] . . . shows that the murders *could not* have happened as the Commonwealth proposed at trial."). Accordingly, because Barbour's new evidence "more likely than not" creates reasonable doubt in the case presented to the jury, the gateway is satisfied.

## b. Barbour's case is "truly extraordinary"

Barbour's new DNA evidence is dispositive, and additional, powerful evidence of innocence corroborates it.

### i. Exculpating DNA evidence

As the District Court found, Barbour presented "objective, reliable, and undisputed" DNA evidence conclusively excluding him and his co-defendant as the semen source ***and*** inculpating a much more plausible suspect who has no connection to Barbour. A35_101-02; *supra* at 17-18. *Schlup* identified "exculpatory scientific evidence" of this type as "reliable evidence" that satisfies the actual-innocence standard. 513 U.S. at 324; *Lund v. United States*, 913 F.3d 665, 667 (7th Cir. 2019)

("The actual innocence exception certainly applies where the petitioner has new evidence, like DNA evidence."). As the District Court correctly observed, because "DNA evidence is sufficient for many juries to convict beyond a reasonable doubt," it necessarily is "also sufficient to create reasonable doubt." A35_90. The probative force of Barbour's DNA evidence decisively creates more than reasonable doubt about the prosecutors' trial case. It proves Barbour's confession (their only evidence against him) false. Based on this evidence alone, a reasonable juror more than likely would not convict Barbour.

The DNA evidence discredits the prosecution's trial case that Hester raped Mrs. Roberts just before the murder. *Supra* at 10-11; A35_99-100. Barbour and Hester's undisputed DNA exclusion and the identification of Jackson, an unrelated third-party, demonstrates that Mrs. Roberts's rape and murder could not have occurred as trial prosecutors urged. A35_24, 79; *see also Floyd v. Vannoy*, 894 F.3d 143, 157 (5th Cir. 2018) (*Schlup* satisfied where forensic evidence "further excludes [petitioner] from the [] scene, invalidates his confession, and links a [new] third party to that scene"); *House*, 547 U.S. at 541 ("When the only direct evidence of sexual assault drops out of the case, so, too, does a central theme in the State's narrative linking House to the crime.").[11]

_____

[11] Because the DNA identifies Jackson, the State cannot seriously contend that this evidence is "cumulative" of anything available at trial, State Br. 34. *See* A35_80.

*Schlup* does not permit consideration of unsubstantiated post-trial theories to rationalize new, reliable evidence of innocence. *Supra* at 25-26. But even if it did, the State's various theories attempting to explain away Jackson's DNA do nothing to undermine the strength of Barbour's innocence showing. The District Court rejected the State's previous theory that Jackson (then 16) and the victim (a 40-year-old churchgoing, married mother) were consensually intimate. A35_62, 84-88 (explaining the victim's children's testimony, science, and "common sense" cut against this theory).

The State now advances a new baseless post-hoc explanation for Jackson's DNA: Jackson participated in the rape and murder, but Barbour (and Hester, apparently) were too scared to name him. State Br. 30. Far from "obvious," *id.*, the record, which the State ignores, directly contravenes this theory. Under oath, Jackson denied ever meeting or knowing Barbour. SuppA3_121_10:19-22; A35_90 n.51 (rejecting a prior version of the State's acting-in-concert theory because it lacks "competent evidence," is "inconsistent with the prosecution's theory at trial and Barbour's confessions," and is "undermine[d] . . . [by] Jackson's testimony"); *accord Williams v. Brown*, 208 F. Supp. 3d 713, 738 (E.D. Va. 2016) (rejecting the government's acting-in-concert scenarios as "at best doubtful"); *Watkins v. Miller*, 92 F. Supp. 2d 824, 839-40 (S.D. Ind. 2000) (rejecting the government's attempt to "abandon[] the foundation of . . . [its] case").

No record evidence reconciles the prosecution's trial case with the objective crime-scene evidence. And, as Barbour urged it would for more than two decades, the DNA evidence "unravels [his] confessions"—"the foundation upon which his conviction rests." A35_100-01. Simply put, "Jackson's involvement is inconsistent with Barbour's confession." A35_79. Thus, by excluding Hester (and Barbour) and identifying Jackson, DNA exposes Barbour's inculpating statements—the only trial evidence implicating him—as false. As the District Court aptly put it, "unlike people, 'DNA doesn't lie.'" A35_102.

The State next attempts to discount the DNA evidence in two unavailing ways. It first mischaracterizes the DNA evidence as undermining "only part of [Barbour's] confession—his identification of Ms. Roberts's rapist." State Br. 26. This flouts *Schlup*'s requirement to consider the new evidence in the context of what the jury heard. *See supra* at 25-26. "Mrs. Roberts' murder was prosecuted on the theory that her rape and murder occurred contemporaneously." A35_23. The prosecution used the confession, and ***only*** the confession, to place Barbour (and Hester) at the scene and to prove his participation in the rape and murder. Moreover, it defies common sense to treat a rapist's identity in a rape-murder case as anything less than highly probative. The State cannot now credibly disaggregate the rape and the murder to pretend the DNA does not wholesale discredit the confession.

Second, the State tries, unavailingly, to downplay the DNA evidence as merely "impeachment." State Br. 31, 33-34. While the DNA undisputably impeaches the credibility of Barbour's statements, it also exculpates him by identifying a third party as the true culprit. *Martin v. State*, 839 So. 2d 665, 675 (Ala. Crim. App. 2001) (exculpatory evidence "bear[s] on the identity of the perpetrator"). Beyond that, impeachment evidence ***can*** be dispositive, "mak[ing] the difference between conviction and acquittal," *United States v. Bagley*, 473 U.S. 667, 676 (1985), when "the credibility of the witness," here Barbour, "may be determinative of a criminal defendant's guilt or innocence," *Nicks v. State*, 783 So. 2d 895, 915 (Ala. Crim. App. 1999) (citation omitted). *Accord Napue v. Illinois*, 360 U.S. 264, 269 (1959).[12]

The State also attempts to sidestep the DNA evidence altogether by falsely claiming the District Court disturbed state court factfinding without applying a presumption of correctness under § 2254(e)(1). *See* State Br. 28-29, 39-40. The State argues that the ACCA made factual findings that Barbour's confessions were not coerced and insists "the district court's *Schlup* determination of actual innocence is

_____

[12] The State's reliance on *Rozzelle v. Secretary*, 672 F.3d 1000 (11th Cir. 2012), where the petitioner "d[id] not even claim that he is actually innocent," *id.* at 1012, and *Stimpson v. Warden*, No. 22-10190, 2025 WL 484049 (11th Cir. Feb. 13, 2025), is misplaced. In each case, the newly proffered evidence constituted solely impeachment and was merely duplicative of what jurors already heard—neither is true here.

really a roundabout determination that Barbour's confession was coerced and involuntary." *Id.* at 39. But, as the District Court explained, the State wrongly conflates coercion with falsity. False confessions may not "be 'involuntary' within the meaning of [the] exclusionary rule," *Smith v. United States*, 348 U.S. 147, 153 (1954), so whether a confession is false is a legally and factually distinct inquiry from whether a confession is voluntary.

Here, the District Court unequivocally explained that it "need not, and [did] not, disturb the state trial court's factual findings [regarding coercion] to determine whether Barbour has presented sufficient evidence to meet the *Schlup* standard," because "even if it is unrebutted that Barbour's confessions were not coerced by law enforcement, they nonetheless could still be false." A35_97.

The State also appears to make a half-hearted argument that the ACCA actually made factual findings about DNA evidence and the falsity of Barbour's confession; it asserts that the District Court should have deferred to the ACCA's rejection of Barbour's request for DNA testing on the ground "that further DNA testing 'would not establish that [Barbour's] confessions were unreliable' or that he is innocent." State Br. 29 (citing ACCA's ruling). As a threshold matter, the State forfeited this point by not presenting it below. *See Serendipity at Sea, LLC v. Underwriters at Lloyd's of London*, 56 F.4th 1280, 1287 (11th Cir. 2023).

In any event, because the ACCA "summarily denied without a hearing" Barbour's motion for DNA testing, it did not, and could not have, made any "findings of fact requiring deference" under § 2254(e)(1). *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003); *cf. Tanzi v. Secretary*, 772 F.3d 644, 651 (11th Cir. 2014) (Section 2254(e)(1) applies only to state court factual determinations, not "mixed determinations of law and fact."). Rather, the ACCA concluded that Barbour's allegations about the rapist's identity had "no relevance" to guilt. A21_118. That is a legal, rather than factual, conclusion. *See United States v. Torniero*, 735 F.2d 275, 730 (2d Cir. 1984) ("Relevance is a question of law[.]"), *superseded by statute on other grounds*, 18 U.S.C. § 17. And the State correctly does not argue that the District Court was obligated to defer to any legal conclusions of the state courts as part of its *Schlup* analysis. *See Fontenot v. Crow*, 4 F.4th 982, 1034 (10th Cir. 2021) (Section 2254(d) deference "has no application to a gateway innocence assertion.").

Accordingly, the State cannot unsettle the uniquely powerful showing of innocence Barbour has made with new DNA evidence. His showing is even stronger than in *House*, where DNA was also of "central importance," 547 U.S. at 540, and *Schlup* was satisfied notwithstanding open questions about other forensic links to the crime, *id.* at 553-54. In Barbour's case, no lingering question, nor any other potentially inculpating evidence, remains. While Barbour presents other innocence

evidence, as detailed *infra*, to satisfy *Schlup*, the exculpating DNA evidence alone more than likely creates reasonable doubt about his guilt. *Schlup*, 513 U.S. at 327.

### ii. Ample corroboration of innocence

Contrary to *Schlup*'s instruction to consider "all the evidence," 513 U.S. at 328 (citation omitted), the State solely addresses the new DNA, entirely overlooking the additional evidence of Barbour's innocence detailed in the District Court's opinion. A35_99-103.

### 1. *Third-party suspect*

Objective evidence implicating a third party is persuasive in the *Schlup* context. *House*, 547 U.S. at 548-53 (weighing the "troubling" evidence of the victim's husband's guilt and "opportunity to commit the crime"); *Munchinski*, 694 F.3d at 338 (relying on alternative-suspect evidence because, "[i]n *House*, the Supreme Court spent a large portion of its analysis on evidence that implicated another suspect").

In addition to Jackson's identification as the semen source, the District Court correctly credited additional and reliable new evidence—largely from Mrs. Roberts's family—implicating Jackson. *Supra* at 21-22; A35_99-100. Jackson, currently serving a life sentence for another woman's murder, was near the crime scene, behaving suspiciously on the night of Mrs. Roberts's murder. A35_99-100. When deposed, Jackson repeatedly invoked his right against self-incrimination with

respect to *_every_* question about Mrs. Roberts.[13] A35_64. Yet Jackson unequivocally testified that he and Barbour did not know each other, foreclosing the State's theory that they acted in concert. *Id.*

The District Court rightly concluded that this "other evidence inculpating Jackson . . . further bolsters the significance of Jackson's DNA alone being found inside Mrs. Roberts because it is additional evidence that someone else—Jackson—may have committed the crimes of which Barbour was convicted." A35_101. A reasonable juror presented with this third-party perpetrator evidence, especially where the DNA has eviscerated the confession's reliability, and in the absence of any reliable evidence linking Barbour to the crime, would more than likely not convict Barbour. *Schlup*, 513 U.S. at 327.

---

[13] Given *Schlup*'s instruction to consider "all the evidence" regardless of admissibility, 513 U.S. at 328 (citation omitted), the Court can draw from these invocations an adverse inference of guilt against Jackson and in Barbour's favor. *Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300, 1310-11 (11th Cir. 2014) (considering "four non-exclusive factors"—including, as relevant here, the non-party witness's role in the case and alignment of interests with a party—to decide, "on a case-by-case basis," "whether the adverse inference is trustworthy under all of the circumstances" (citations omitted)). Here, "[t]he chance is remote that [Jackson] would have invoked the Fifth Amendment if he neither knew of nor participated in [Mrs. Roberts's murder] because doing so increased his own exposure to criminal prosecution." *Id.* at 1311.

## 2. *Other evidence discrediting the confession*

Additional evidence in the record, "old and new," *House*, 547 U.S. at 538, further establishes that Barbour's confession was false.

Numerous discrepancies between Barbour's statements and the crime scene, catalogued *supra* at 7-8, "further undermine[] . . . evidence of Barbour's guilt, especially his confessions." A35_101. Far from "minutiae," State Br. 28, these discrepancies concern essential facts that, as the District Court concluded, "would likely cause reasonable jurors to view Barbour's confession even more skeptically." A35_93. The State unconvincingly alleges a "degree" of corroboration between the confession and the crime, State Br. 28-29, but the undisputed, glaring inconsistency as to who raped Mrs. Roberts narrows that degree to well within reasonable doubt.

Other significant discrepancies between Hester's plea and Barbour's confession—different participants, motive, and conduct within the home, *supra* at 14—plus the fact that charges against the alleged third perpetrator, Mitchell, were dropped, also "would likely raise additional questions about the reliability of Barbour's confession in the minds of reasonable jurors." A35_94; *G.E.G. v. State*, 54 So. 3d 949, 955-56 (Ala. 2010) ("a factual basis for the plea 'is to ensure the accuracy of the plea'" (citation omitted)). The State's attempt to portray Hester's

plea as "[i]nculpatory," State Br. 31, likewise ignores that this argument is incompatible with the new DNA results (and Barbour's confession).[14]

### iii. Barbour's *Schlup* showing exceeds others

The State fails to identify a single case wherein a court has denied review based on a remotely comparable *Schlup* showing of innocence—DNA or otherwise.[15] This is unsurprising. There is no case where a court refused to vacate a rape-in-the-course-of-murder conviction after DNA identified semen from someone unconnected to the defendant and co-defendant, __*with*__ a CODIS hit to a convicted felon who has a record for rape and murder.

As discussed *supra*, DNA is widely recognized as uniquely powerful proof in the actual-innocence context. And here, the DNA evidence is dispositive. It eviscerates the prosecution's theory and sole inculpating evidence, leaving no

---

[14] The State's lengthy critique of Leo's credibility, State Br. 36-38, is wholly beside the point. While the District Court credited his testimony on false confessions, *Owens v. Wainright*, 698 F.2d 1111, 1113 (11th Cir. 1983) (witness-credibility determinations are entitled to significant deference), it did not rely on it in finding *Schlup* satisfied, A35_95, 98.

[15] The State's reliance on *Scarlett v. Secretary*, 404 F. App'x 394 (11th Cir. 2010), is misplaced because the DNA results did __*not*__ exclude that petitioner. *Id.* at 403. Its attempt to distinguish *Godschalk v. Montgomery County District Attorney's Office*, 177 F. Supp. 2d 366 (E.D. Pa. 2001), likewise misses the mark because, like Barbour, Godschalk had confessed twice but DNA testing ultimately proved those inculpating statements false. *See also In re Payne*, 129 A.3d 546, 565 (Pa. Super. Ct. 2015).

reliable evidence of Barbour's guilt. *See supra* at 32-33 (noting the *Schlup* showing here is even stronger than *House* for this reason).

Accordingly, as the District Court correctly noted, A35_102, Barbour's actual-innocence showing is equally, if not more, compelling as other *Schlup* grants. *E.g.*, *Fontenot*, 4 F.4th at 1051–55 (*Schlup* satisfied where petitioner, who had falsely confessed, tendered evidence including alibi and identification affidavits, but not exculpating DNA); *see also* A33_127-28 (citing courts of appeals decisions finding *Schlup* satisfied without exculpatory DNA evidence).

\* \* \*

While the DNA evidence alone—and especially in conjunction with the corroborating postconviction record of Barbour's innocence and a more plausible suspect's guilt—surely satisfies *Schlup*, it also constitutes a "truly persuasive demonstration of 'actual innocence,'" as would be required for a freestanding innocence claim contemplated by *Herrera v. Collins*, 506 U.S. 390, 417 (1993). The District Court determined this claim to be moot because it granted relief on other grounds, A37_155, but if any case could meet *Herrera*'s "extraordinarily high . . . threshold," 506 U.S. at 417, it is precisely this one.

### 2. *Schlup* Excuses Any Procedural Default

To distract from this "extraordinary case" of innocence, *Schlup*, 513 U.S. at 321, the State attempts to avoid a *Schlup* inquiry altogether. While acknowledging

*Schlup* "unlock[s] federal review" of procedurally-defaulted claims where a miscarriage of justice would otherwise result, State Br. 20, the State argues that *Schlup* would allow the miscarriage of justice here. In its view, because Barbour did not return to state court yet again in 2022 after DNA testing inculpated Jackson, a new procedural default occurred, which *Schlup* cannot overcome.

That novel theory is clearly wrong. *Schlup* is available in all cases where the failure to consider a procedurally-defaulted claim would result in a miscarriage of justice. And, in any event, there was no new procedural default here because there was no available state court remedy in 2022.

### a.    *Schlup* **applies to all procedural defaults**

The law is clear: *Schlup* applies to "***any*** constitutional claim that ***would otherwise be defaulted*** because the petitioner failed to raise that claim in state court." *In re Davis*, 565 F.3d 810, 813 n.1 (11th Cir. 2009) (emphases added). Procedural default asks not when or how many times a state remedy was available, but simply if the petitioner's claims "are ***now*** procedurally barred under [state] law." *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) (emphasis added) (citation omitted). There is thus no difference between the procedural bar the State asserts—not filing a new evidence of innocence claim within the "six-month limitations period" applicable to Alabama Rule of Criminal Procedure 32.1(e), *Brown v. Hooks*, 176 F. App'x 949, 954-55 (11th Cir. 2006) (citing *Henderson v. Campbell*, 353 F.3d 880, 891 (11th Cir.

2003))—and any other state procedural rule foreclosing relief. For *Schlup*'s purposes, all that matters is whether the petitioner "may obtain review of his [defaulted] claims" by showing that "he falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" *Schlup*, 513 U.S. at 315 (citation omitted).

The State does not cite a single case to the contrary. It refers generally to AEDPA's amendments to habeas law, State Br. 23, but the Supreme Court has already explained that AEDPA does not displace *Schlup* with respect to "the type of petition at issue here[:] a first federal habeas petition seeking consideration of defaulted claims based on a showing of actual innocence." *House*, 547 U.S. at 539. And *Schlup* accommodates AEDPA's goals. Recognizing that comity and federalism interests must, in rare cases, "yield to the imperative of correcting a fundamentally unjust incarceration," *Schlup* articulated a miscarriage-of-justice standard that "properly strikes" the balance between those interests and "the individual interest in justice that arises in the extraordinary case." 513 U.S. at 320-21, 324 (citation omitted). *Schlup*'s high bar thus ensures that "tenable actual-innocence gateway pleas [remain] rare," *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013), guarding against the "abuse[s] [of] AEDPA" the State warns of, State Br. 23.

Moreover, contrary to the State's assertion, Barbour did not intentionally circumvent state-court factfinding with respect to the new DNA evidence. As explained *infra*, he specifically presented his innocence allegations to the state courts

and asked for DNA testing. The state courts, however, agreed with the State that such evidence would be irrelevant and denied his request.

While the State attempts to cast the District Court's decision as an "expansion of *Schlup*," State Br. 23, it is ***the State*** that asks this Court to upset *Schlup*'s careful balance between comity and justice and defy settled precedent.

> **b.    Barbour was neither required, nor able, to return to state court**

The State's argument fails for a second reason: its central premise—that after receiving DNA results in 2022, Barbour could or should have pursued Rule 32.1(e) relief in state court—is wrong.

The State's suggestion that Barbour could have used "the new DNA testing" to raise "his new *Brady* and *Napue* claims," State Br. 21, is clearly incorrect, as those claims do not rely on the new DNA testing. The *Napue* claim is based on the trial record, and the *Brady* claim is based on test strips that were not disclosed until after the DNA testing that, according to the State, should have prompted Barbour to again return to state court. Nor could Barbour have sought to assert those other claims by using Rule 32.1(e) as a procedural gateway; unlike *Schlup*, Rule 32.1(e) does not create such a gateway but instead allows petitioners to raise certain "stand-alone claim[s] of newly discovered evidence." *Ward v. State*, 382 So. 3d 574, 579 (Ala. Crim. App. 2020).

In arguing that the "new DNA testing" required Barbour to return to state court, the State refers not to Barbour's *Brady* or *Napue* claims, but to a position statement that Barbour filed after receiving the DNA results, State Br. 21, in which Barbour explained that the DNA testing exonerated him and satisfied the *Schlup* standard to excuse any untimeliness or default, A26_158-61. The State thus suggests that, after the new DNA results were revealed, Barbour should have again returned to state court to exhaust his *Schlup* argument.

The State did not make any such argument then. *See* A26_57-71; SuppA2_122-27 (State's position on next steps in light of DNA testing). With good reason. *Schlup* proceedings "do[] not pose any occasion for applying the exhaustion doctrine" because whether a petitioner meets the miscarriage-of-justice gateway is "a question of federal law" that does not require "deciding an independent and unexhausted constitutional claim on the merits." *Murray v. Carrier*, 477 U.S. 478, 489 (1986) (discussing the analogous context of the cause-and-prejudice exception to procedural default). For this reason, federal courts granting review through the *Schlup* gateway have assessed the strength of the evidence developed in federal court regardless of whether that evidence could have been presented in state court pursuant

to a separate state procedural rule. *See, e.g.*, *House*, 547 U.S. at 540-54; *Wolfe v. Johnson*, 940 F. Supp. 2d 280, 287 (E.D. Va. 2010).[16]

Moreover, even if Barbour had been required to exhaust his *Schlup* innocence argument in state court, he already did. In 2001, Barbour asked the District Court to stay proceedings so he could return to state court to assert innocence. SuppA1_109. The State objected, arguing that Barbour's assertions could not satisfy the Rule 32.1(e) standard, and there was no state remedy available. SuppA1_114-16. The District Court stayed the case so Barbour could press for state court review. *See* SuppA1_120-21.

As the State recognizes, Barbour did precisely that. He argued in state court that DNA testing "would 'show beyond doubt that neither he nor [Christopher Hester] sexually assaulted the victim.'" State Br. 9 (quoting Barbour's Montgomery Circuit Court pleadings); *see also* A20_59-76 (raising same argument in ACCA); A22_108-24 (same in Alabama Supreme Court). But, adopting the State's arguments, the state courts held that there was no state court remedy available. The ACCA concluded that DNA testing "would have no relevance" to Barbour's innocence, and

_____

[16] When petitioners discovered the innocence evidence in those cases, state court remedies akin to Rule 32.1(e) existed. *See* Tenn. Code § 40-30-102(b)(2); Va. Code § 19.2-327.11.

was instead an attempt "to circumvent the procedural bar[s]" prohibiting review of his coerced confession claim. A21_118.

By repeatedly arguing that Barbour had no available remedy in state court, *supra* at 16, the State "expressly waive[d]" any contention that Barbour had to exhaust his innocence argument in state court. 28 U.S.C. § 2254(b)(3). Over the State's objection, Barbour nevertheless exhausted that argument by fairly presenting "the substance of" it to the state courts. *Vasquez v. Hillery*, 474 U.S. 254, 258 (1986).

The only thing that has changed since then is that DNA testing revealed exactly what Barbour told the state court it would: "a third person unknown to" him and Hester raped Mrs. Roberts. A14_150. Exhaustion does not "require prisoners to file repetitive petitions" that only confirm specific allegations already presented to (and rejected by) the state court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999). The State's contrary arguments would require *Schlup* proceedings to stop and start whenever petitioners develop new evidence supporting their innocence assertions, even when the state courts already deemed those assertions irrelevant. That, of course, is not the law. *See Vasquez*, 474 U.S. at 260 (returning to state court for further exhaustion is required only when new facts "fundamentally alter the legal claim already considered by the state courts"); *see id.* at 257-58.

The State's argument also fails because exhaustion is only required when there is a state "remed[y] available." 28 U.S.C. § 2254(b)(1)(A). Because Alabama

courts already "rejected the very argument" Barbour would have raised in 2022, no such remedy existed. *Fisher v. Univ. of Tex. at Austin*, 169 F.3d 295, 303 (5th Cir. 1999). The state courts' conclusion that any DNA testing—***regardless of the results***—would be irrelevant to Barbour's innocence foreclosed any argument of DNA-based innocence in state court. Had Barbour asserted such an argument, the State surely would have opposed it—not just on these grounds, but also, given its repeated characterization of the DNA evidence as "impeachment," State Br. 29, 31, 33, on Rule 32.1(e)'s requirement that new evidence not "merely amount to impeachment evidence," Ala. R. Crim. P. 32.1(e)(3).

Accordingly, the State's procedural default argument is a red herring that is foreclosed by settled precedent and the present record.

### 3. Cause and Prejudice Also Applies

Although *Schlup* is dispositive with respect to all claims, as the District Court correctly held, Barbour's *Brady* claim satisfies cause and prejudice because those requirements "parallel two of the three components of" a *Brady* violation— suppression and materiality—that Barbour has established. A37_121 (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999)); *infra* at 54-65. The State failed to address this exception below, and therefore forfeited any opposition to it on appeal. *See Serendipity at Sea*, 56 F.4th at 1287. Even so, the State now disputes the District Court's finding based on unsubstantiated allegations that Barbour could have

discovered the bench notes before their 2022 disclosure. State Br. 40 n.3. But Barbour did seek this discovery. *Supra* at 10. And regardless, this argument contravenes Supreme Court precedent rejecting "the notion that defendants must scavenge for hints of undisclosed *Brady* material," which defeats any dispute as to *Brady* suppression and, in turn, satisfies the "[c]orresponding" cause requirement to overcome procedural default. *Banks v. Dretke*, 540 U.S. 668, 691, 695 (2004).

## B. *Napue & Brady* Relief Should Be Affirmed

### 1. Section 2254(e)(2) Poses No Bar in This Case

The State contends the District Court erred by considering *Schlup* evidence in adjudicating Barbour's claims.[17] This argument could apply, in theory, only to Barbour's *Brady* claim (no other claim is premised on such evidence). Yet even as to *Brady*, this argument fails.

The State faults the District Court for not determining whether Barbour "could clear the bar in § 2254(e)(2) for expanding the state court record," *Shoop v. Twyford*,

---

[17] The State incorrectly implies the District Court ordered discovery and an evidentiary hearing on Barbour's merits claims. The discovery and hearing specifically pertained to Barbour's actual innocence. A26_179-80; *accord* SuppA3_12 (clarifying that the Court "allowed discovery on Barbour's actual innocence claim and not any underlying constitutional claim"); A27_77-79. However, so long as § 2254(e)(2) is satisfied (or, as here, inapplicable), courts can consider such evidence when evaluating the merits of a petitioner's claims. *See House v. Bell*, No. 3:96-CV-883, 2007 WL 4568444, at *2 (E.D. Tenn. Dec. 20, 2007) (on remand from Supreme Court's decision finding *Schlup* gateway satisfied, considering claims "based upon evidence that was developed at the evidentiary hearing on the actual innocence claim").

596 U.S. 811, 823 (2022), because Barbour "never argued . . . that the bar was somehow inapplicable," State Br. 41 (quoting *Twyford*, 596 U.S. at 823). But that is ***precisely*** what Barbour argued. A36_20-21, 48-49.

As Barbour explained below, § 2254(e)(2)'s new-evidence limitations only apply where the petitioner "failed to develop the factual basis of a claim in State court[.]" In other words, § 2254(e)(2) is triggered by "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). Recognizing that "a petitioner cannot be 'at fault' for failing to develop a claim in state court where 'the prosecution concealed the facts,'" A37_96 (quoting *Williams*, 529 U.S. at 432), the District Court agreed that it could "consider the evidence [Barbour] presented during the *Schlup* proceedings" in assessing his *Brady* claim, A37_100, 103. This was correct; the prosecution's undisputed 30-year "conceal[ment]" of the 1992 Report, *see infra* at 53-58, renders § 2254(e)(2) inapplicable as to Barbour's *Brady* claim.

### 2.    The State Violated *Napue*

Pursuant to *Napue v. Illinois*, the prosecution violates Due Process when it "knowingly use[s] false evidence . . . to obtain a tainted conviction." 360 U.S. at 269. The District Court correctly determined that *Napue* requires relief here, where the prosecution (i) "knew that [Barbour's confession] was false" because DNA evidence showed Hester was not the rapist, "yet repeatedly told the jury it was true," and

(ii) had it not done so, "there is a reasonable likelihood that the jury would have discredited Barbour's confession and would not have convicted him." A37_127-28.

Rather than engage with the District Court's well-reasoned analysis, the State attempts to evade responsibility for its "deliberate deception of a court and jurors." *Giglio v. United States*, 405 U.S. 150, 153 (1972). Those attempts cannot withstand scrutiny, and the State's skeletal remaining arguments as to the elements of *Napue* likewise fail.

### a.    Due Process imposes non-delegable duties on the State

The State rests almost entirely on its recurring contention, couched in varying terms each time, that the District Court's decision "ran afoul of this Court's well-established authority" precluding *Napue* relief where defense counsel was aware of the false evidence and failed to object. State Br. 50; *see also id.* at 51 (asking the Court to resolve "any lingering doubts about a *Napue* violation" in its favor because Barbour's counsel was aware of the 1992 Report showing Hester was not the rapist); *id.* at 51-52 (arguing fairness concerns are not present because same). But no matter how the State rephrases the argument, precedent forecloses it.

Indeed, the Supreme Court recently rejected the State's precise argument in *Glossip v. Oklahoma*, 604 U.S. 226 (2025), which concerned an appeal from the Oklahoma Court of Criminal Appeals ("OCCA"). The OCCA declined to find a *Napue* violation for the same reason the State now advances: "the defense 'was

aware or should have been aware [of the false testimony] at the time of trial,' and the prosecution could not have 'knowingly concealed' something the defense already knew." *Id.* at 630.

In reversing the OCCA, the Supreme Court squarely rejected this reasoning. "As an initial matter," the Court disagreed with the premise that defense counsel was aware of the false testimony. *Id.* "In any event," the Court held that the OCCA's focus on the defense's knowledge constituted "a mistaken interpretation of *Napue*" because Due Process "imposes 'the responsibility and duty to correct' false testimony on 'representatives of the State,' ***not on defense counsel***." *Id.* (quoting *Napue*, 360 U.S. at 269-70) (emphasis added). *Glossip* thus confirms that defense counsel's knowledge of the 1992 Report is irrelevant to *Napue*'s analysis, dooming the State's challenges on this score.

In arguing otherwise, the State ignores *Glossip*—relying instead on a selective handful of pre-*Glossip* Eleventh Circuit cases. Worse, the State's reliance on these cases misleads. That is, while this Circuit previously stated that *Napue* does not generally apply where the defense is aware of the false evidence, it recognized an express exception where, as here, the prosecution "not only adopt[s]" the false evidence, "but capitalize[s] on it." *DeMarco v. United States*, 928 F.2d 1074, 1076 (11th Cir. 1991); *see also United States v. Stein*, 846 F.3d 1135, 1147 (11th Cir. 2017).

Of course, because *Glossip* is "clearly on point" and "*clearly contrary*" to the Eleventh Circuit's prior case law placing a duty on defense counsel to object to false testimony, *Glossip* "undermine[d] [that] precedent to the point of abrogation." *Edwards v. U.S. Att'y Gen.*, 97 F.4th 725, 743 (11th Cir. 2024) (emphasis in original).[18] This Court's analysis can and should end there. But even putting *Glossip* aside, the State's position fails because the *DeMarco* carveout squarely applies here. Despite knowing that the 1992 Report showed that Barbour's confession, which identified Hester as the rapist, was false, *infra* at 50-51, the prosecution "affirmatively capitalize[d] on it," *Stein*, 846 F.3d at 1147, repeatedly urging the jury to believe the falsity, including the assertion that Hester raped Mrs. Roberts, as the true account of the crime, *supra* at 10-14.

###### b.    The State's challenge to *Napue* elements fails

Beside wrongly urging that defense counsel's awareness excuses the prosecution misleading the jury at trial, the State offers only a brief argument

---

[18] After being confronted with *Glossip*'s holding below, the State attempted to downgrade it to "dicta" because the Supreme Court reached it "[o]nly after rejecting the state court's decision on its facts." SuppA8_87. But, even if the Supreme Court's "initial" rejection of the OCCA's factual premise makes its holding about the prosecution's non-delegable duty an alternative ground for its decision, *Glossip*, 604 U.S. at 252, "additional or alternative holdings are not dicta, but instead are as binding as solitary holdings." *Bravo v. United States*, 532 F.3d 1154, 1162 (11th Cir. 2008); *see also Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949).

regarding *Napue*'s elements—knowing presentation of false evidence and materiality.

As to the former, the State contends that it "could have believed Barbour's confession, despite the existence of potentially conflicting DNA test results." State Br. 50. But the 1992 Report is not just "potentially conflicting" with the confession, *id.*—the two are irreconcilable.

While a *Napue* violation does not "require[] an evidentiary record free of doubt," *Glossip*, 604 U.S. at 256, this record establishes that even before trial, the prosecution was aware that Barbour's statements naming Hester as the rapist were irreconcilable with the evidence.[19] The 1992 Report stated that, whereas Hester's DQalpha type was "2,4," "the source of the semen on the vaginal swabs is either HLA-DQ-alpha type (4), (3,4), (1.2,4) or (1.1,4)." SuppA5_5. That mismatch provided "strong reason to believe" Hester was not "the source of the semen." SuppA5_6. In other words, as the trial prosecutors learned from their own expert, because Hester "contains a two characteristic which is absolutely lacking in the vaginal swabs," it was "highly unlikely he could have been a contributor to that

_____

[19] The State's own arguments also demonstrate its recognition of the 1992 Report's significance. State Br. 44-45 (arguing that because Barbour's trial counsel had access to the 1992 Report, they "knew or had reason to know that Barbour was allegedly mistaken or lying or misremembering when he told investigators that Hester raped Mrs. Roberts," and "had everything [they] needed" to "undermine the confession.")

semen." A5_165:14-20. Accordingly, as the State conceded below, "DNA testing performed before trial determined that Hester was not a contributor to the sample collected from Roberts's body." SuppA8_26, ¶ 44. *See also* SuppA3_71:5-13 (Gunter confirming Hester "[was] not implicated" by forensic evidence a year before Barbour's trial).

And as the District Court correctly concluded, any attempt to reconcile the Report with Barbour's claim that Hester raped Mrs. Roberts (while he and Mitchell helped) "defie[s] logic and common sense." A37_127. Therefore, "[t]he straightforward inference is that [the prosecution] was aware before trial that" DNA excluded Hester as the semen source, and that Barbour's statements identifying Hester as the rapist were thus false. *Glossip*, 604 U.S. at 628. Nevertheless, the prosecution played the demonstrably false confession for the jurors and repeatedly urged them to accept it—including the statement implicating Hester as the rapist—as the true account of the crime.

The State also disputes that it knowingly presented false evidence because "the prosecution was entitled to cite the defendant's own statements." State Br. 51. But given the risk of "false confessions" long recognized by "courts, the police, and the medical profession," *Smith*, 348 U.S. at 154, a prosecutor cannot simply assume a defendant's inculpatory statements are true in the face of contrary, reliable evidence. The fact that the statements came from Barbour thus has no bearing on

falsity or the prosecution's duty to correct. Rather, "[a] lie is a lie, no matter what its subject"—or, for that matter, its source—"and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth." *Napue*, 360 U.S. at 269-70 (citation omitted). Moreover, the State did not just "***cite***" the coerced confession. State Br. 51 (emphasis added). It based the entire prosecution theory on it, repeatedly urging jurors to accept it as true. That the prosecution did not just introduce false evidence, "but argued it as a relevant matter for the jury to consider . . . merit[s] reversal." *United States v. Sanfilippo*, 564 F.2d 176, 179 (5th Cir. 1977).

That leaves materiality. The District Court properly concluded that, "had the jury heard that it could not be true that Hester raped Mrs. Roberts, as Barbour stated in his confession, there is a reasonable likelihood jurors would have discredited Barbour's confession and would not have convicted him." A37_127-28. Indeed, where, as here, the prosecution's misconduct relates to "the only evidence presented to support [the petitioner's] guilt"—here, Barbour's statements—courts routinely find materiality satisfied. *Floyd*, 894 F.3d at 166-67 (finding suppression of evidence impeaching petitioner's incriminating statements material under *Brady*'s higher standard where such statements "were the only evidence presented to support his guilt"); *see Smith v. Cain*, 565 U.S. 73, 76 (2012) (same, where suppressed evidence

impeached eyewitness testimony, "the *only* evidence linking [the petitioner] to the crime").

The State did not dispute materiality in the District Court, A37_128, and therefore cannot dispute materiality now, *Serendipity at Sea*, 56 F.4th at 1287. Even if it could, its one-sentence materiality argument—contending that Barbour "cannot prove materiality" because his trial counsel did not utilize the 1992 Report, State Br. 52—fails as yet another run at using defense counsel's knowledge of the false evidence to evade the prosecution's obligations. Try as it might, the State cannot escape the Supreme Court's edict that the prosecution, not the defense, bears "the responsibility and duty to correct false testimony." *Glossip*, 604 U.S. at 630 (quoting *Napue*, 360 U.S. at 269-70). The State violated that duty by capitalizing on false evidence to "obtain [Barbour's] tainted conviction." *Napue*, 360 U.S. at 269.

### 3.    The State Violated *Brady*

In April 2022, the State first disclosed bench notes underlying pretrial DNA testing. The bench notes established that, contrary to the 1992 Report, pretrial DQalpha testing of the semen excluded Barbour, and confirmed Hester's exclusion.

Recognizing "'the special role played by the American prosecutor in the search for truth in criminal trials,'" *United States v. Deblasi*, No. 22-10020, 2024 WL 4212693, at *9 (11th Cir. Sept. 17, 2024) (Lagoa, J., concurring) (citation omitted), *Brady v. Maryland* announced that "the suppression by the prosecution of

evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." 373 U.S. 83, 87 (1963). To establish a *Brady* violation, a petitioner must show the evidence was suppressed, favorable, and material. *Strickler*, 527 U.S. at 281-82.

Without disputing favorability, the State contends suppression cannot be attributed to the prosecution and that the evidence, despite its indisputably favorable nature, is not material. Both arguments lack merit.

### a.    ADFS imputation was proper

The failure to disclose exculpating bench notes violates *Brady* because the prosecution has a duty to discover and disclose favorable evidence "known to others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995). *Brady* thus imputes possession of evidence "by a district's prosecution team, which includes both investigative and prosecutorial personnel," to the prosecution. *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989) (quotation marks and citation omitted).

There is "no per se rule to determine whether information possessed by one government entity should be imputed to another." *Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002). Accordingly, this Circuit undertakes "a case-by-case analysis of the extent of interaction and cooperation between the two governments," imputing

knowledge where there is "extensive cooperation." *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979).

Consistent with this precedent, the District Court analyzed "the government entity's role in [this] particular case," and, based on "[t]he specific facts," including those testified to at the *Schlup* hearing, found that "ADFS was a part of the prosecution team in this case." A37_115. The State disregards these findings, which warrant deference. *Stano v. Butterworth*, 51 F.3d 942, 946 (11th Cir. 1995) (applying clear-error standard in this context).

As the District Court correctly found—and the record makes crystal clear— ADFS played an "extensive investigatory role" for the prosecution, including: (i) testing numerous items at their behest; (ii) sending final reports "directly to law enforcement officers assisting with the prosecution—not to the defense;" and (iii) having, per Carmichael, "extensive talks" about test results that directly shaped the prosecution's investigative trajectory. A37_114-15; SuppA5_3; SuppA1_50. ADFS also "provided significant assistance to the State's prosecution of Barbour at trial," and "solely . . . the prosecution," by consulting with them about testing and

having analysts testify as state witnesses. A37_114-15; SuppA8_81; SuppA6_90:23-91:25.[20]

This Circuit's precedent forecloses the State's attempts to evade the District Court's fact-bound determination that "ADFS was a part of the prosecution team in this case." A37_115. The State points to its experts' testimony that ADFS is, "as a general matter," "an independent state agency" with its own procedures and guidelines. State Br. 48-49; *but see* A36_54 n.14 (ADFS's authorizing legislation provides the Attorney General with authority to appoint its director). However, how ADFS labels itself, or its typical procedures, is immaterial to the "case-by-case analysis" required here. *Antone*, 603 F.2d at 570. That analysis reveals that ADFS worked steadfastly with and for the prosecution. A37_114-15.

The State also misreads *Moon*, arguing that the favorable bench notes fell outside prosecutors' disclosure obligations because they "lacked any authority over [their] creation or production." State Br. 47-48.[21] *Moon* rejected the type of narrow, brightline rule focused on one factual inquiry (authority to direct conduct) the State

---

[20] ADFS's conduct during federal habeas proceedings, including conducting testing for the State without apprising Barbour, similarly demonstrates its continuing extensive and exclusive cooperation with the State. *Supra* at 18.

[21] This argument squarely conflicts with precedent requiring the prosecution "'to learn of any favorable evidence known to others acting on the government's behalf,' . . . ***whether or not the prosecutor knew of the existence of the evidence***." *Parker v. Allen*, 565 F.3d 1258, 1277 (11th Cir. 2009) (quoting *Kyles*, 514 U.S. at 437) (emphasis added).

sets forth here. Instead, *Moon* evaluates "the extent of interaction and cooperation between the two governments" in investigating and prosecuting a defendant. 285 F.3d at 1309-10 (further noting in its imputation analysis that the entities "shared no resources or labor," "did not work together to investigate the . . . murders," and the investigator "could have refused to share any information with the Georgia prosecutor").

Thus, when an entity "extensive[ly]" cooperates with the prosecution—through, for instance, testing, consultation, and trial preparation, as occurred here—its knowledge is properly imputed to the prosecution. *Compare Antone*, 603 F.2d at 569-70 (imputing knowledge given the entities' "extensive cooperation," including "pool[ing] their investigative energies to a considerable extent"); *Hays v. Alabama*, 85 F.3d 1492, 1497 n.2 (11th Cir. 1996) (affirming imputation "based on the level of cooperation between the state prosecution and the FBI"), *with United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011) (no imputation because the entities "conduct[ed] a separate investigation" and "d[id] not collaborate extensively").[22]

---

[22] *See also McCormick v. Parker*, 821 F.3d 1240, 1247 (10th Cir. 2016) (nurse who examined the victim for law enforcement and testified is member of prosecution team); *Harridge v. State*, 534 S.E.2d 113, 116 (Ga. Ct. App. 2000) (crime lab, which "was fully involved in the investigation," including testing evidentiary samples, is member of prosecution team), *overruled on other grounds*, *Jackson v. State*, 800 S.E.2d 356 (Ga. 2017); *see also Horn v. Stephenson*, 11 F.4th 163, 173 (2d Cir. 2021) (forensic examiner, who "worked closely with the police and the prosecutor," is member of prosecution team).

Because ADFS extensively cooperated in Barbour's investigation and prosecution, knowledge of the suppressed bench notes is properly imputed to the prosecution.

Nevertheless, even if *Moon* focused solely on whether the prosecution had authority over the other entity (*Moon* does not), the record is clear that the prosecution in this case ***had*** authority to direct ADFS's conduct. In fact, the District Court found that "ADFS worked at the direction of the prosecution here." A37_107, 114-15. It conducted DNA testing at the prosecution team's request, and one ADFS analyst who worked on this case testified that the prosecution controlled whether ADFS could share material with the defense. SuppA2_211_45:8-19 (Mary Holt: "[It was] up to the DA as to when [the requested material] is shared [with the defense]."); SuppA2_211_48:7-10 (if contacted by the defense, "we would have notified the district attorney because we don't want to do anything that would harm the prosecution of a criminal case"). Imputation is thus proper here.

**b.    The District Court correctly determined materiality**

Suppressed, favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. The State's case against Barbour rose or fell on the confession, and the prosecution repeatedly emphasized it to jurors. *Supra* at 10-11; A37_62, 119 ("The only direct evidence of guilt presented at Barbour's trial was his confession.").

The suppressed bench notes conclusively discredit that confession. They establish that Barbour is not the source of the semen collected at the crime scene and provide even more definitive evidence that Hester, too, is excluded. A28_34:6-9 (Keel: after review of the DQalpha test strips, "we definitively know that Mr. Barbour and Mr. Hester and Mr. Roberts are all absolutely eliminated as potential semen donors."); A28_162:2-11 (Harmor: same conclusion). Barbour's exclusion is significant because, as the District Court aptly explained, it not only "undermine[d] Barbour's claim that Hester raped Mrs. Roberts," but "eliminate[d] any inference that he lied about the identity of the rapist to conceal the fact that *he* committed the rape." A37_119.

Showing that both Barbour and Hester were excluded would have been especially significant because a prosecution witness had told jurors the scientific evidence had been tested against both Barbour and Hester, but jurors never learned the results of that testing. *Supra* at 13-14. Barbour could have presented this exculpatory scientific evidence to the jury to undermine the prosecution's case against him, or adopted a different trial strategy, such as a markedly stronger third-party defense. A37_116-17; *Guzman v. Secretary*, 663 F.3d 1336, 1353 (11th Cir. 2011) (courts must consider "the strategies, tactics, and defenses that the defense could have developed and presented" had the evidence been disclosed).

Because materiality "must be evaluated in the context of the entire record," *Davis v. Sellers*, 940 F.3d 1175, 1192 (11th Cir. 2019), "withheld evidence is more likely material when the State presents a weaker case for guilt," *Floyd*, 894 F.3d at 167. The prosecution's case against Barbour was weak, resting on a confession without corroboration. A3_11 (Sentencing judge: "The [e]vidence in this case was circumstantial, and the prosecution's case rested on Barbour's two voluntary confessions."). And while a petitioner seeking relief under *Brady* need not undermine all inculpatory evidence to prove materiality, *Kyles*, 514 U.S. at 434-35, it is notable that Barbour's case was without ***any*** inculpatory evidence other than the discredited confession.

Barbour's case is analogous to *Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018), which, too, involved a petitioner who was convicted based solely on his false confession. The Fifth Circuit concluded that the suppression of favorable forensic evidence—which, as in Barbour's case, "supported [petitioner's] third-party-guilt defense," undermined his confessions, and "'would have had some value in countering' . . . the State's theory"—was material because it "significantly impact[ed] the only evidence supporting [petitioner's] guilt (his incriminating statements, including, most especially, his confession)." *Id.* at 163, 166 (citation omitted). Here, as in *Floyd*, the suppressed bench notes are material because they

"significantly impact the only evidence supporting [Barbour's] guilt"—his false confession. *Id.* at 166.

The State's dispute with Barbour's experts on whether the bench notes excluded Barbour and Hester misunderstands materiality. State Br. 14-15, 45-46. Materiality asks whether suppression of the evidence "undermine[s] confidence in the verdict." *Kyles*, 514 U.S. at 435. Even under the State's view, disclosure of the bench notes likely would have precipitated a "battle of the experts," creating a reasonable probability that jurors would have doubted the confession's veracity and reached a different outcome. A37_120; *Gary v. Hall*, 558 F.3d 1229, 1257 (11th Cir. 2009) (considering "the cumulative impact of the suppressed evidence . . . and the expert testimony its disclosure may have engendered"); *Phillips v. Valentine*, 826 F. App'x 447, 449 (6th Cir. 2020) (suppressed x-ray of the victim's skull was material because disclosure could have produced "a 'battle of the experts,'" an outcome "different enough from what actually happened" to "undermine[] confidence in the outcome of the trial" (citation omitted)).[23]

---

[23] Barbour's experts were, in any event, more persuasive. He presented two experts with substantial experience conducting DQalpha testing, who independently concluded that any qualified analyst in 1992 would have excluded Barbour and Hester, and that ADFS erred in failing to consider dot intensity in the testing process. *Supra* at 19-20. The State's expert could not undermine their testimony. He had little to no experience conducting DQalpha testing, and although he did not work at ADFS in 1992, he unconvincingly defended its testing process by claiming ADFS applied

Next, the State's argument that "the non-disclosure of the bench notes did not alter . . . Barbour's ability at trial to factually impeach the credibility of his confession," as evidenced by Barbour's trial counsel's failure to exploit the 1992 Report, rests on two faulty premises. State Br. 44. First, the State views materiality through the lens of what "Barbour's trial counsel would have done with the information contained in the bench notes," *id.*, rather than whether disclosure "to ***competent*** counsel would have made a different result reasonably probable," *Kyles*, 514 U.S. at 441 (emphasis added).

Because "[t]he prosecution's case was built around Barbour's confession, and the prosecutors repeatedly emphasized it to the jury," A37_117, competent counsel would have sought to discredit it, including by retaining an expert had the bench notes been disclosed. And, as two highly experienced experts explained below, "any qualified DNA analyst in 1992" reviewing the bench notes would have conclusively excluded both Barbour and Hester as the semen source, allowing counsel to also develop a markedly stronger third-party defense. A27_44 (Harmor); *see also* SuppA5_10-11 (Keel). With the rapist's identity disproved, competent counsel could have shown jurors that, especially alongside the many other inconsistencies

_____

an exception for ignoring dot intensity that is not mentioned in ADFS's (or the test manufacturer's) manual. *See id.*

between the confession and crime scene, there were powerful reasons to doubt the State's case.[24]

The second faulty premise is that Barbour already had "everything he needed" to impeach his confession without the bench notes because the 1992 Report excluded Hester. State Br. 44-45. This overlooks the salient fact that the bench notes also excluded Barbour as the semen source—a fact of which counsel had no evidence at trial. In fact, at the time of trial, both the Report and Huys's in-chambers testimony pointed out that Barbour was a potential semen source. SuppA5_5; A5_166:1-4, 168:10-12. With the benefit of the notes, Barbour could have convincingly demonstrated to the jury, with objective, scientific substantiation, that the State's sole piece of biological evidence (the semen) contradicted the only evidence against him at trial (his confession) and the State's theory of the case, without any attendant

_____

[24] The State unsuccessfully attempts to characterize the District Court's well-supported materiality determination as "speculative." State Br. 46. But, as the State recognizes, "*Brady* materiality often requires a difficult counterfactual analysis of how the undisclosed evidence would have affected the trial." *Id*. at 44. That is precisely what the District Court did here. For this same reason, the State's assertion that the District Court's materiality inquiry should have been confined to the trial record, *id.* at 42, is wrong. *Brady* evidence is necessarily not part of the trial record. And because the evidence was suppressed, the impact its disclosure would have had on the trial is often not evident from the trial record. *E.g.*, *Wearry v. Cain*, 577 U.S. 385, 390 (2016) (per curiam) (materiality inquiry informed by expert testimony about suppressed medical records). Accordingly, the District Court properly relied on post-trial evidence, including regarding how experts would have testified "in 1992," A37_109, 116, to determine how competent counsel would have used the *Brady* material at trial.

risk of inferences that he was shifting culpability for the rape. A37_116-17. His inability to do this plainly "undermine[s] confidence in the verdict." *Kyles*, 514 U.S. at 435.

The State lastly argues that granting relief here would expand *Brady* to require prosecutors to have "the foresight and scientific acumen to think that *their expert was mistaken*." State Br. 46. This is wrong. *Brady* frames the duty to disclose through the character of the evidence, not the prosecutor. *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988) ("good or bad faith of the State [is] irrelevant"). Therefore, the issue is not whether an expert is mistaken or the prosecution believes he is mistaken, but whether underlying facts are favorable and material, and thus the prosecution team's failure to disclose them constitutes a *Brady* violation. *E.g.*, *Kyles*, 514 U.S. at 438-39 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

\* \* \*

Because the *Napue* and *Brady* violations each satisfy materiality when considered individually, the Court's materiality inquiry should end there. However, should the Court conclude otherwise, it must then evaluate the two violations' cumulative effect. The Supreme Court recently explained in *Glossip*, after finding a *Napue* violation, that a "prejudice analysis requires a 'cumulative evaluation' of all

the evidence." 604 U.S. at 251 (citation omitted). Therefore, "additional conduct by the prosecution," including disclosure of information "not previously turned over to the defense," "reinforce[d]" its conclusion that "the *Napue* error . . . prejudiced the defense." *Id.* at 250-51. For that reason, the District Court rightly concluded, as an alternative holding, that "the cumulative effect of the *Napue* and *Brady* violations" further "establish constitutional infirmity in [Barbour's] trial." A37_128-29; *Kyles*, 514 U.S. at 440.

### C.     Alternative Ground for Relief

An appellee "may 'urge in support of a decree any matter appearing in the record.'" *Jennings v. Stephens*, 574 U.S. 271, 276 (2015) (citation omitted). Barbour's ineffective assistance of counsel claim—which the District Court erroneously denied—provides a compelling additional basis for supporting habeas relief.

### 1.     Ineffective Assistance of Counsel

The Sixth Amendment guarantees criminal defendants an attorney who "plays the role necessary to ensure that the trial is fair," and who provides defendants "ample opportunity to meet the case of the prosecution." *Strickland v. Washington*, 466 U.S. 668, 685 (1984). Here, in the State's words, "all [counsel] had to do to undermine [Barbour's] confession was introduce the [1992] [R]eport into evidence or cross-examine Huys." State Br. 44-45. Instead, counsel did "*absolutely nothing*"

with the Report, and the jury therefore never learned that the prosecution's entire theory of the case was discredited by its own scientific evidence. *Id.* at 44 (emphasis in original). This failure constitutes ineffective assistance of counsel.

"One of the primary duties defense counsel owes to his client is the duty to prepare himself adequately prior to trial." *Magill v. Dugger*, 824 F.2d 879, 886 (11th Cir. 1987). Here, the trial record makes clear that counsel was completely unprepared to capitalize upon the contents of the 1992 Report.[25]

On the second day of trial, Huys was called by the prosecution to introduce the 1992 Report, which recognized that Hester was likely not the source of semen found inside the victim's body. A5_149. Partway through his testimony, the court conducted an *in-camera* conference to discuss the nature and admissibility of his findings. A5_160. During that conference, the prosecutor asked Huys to explain "what your results were," and said it would be easier to follow if Huys explained while the attorneys looked at his report. A5_164:3-6. Huys responded, "[a]ll right. Has everybody got a copy of this[?]" A5_164:7-8. While Barbour's counsel did not dispute the Report had been produced, he indicated he did not have a copy with him

---

[25] Below, the State argued that facts relevant to this claim were not developed during Rule 32 proceedings. A36_137. But when, as here, deficient performance is clear from the face of the trial record, no further postconviction factual development is necessary. *See, e.g.*, *Buck v. Davis*, 580 U.S. 100, 121-22 (2017) (finding ineffective assistance based on the trial record alone); *Higgins v. Renico*, 470 F.3d 624, 632-33 (6th Cir. 2006) (same).

and then revealed that he had never read the Report, stating, "and I wouldn't have known what it was if I looked at it." A5_164:8-13.

Huys then explained it was "highly unlikely" that Hester could have been the semen source, A5_165:19-20, alerting trial counsel to this fact for the first time. But trial counsel never presented this fact to the jury. Instead, after the *in-camera* conference, the prosecution announced that it had no further questions, and trial counsel stated that they too had "no questions." A5_172:5-8. Thus, the jury never learned that the 1992 Report undermined Barbour's confession. They instead knew that scientific testing had been done on the semen—a point that had been established through multiple prosecution witnesses and highlighted in the prosecution's opening statement—and that it had been compared to both Hester and Barbour, but that defense counsel objected when the prosecution sought to present testimony about the results of that testing. *Supra* at 11-13.

Because of counsel's failure to prepare and elicit favorable testimony from Huys, "evidence which was critical to the determination of [Barbour's] guilt or innocence" was "never disclosed to the jury." *Smith v. Wainwright*, 799 F.2d 1442, 1443-44 (11th Cir. 1986) (per curiam). This constitutes deficient performance under *Strickland*. *See id.* Moreover, because counsel failed to present "[a]vailable evidence" to undermine the prosecution's theory on "the central issue in the case," there is "a

reasonable probability that . . . the result would have been different" had counsel performed adequately, thereby satisfying *Strickland* prejudice. *Id.*

In reaching a contrary conclusion, the District Court made multiple errors. First, it asserted that, because trial counsel did some meaningful work prior to trial, they were not ineffective. A37_139-41. This analysis overlooks the fact that defense counsel—who sought excusal for insufficient compensation—did not present a single witness in the guilt phase of this capital case, but in any event is wrong because ineffective assistance can be established "by even an isolated error of counsel if that error is sufficiently egregious and prejudicial." *Murray*, 477 U.S. at 496.

Second, the District Court speculated that counsel could have made a "strategic" decision not to cross-examine Huys because his testimony could confuse the jury or worse suggest that if Hester was not the rapist, then Barbour was. A37_142-43. But even if the decision was strategic, "strategic" decisions may still be unreasonable in the absence of preparation. *See Wiggins v. Smith*, 539 U.S. 510, 521, 522, 526-27 (2003). Counsel's decision here, strategic or not, was not supported by adequate preparation because counsel failed to read the 1992 Report before trial and therefore was unable to make an "informed choice among possible defenses." *Id.* at 525. Had counsel done so, they could have prepared a straightforward cross-examination that would have shown how Huys's testing undermined Barbour's

confession, as the State itself emphasizes in its brief to this Court. State Br. 44-45; *see Driscoll v. Delo*, 71 F.3d 701, 707-09 (8th Cir. 1995) (finding ineffective assistance under similar circumstances).

The District Court sought to minimize counsel's admission that he had not read the 1992 Report by highlighting quotes from counsel implying he understood it. A37_141-42. All of these quotes, however, are from after the start of the *in-camera* conference and thus further establish that counsel only learned about the Report's contents as the conference progressed. A37_160-71.

Even beyond this lack of preparation, counsel performs deficiently by failing to elicit "[a]vailable evidence" through cross-examination that would discredit the prosecution's theory on a central issue in the case. *Smith*, 799 F.2d at 1444; *see also Higgins*, 470 F.3d at 633-34 (citing multiple cases). That is precisely what happened here.

Finally, the District Court's speculation that counsel may have feared that eliciting testimony excluding Hester could cause the jury to infer that Barbour himself was the rapist is inconsistent with the principle that, absent contrary evidence of a decisionmaker's idiosyncrasies, jurors are presumed to act

"reasonably"—in other words, believing the case as presented to them (that Hester was the rapist)—and to follow the law. *Strickland*, 466 U.S. at 695.[26]

What the 1992 Report does show—without the need for speculation—is that the State's own scientific evidence undermined Barbour's confession. Counsel not only failed to elicit this fact, but they raised no objection when the prosecution, in closing, urged jurors to accept the truth of Barbour's statements. A6_40:5-17; *see Smith*, 799 F.2d at 1444 (emphasizing how inadequate representation in failing to cross-examine allowed the prosecution to capitalize on the unimpeached evidence in closing).

The jury thus convicted Barbour believing his confession was reliable. Had counsel prepared enough to deploy the 1992 Report, that belief would have been upended by scientific evidence that discredited the confession. There is therefore "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Smith*,

---

[26] In opposition to the *Brady* claim, the State argues that the bench notes' exclusion of Barbour is immaterial because the 1992 Report already showed Hester was likely excluded and therefore Barbour had "everything he needed" at trial to put on a third-party defense. State Br. 44. That is wrong because any third-party defense would surely have been much stronger with evidence showing that Barbour, too, was excluded. *See supra* at 59, 62. While the State is correct that Barbour had a lesser third-party defense available to him at trial via the 1992 Report, counsel's lack of preparation and lack of reasonable judgment prevented them from taking advantage of that defense.

799 F.2d at 1444 (relief for failure to impeach key prosecution witness). This claim

provides an alternative ground for relief.

## CONCLUSION

This Court should affirm the District Court's carefully considered grant of

habeas relief.

Respectfully submitted,

*/s/George H. Kendall*
George H. Kendall
Carine M. Williams
Nicola Cohen
Alexandra Daniels
SQUIRE PATTON BOGGS (US) LLP
1120 Avenue of the Americas, 13th Floor
New York, NY 10036
(212) 872-9800
George.Kendall@squirepb.com
Carine.Williams@squirepb.com
Nicola.Cohen@squirepb.com
Ally.Daniels@squirepb.com

Miriam Gohara
CRIMINAL JUSTICE ADVOCACY
CLINIC
127 Wall Street
New Haven, CT 06511
(203) 436-9167
Miriam.Gohara@ylsclinics.org

Daniel Loehr
CUNY SCHOOL OF LAW
2 Court Square West
Queens, NY 11101
daniel.loehr@law.cuny.edu
*Admitted Pro Hac Vice*

Samuel Spital
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
SSpital@naacpldf.org

Santino Coleman
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND
700 14th Street, Suite 600
Washington, D.C. 20005
(202) 682-1300
SColeman@naacpldf.org

*Counsel for Petitioner-Appellee*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word limit contemplated by Fed. R. App. P. 32(e) and this Court's February 13, 2026 Order granting Appellee's motion to file an oversized brief of no more than 16,000 words. This motion contains 15,927 words, including all headings, footnotes, and quotations, and excluding the parts of the motion exempted under Fed. R. App. P. 32(f).

This motion also complies with the typeface requirements outlined by Fed. R. App. P. 32(a)(5) and the type-style requirements outlined by Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

*/s/ George H. Kendall*
George H. Kendall

*Counsel for Petitioner-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will provide notification of such filing to the following CM/ECF participants: Polly Kenny, Robert M. Overing, and Brenton Thompson.


*/s/ George H. Kendall*
George H. Kendall

*Counsel for Petitioner-Appellee*