IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 25-13065-P

CHRISTOPHER BARBOUR,

*Petitioner-Appellee,*

v.

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,

*Respondent-Appellant.*

BRIEF OF AMICUS CURIAE THE INNOCENCE PROJECT
SUPPORTING APPELLEE CHRISTOPHER BARBOUR

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA NORTHERN DIVISION

Peter J. Neufeld
Lauren Gottesman
Matthew A. Wasserman
The Innocent Project
40 Worth Street, Suite 701
New York, New York 10013
Telephone: 212.364.5392
Pneufeld@innocenceproject.org
Lgottesman@innocenceproject.org
Mwasserman@innocenceproject.com

Elliot H. Scherker
Brigid F. Cech Samole
Katherine M. Clemente
Esteban Cardona
Greenberg Traurig, P.A.
333 S.E. Second Avenue, Suite 4400
Miami, Florida 33131
Telephone: 305.579.0500
scherkere@gtlaw.com
Brigid.CechSamole@gtlaw.com
Katherine.Clemente@gtlaw.com
Esteban.Cardona@gtlaw.com
miamiappellateservice@gtlaw.com

*Counsel for Amicus Curiae The Innocence Project*

### CHRISTOPHER BARBOUR V. COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS
CASE NO. 25-13065-P

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Amicus Curiae, The Innocence Project, submits this list, which includes the trial judge, and all attorneys, persons associations of persons, firms, partnerships or corporations that have an interest in the outcome of this review[1]:

1.    Ahmed, Zawar, The Innocence Project, Amicus Curiae in support of Mr. Barbour;

2.    Akselrod, Olga, NAACP Legal Defense & Educational Fund, former counsel for Mr. Barbour in the federal habeas proceedings;

3.    Allen, Richard, former Commissioner of the Alabama Department of Corrections;

4.    Ball, Cameron, Assistant Attorney General in the federal habeas proceedings;

5.    Barbour, Christoper, petitioner in federal habeas proceedings;

6.    Barnett, Vernon, Commissioner of the Alabama Department of Revenue, former counsel with the Alabama Department of Corrections;

7.    Bertsch, Tatiana, Equal Justice Initiative, counsel for Lola Roberts, William Roberts, and Lakeisha Hall;

8.    Brasher, Andrew L., Eleventh Circuit Judge, former Alabama Solicitor General and Deputy Solicitor General during the pendency of Mr. Barbour's federal habeas proceedings;

---

[1] The Circuit Judge who presided over Christopher Barbour's trial and initial postconviction proceedings, the Honorable William Gordon, is deceased. Likewise, former District Attorney Albert Sim Butler, who was the District Attorney for the Fifteenth District of Alabama when the case was initially at the district attorney's office, is deceased.

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT *(CTD.)***

9.  Brooks, Ellen, former district attorney for the Fifteenth Judicial Circuit at trial, on direct appeal, and in postconviction proceedings;

10. Campbell, Donald, former Commissioner of the Alabama Department of Corrections;

11. Cardona Leon, Esteban, Greenberg Traurig, counsel for The Innocence Project, Amicus Curiae in support of Mr. Barbour;

12. Cech Samole, Brigid, Greenberg Traurig, counsel for The Innocence Project, Amicus Curiae in support of Mr. Barbour;

13. Clark, David Richard, former Assistant Attorney General;

14. Clemente, Katherine M., Greenberg Traurig, counsel for The Innocence Project, Amicus Curiae in support of Mr. Barbour;

15. Cohen, Nicola, Squire Patton Boggs, counsel for Mr. Barbour in the federal habeas proceedings;

16. Coleman, Santino, NAACP Legal Defense & Education Fund, counsel for Mr. Barbour in the federal habeas proceedings;

17. Crenshaw, Clay, Chief Deputy Attorney General, former Assistant Attorney General during state postconviction and federal habeas proceedings;

18. Daniel, Laurie Webb, Holland & Knight LLP, counsel for Mr. Barbour in federal civil suit;

19. Daniel, Tracy, former Assistant Attorney General in direct appeal proceedings;

20. Daniels, Alexandra, Squire Patton Boggs, counsel for Mr. Barbour in the federal habeas proceedings;

21. Dunn, Jefferson, former Commissioner of the Alabama Department of Corrections;

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT *(CTD.)*

22.    Espy, Joseph C., former counsel in Mr. Barbour's first postconviction Rule 32 proceedings;

23.    Evans, James H., former Attorney General of Alabama;

24.    Fabricant, M. Christopher, The Innocence Project, Amicus Curiae in support of Mr. Barbour;

25.    Forrester, Nathan A., former Deputy Attorney General;

26.    Gohara, Miriam, Yale Law School, counsel representing Mr. Barbour during successive state postconviction and federal habeas proceedings;

27.    Gottesman, Lauren, The Innocence Project, Amicus Curiae in support of Mr. Barbour;

28.    Gunter, William, former Assistant District Attorney that assisted in prosecuting Mr. Barbour;

29.    Haley, Michael, former Commissioner of the Alabama Department of Corrections;

30.    Hanlon, Stephen, Holland & Knight LLP, counsel for Mr. Barbour in federal civil suite;

31.    Heard, Clifford, former trial counsel for Mr. Barbour;

32.    Houts, James, Assistant Attorney General, counsel for the State of Alabama in the successive postconviction proceedings;

33.    Johnson, Henry M., Assistant Attorney General in the federal habeas proceedings;

34.    Jones, Charlie E., former Commissioner of the Alabama Department of Corrections;

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT *(CTD.)*

35.   Jordan, Audrey, former Assistant Attorney General in the federal habeas proceedings;

36.   Kendall, George H., Squire Patton Boggs, counsel representing Mr. Barbour during successive state postconviction and federal habeas proceedings;

37.   Kenny, Polly, S., Assistant Attorney General in the federal habeas proceedings;

38.   King, Troy, former Attorney General of Alabama;

39.   Lee, Jin Hee, NAACP Legal Defense & Educational Fund, counsel for Mr. Barbour in the federal habeas proceedings;

40.   Loehr, Daniel Briggs, CUNY School of Law, counsel for Mr. Barbour in the federal habeas proceedings;

41.   Marks, Emily C., United States District Judge for the Middle District of Alabama, presiding over federal habeas proceedings;

42.   Marshall, Steve, Alabama Attorney General;

43.   McCooey, Tracy, circuit judge during postconviction Rule 32 proceedings;

44.   McNeill Randall, prosecutor at Mr. Barbour's trial;

45.   Neufeld, Peter J., The Innocent Project, filed amicus brief in federal habeas proceedings;

46.   Newsome, Kevin C., Eleventh Circuit Judge, former Solicitor General of the Alabama Attorney General's Office;

47.   Nunnelley, Michael, former Assistant Attorney General in the federal habeas proceedings;

48.   Nurse-Guilford, Jenay Aretha, Squire Patton Boggs, former counsel for Mr. Barbour in the federal habeas proceedings;

## CERTIFICATE OF INTERESTED PERSONS AND
## <u>CORPORATE DISCLOSURE STATEMENT</u> *(CTD.)*

49. Overing, Robert M., Deputy Solicitor General in federal appellate proceedings;

50. Pool, Jimmy, former Montgomery County Circuit Judge, former counsel for co-defendant Cristopher Hester;

51. Pryor, William H., Eleventh Circuit Judge, former Attorney General;

52. Roberts, Lola, daughter of victim Mrs. Thelma Roberts;

53. Roberts, Melvin, husband of the victim Mrs. Thelma Roberts;

54. Roberts, William, son of the victim Mrs. Thelma Roberts;

55. Scherker, Elliot H., Greenberg Traurig, counsel for The Innocence Project, Amicus Curiae in support of Mr. Barbour;

56. Setzer, Angela, Equal Justice Initiative, counsel for Mr. Barbour in federal civil suit;

57. Shaw, Theodore Michael, NAACP Legal Defense & Educational Fund, former counsel for Mr. Barbourin the federal habeas proceedings;

58. Stevenson, Bryan A., Equal Justice Initiative, counsel for Mr. Barbour in federal civil suit;

59. Taylor, Jon Carlton, District Court-appointed counsel for Jerry Tyrone Jackson;

60. Taylor, Jon Carlton, District Court-appointed counsel for Jerry Tyrone Jackson;

61. Thomas, Holly, NAACP Legal Defense & Educational Fund, former counsel for Mr. Barbour in the federal habeas proceedings;

62. Thomas, Kim, former Commissioner of the Alabama Department of Corrections;

63. Thompson, Brenton, Assistant Attorney General in federal appellate proceedings;

**CERTIFICATE OF INTERESTED PERSONS AND**
**CORPORATE DISCLOSURE STATEMENT** *(CTD.)*

64. Thompson, Myron H., former United States District Court Judge for the Middle District of Alabama in the habeas proceedings;

65. Walker, Susan R., retired United Stated Magistrate Judge for the Middle District of Alabama in the habeas proceedings;

66. Wasserman, Matthew A., The Innocence Project, Amicus Curiae in support of Mr. Barbour;

67. Watkins, William Keith, former Chief United States District Judge in the Middle District of Alabama in the habeas proceedings;

68. Williams, Carine M., Squire Patton Boggs, counsel for Mr. Barbour in the federal habeas proceedings;

69. Williams, Gilda, former Assistant Attorney General in direct appeal proceedings;

70. Wu, Victorien, NAACP Legal Defense & Educational Fund, former counsel for Mr. Barbour in the federal habeas proceedings.

**CERTIFICATE OF INTERESTED PERSONS AND**
**CORPORATE DISCLOSURE STATEMENT *(CTD.)***
**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Amicus Curiae, the Innocence Project, makes the following statement as to corporate ownership:

Amicus Curiae, the Innocence Project, hereby discloses that no publicly held corporation owns 10% or more of its stock.

/s/ Elliot H. Scherker

# TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .................................................................... C-1

TABLE OF CITATIONS ................................................................................... ii

IDENTITY AND INTEREST OF AMICUS CURIAE ................................................ 1

INTRODUCTION ................................................................................................ 3

ARGUMENT .................................................................................................... 7

I. The rise of DNA evidence has revealed the prevalence of false confessions—and their role in wrongful convictions. ................................................................................ 7

II. Decades of scientific research on false confessions support Barbour's innocence and the district court's findings below. ................................................................. 12

    A.    *Certain police interrogation tactics, like those used against Barbour, place innocent people—especially innocent young people—at risk of falsely confessing.* ................ 12

    B.    *False facts, inconsistencies, and contamination are all indicia of false confession.* ...... 20

CONCLUSION ................................................................................................. 27

CERTIFICATE OF COMPLIANCE ......................................................................... 28

CERTIFICATE OF SERVICE ............................................................................... 28

# TABLE OF CITATIONS

## Cases

*Aleman v. Village of Hanover Park,*
    662 F. 3d 897 (7th Cir. 2011) ...................................................... 17

*Corley v. United States,*
    556 U.S. 303 (2009) ...................................................................... 18

*District Attorney's Office for Third Judicial Dist. v. Osborne,*
    557 U.S. 52 (2009) .......................................................................... 7

*McCloud v. State,*
    208 So. 3d 668 (Fla. 2016) ......................................................... 14

*Miranda v. Arizona,*
    384 U.S. 436 ................................................................................... 18

*State v. Perea,*
    322 P.3d 624 (Utah 2013) .......................................................... 14

*Tekoh v. Cnty. of Los Angeles,*
    75 F. 4th 1264 (9th Cir. 2023) .................................................. 14

*Tigue v. Commonwealth,*
    600 S.W.3d 140 (Ky. 2018) ........................................................ 14

*United States v. Ansari,* No. 23-2703, 2024 WL 5231260 (9th Cir. Dec. 27,
    2024) ................................................................................................ 14

*United States v. Hall,*
    93 F .3d 1337, 1346 (7th Cir. 1996) ........................................ 14

*United States v. Rutledge,*
    900 F. 2d 1127 (7th Cir. 1990) ................................................. 17

*Williams v. Brown,*
    208 F. Supp. 3d 713 (E.D. Va. 2016) ...................................... 10

**Other Authorities**

Brandon L. Garrett, *Confession Contamination and DNA Exoneration Cases, 1989-2025*, https://convictingtheinnocent.com/wp-content/uploads/sites/7/2026/02/Garrett-False-Confessions-Appendix-2026.pdf (last visited Mar. 1, 2026) ........................................... 24

Brandon L. Garrett, *The Substance of False Confessions*, 62 Stanford L. Rev. 1051 (2010) ...................................................................................... 18, 21, 25

Catherine Insel et al., *White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys, and Policy Makers* 32 (2022), https://clbb.mgh.harvard.edu/white-paper-on-the-science-of-late-adolescence/ (last visited Mar. 1, 2026) ....................................... 19

Charles R. Honts, *The Innocent at Risk: The Dark Side of Certain Polygraph Practices*................................................................................................... 16

Daniel Kahneman, *Thinking, Fast and Slow* (2011) .................................... 9

DNA Exonerations Database, *Exoneree: Frank Sterling*, https://convictingtheinnocent.com/exoneree/frank-sterling/ ............................. 16

DNA Exonerations Database, https://convictingtheinnocent.com/ (last visited Mar. 2, 2026) .......................................................................... 5, 8

Exonerations, *Case List*, https://exonerationregistry.org/cases (last visited Feb. 25, 2026).................................................................................... 7

Fed. R. App. P. 29(a)(2) ............................................................................ 1

Gisli H. Gudjonsson, *The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions*, 12 Frontiers in Psych. 1 (2021) ......................... 25

Innocence Project, *Cases: Frank Sterling*, https://innocenceproject.org/cases/frank-sterling/ (last visited Mar. 2, 2026).................................................................................... 15

Innocence Project, *Cases: James Harden*, https://innocenceproject.org/cases/james-harden/ (last visited Mar. 2, 2026).................................................................................... 22, 23

# TABLE OF CITATIONS
## (Continued)

Page(s)

Innocence Project, *Our Impact: By the Numbers*,
https://innocenceproject.org/exonerations-data/ (last visited Mar. 2,
2026) ................................................................................................................ 1, 2

Itiel E. Dror, *Biased and Biasing: The Hidden Bias Cascade and Bias Snowball
Effects*, 15 Behav. Sci. 490 (2025) .................................................................. 9

Jeffrey Kaplan *et al.*, *Development of the Interview and Interrogation Assessment
Instrument*, 29(1) Psychol., Pub. Pol'y, & L. 46 (2022) ................................. 13

Jessica M. Salerno et al., *Failing to Express Emotion on 911 Calls Triggers
Suspicion Through Violating Expectations and Moral Typecasting,* 128 J. of
Personality & Soc. Psych., Attitudes and Soc. Cognition 4,781 (2025) .................. 24

Lisa Feldman Barrett, et al., *Emotional Expressions Reconsidered: Challenges to
Inferring Emotion from Human Facial Movements,* 20(1) Psych. Sci. and
Pub. Interest 1 (2019) ...................................................................................... 24

Nat'l Research Council, *The Polygraph and Lie Detection* 2 (2003) ..................................... 14

Priyanka Boghani, PBS, *Norfolk Four Pardoned 20 Years After False
Confessions*, https://www.pbs.org/wgbh/frontline/article/norfolk-
four-pardoned-20-years-after-false-confessions/ (Mar. 22, 2017) .......................... 11

Richard A. Leo et al., *Promoting Accuracy in the Use of Confession Evidence: An
Argument for Pretrial Reliability Assessments to Prevent Wrongful Convictions*,
85 Temple L. Rev. 759, 770 (2013) ................................................................. 26

Richard A. Leo, *Police Interrogations and American Justice* 217 (2008) .............................. 15

Robert Kolker, *Why Do People Confess to Crimes they Didn't Commit?*, New
York Magazine, Oct 1. 2010,
https://nymag.com/news/crimelaw/68715/ ..................................................... 15

Samuel Gross et al., *Government Misconduct and Convicting the Innocent: The
Role of Prosecutors, Police and Other Law Enforcement*, Nat'l Registry of
Exonerations 50 (2020),
https://repository.law.umich.edu/other/165/ last visited Mar. 1,
2026) ................................................................................................................ 18

iv

# TABLE OF CITATIONS
## (Continued)

Page(s)

Saul M. Kassin, *Duped: Why Innocent People Confess—and Why We Believe Their Confessions* 307 (2022) ................................................................ 8

Saul M. Kassin et al., *The Forensic Confirmation Bias: Problems, Perspectives, and Proposed Solutions*, 2 J. Applied Rsch. Mem. & Cognition 42 (2013) .................... 9

Saul M. Kassin et al., *Police-Induced Confessions, 2.0: Risk Factors and Recommendations*, 49 L. & Hum. Behav. 7 (2025) .................... 4, 13, 14, 15, 17, 19, 20

Saul M. Kassin et al. *Police-Induced Confessions: Risk Factors and Recommendations*, 34 L. & Hum. Behav. 3 (2010) ....................................... 12

Saul M. Kassin, *On the Psychology of Confessions: Does Innocence Put Innocents at Risk?*, 60 Am. Psych. 215 (2005) ..................................................... 8, 10, 11

Saul M Kassin, *Why Confessions Trump Innocence*, 67 Am. Psych. Assoc. 431 (2012) .................................................................................................. 8

Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 905 (2004) ....................................... 7

## IDENTITY AND INTEREST OF AMICUS CURIAE

The Innocence Project was founded in 1992 to use new DNA technology to test biological evidence in cases of disputed convictions. Since then, it has been dedicated to providing pro bono legal and investigative services to indigent prisoners whose actual innocence may be established through post-conviction evidence. Starting with its first client, Glenn Woodall, it has helped to free or exonerate 255 innocent people, who spent a total of 4,078 years in prison. Innocence Project, *Our Impact: By the Numbers*, https://innocenceproject.org/exonerations-data/ (last visited Mar. 2, 2026).[2]

The advent of DNA testing has provided scientific proof that wrongful convictions are not isolated or rare events. In addition to litigating individual innocence cases, the Innocence Project has long deconstructed the exonerations to identify the causes of these injustices and shared the data with research scientists. In particular, the Innocence Project's work with post-conviction DNA evidence has been central to uncovering the phenomenon and prevalence of false confessions. Hundreds of DNA exonerations have now proven that false confessions, once thought to be vanishingly

---

[2] Counsel for the Innocence Project authored the brief in whole. No party or person other than the Innocence Project and its counsel contributed money that was intended to fund the preparation or submission of this brief. In accordance with the Federal Rules of Appellate Procedure 29(a)(2), all parties have consented to the filing of this *amicus* brief.

rare, are in fact one of the leading causes of wrongful conviction, playing a role in nearly 30 percent of the wrongful convictions that the Innocence Project has exposed. *Id.*

Here, post-conviction DNA testing reveals that the Appellee's confession, the only direct evidence against him, is false and patently unreliable. Yet the State continues to defend a death sentence predicated on this confession. The Innocence Project's mission and expertise are thus central to the issues in this case.

# INTRODUCTION

Christopher Barbour was convicted of the rape and murder of Thelma Roberts based on his statements to the police, elicited after hours of police interrogation. Ultimately, Barbour confessed to stabbing Roberts, after he and Michael Mitchell[3] held her down while another man, Christopher Hester, raped her. Post-conviction DNA evidence, however, proves this confession is false. Hester and Barbour have now been definitively excluded from the semen recovered from inside the victim (and Hester was likely excluded at the time of trial, although the jury never heard this). Barbour's confession also omits or contradicts other crucial details from the crime scene: For example, he did not mention the bag placed over Roberts's head to suffocate her (which had been removed in the crime scene photographs he was apparently shown), and told the police Roberts had drunk beer with them when she did not have any alcohol in her system.

Indeed, in addition to the stark scientific evidence showing its falsity, Barbour's statements to the police bear all the hallmarks of a false confession. They are riddled with inaccuracies and contradicted by the crime scene evidence. There is evidence in the record that police fed him facts. Moreover, Barbour's statements came only after a lengthy interrogation, during which an officer used a coercive tactic known as the "false evidence ploy"—a tactic in which police present a suspect with false or exaggerated

---

[3] Shortly after Mitchell's arrest for his alleged role in Roberts's rape and murder, the prosecution dropped all charges against him. Barbour Br. at 9.

evidence of guilt. Here, officers told Barbour he failed a polygraph, as if this was scientific proof of guilt, when in fact the results did not, and could not have, conclusively determined his guilt—a tactic used in *20 percent* of the proven false confessions uncovered by post-conviction DNA testing.[4] Barbour, who was only twenty-two at the time, was at particular risk of falsely confessing in response to these interrogation tactics, given his age and that he had recently suffered significant trauma.

Most importantly, not only does the post-conviction DNA testing exclude both Hester and Barbour as the source of the semen recovered from inside Roberts's anal and vaginal cavities, it identifies the single source of all the recovered semen: the true perpetrator, Roberts's neighbor Tyrone Jackson. At the time that Roberts was vaginally and anally raped and murdered, she was forty; Jackson was sixteen. There is no evidence that there was a consensual relationship between the two. Prior to the attack on Roberts, Jackson had previously been charged with rape, and he is currently serving life in prison for stabbing to death another woman after she rebuffed his sexual advances. This woman, like Roberts, suffered a penetrating stab wound to her left chest. Before Roberts was killed, Jackson repeatedly told Roberts's son that he was "going to get" her, and on the night of this crime Jackson apologized to Robert's son, telling him over

---

[4] Rather than using the polygraph for its intended purpose—as an investigatory tool—it appears the officers here used Barbour's purported "failure" to pressure him into confessing. *See* Saul M. Kassin et al., *Police-Induced Confessions, 2.0: Risk Factors and Recommendations*, 49 L. & Hum. Behav. 7, 16 (2025) ("2025 Scientific Review Paper") (discussing the use of polygraphs "to pressure suspects" into confessions).

and over again "I'm sorry, I'm sorry," as he was shaking. Jackson also continually invoked the Fifth Amendment when questioned about this crime at a post-conviction deposition but testified that he "did not know and had never met Barbour." Barbour Br. at 22.

The State argues that the DNA merely contradicts the portion of Barbour's confession describing the rape but does not undermine the confession to murder. *See* State's Br. at 2. Yet *amicus* is aware of no appellate court that has accepted the strained and implausible argument that such DNA evidence only exonerates the innocent confessor of the rape, but not the murder. Of the 455 DNA exonerations of innocent men and women to date, 103 involved false confessions; fifty-two of these false-confession cases, like Barbour's, involved convictions for rape/murder. *See* DNA Exonerations Database, https://convictingtheinnocent.com/ (last visited Mar. 2, 2026). In almost every rape/murder exoneration, the exculpatory DNA evidence that exonerated the false confessor was the semen collected from the rape kit.

Moreover, in its thirty-five years researching and litigating wrongful conviction cases, *amicus* is not aware of a single case in the United States with comparable DNA evidence both demonstrating someone's innocence and identifying another man through the FBI's convicted offender database—who is neither the husband nor romantic partner of the victim—where courts did not vacate the conviction. Indeed, in most instances, prosecutors have agreed to vacate a conviction when confronted with comparable scientific evidence identifying another person as the true culprit. Alabama

is asking this Court to be the first and only court in the country to reinstate a conviction based on a confession proven to be false by incontrovertible DNA evidence.

**ARGUMENT**

**I.     The rise of DNA evidence has revealed the prevalence of false confessions—and their role in wrongful convictions.**

"DNA testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty." *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 55 (2009). Since it was first used to clear a murder suspect and identify the true killer nearly four decades ago, DNA evidence has transformed the criminal legal system. It "has established factual innocence with certainty in numerous post-conviction cases." Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 905 (2004). And it has laid bare the counterintuitive prevalence of false confessions.

Until the advent of widespread DNA testing, it was hard for many people to believe that an innocent person would "falsely confess to a serious crime unless he is physically tortured or mentally ill." *Id.* at 910. But DNA evidence has made clear that such false confessions are far from anomalies. False confessions are particularly prevalent in homicide cases like this one. Since 1989, at least 1,461 people have been exonerated after having been wrongfully convicted of murder. Nat'l Registry of Exonerations, *Case List*, https://exonerationregistry.org/cases (last visited Feb. 25, 2026). False confessions contributed to 330 of those wrongful convictions, more than 22 percent. *Id.* The numbers become even more alarming in DNA exoneration cases: Of the 180 people who have been proven innocent by DNA evidence after being

convicted of murder (or rape and murder), 77—*more than 42 percent*—falsely confessed. *See DNA Exonerations Database*, https://convictingtheinnocent.com/ (last visited Mar. 2, 2026).

Most of these cases, like Barbour's, involved a confession that was deemed "voluntary" under the Fifth and Fourteenth Amendment due-process test, but thereafter was conclusively proven false. Indeed, in every false-confession case where the accused raised a pretrial challenge to the voluntariness of their confession, the court determined it to be voluntary and allowed it into evidence. *See* Saul M. Kassin, *Duped: Why Innocent People Confess—and Why We Believe Their Confessions* 307 (2022). Voluntariness is not the same thing as reliability, however. Although these confessions withstood a constitutional voluntariness challenge, the confessions were unreliable because they were proven to be false by DNA evidence. Nonetheless, once a false statement of guilt extracted in an interrogation room is admitted at trial, the innocent confessor is at grave risk of wrongful conviction because "confessions have more impact on verdicts than do other potent forms of evidence." Saul M Kassin, *Why Confessions Trump Innocence*, 67 Am. Psych. Assoc. 431, 433 (2012) (citations omitted).

Counterintuitively, innocent people are at an increased risk of false confessions precisely because of their innocence. Research shows that innocent people are more likely to confess just to relieve the overwhelming stress of interrogation and get out of the interrogation room, confident that, with time, "their innocence will become self-evident to others." Saul M. Kassin, *On the Psychology of Confessions: Does Innocence Put*

*Innocents at Risk?*, 60 Am. Psych. 215, 224 (2005). But it is rarely that simple. Once an individual falsely confesses, even when their confession contradicts aspects of the crime scene like Barbour's, the train has left the station; a conviction is likely to result.

In addition to its powerful effect on juries, confessions can cause police and prosecutors to develop "tunnel vision" and "confirmation bias," resulting in curtailed investigations, and failures to consider even compelling alternative suspects and theories.[5] Focusing on a suspect who confessed "leads investigators to seek out and favor inculpatory evidence [against that suspect], while overlooking or discounting any exculpatory evidence." Saul M. Kassin et al., *The Forensic Confirmation Bias: Problems, Perspectives, and Proposed Solutions*, 2 J. Applied Rsch. Mem. & Cognition 42, 45 (2013) (citations omitted). Researchers have found that false confessions can even "corrupt other evidence": For instance, when polygraph examiners are told a suspect confessed, they are more likely to determine that the suspect was deceptive, and when eyewitnesses

---

[5] Cognitive biases like tunnel vision and confirmation bias are a well-documented phenomenon both in human cognition generally and in police and forensic investigations specifically. *See generally* Itiel E. Dror, *Biased and Biasing: The Hidden Bias Cascade and Bias Snowball Effects*, 15 Behav. Sci. 490 (2025); Daniel Kahneman, *Thinking, Fast and Slow* (2011). Rather than reflecting intentional bias or prejudice, cognitive bias is "an outcome, a by-product, of people's cognitive architecture and of how the brain processes information." Dror, *supra*, at 491. In the context of a criminal case, confirmation bias refers to the ways that "an individual's pre-existing beliefs, expectations, motives, and situational context influence the collection, perception, and interpretation of evidence." Kassin et al., *The Forensic Confirmation Bias*, *supra*, at 45.

are told a suspect confessed, they are more likely to identify that suspect—even if they had initially identified someone else. *Id.* at 46.

The case of the "Norfolk Four" demonstrates how police interrogation tactics can generate false confessions, and how these false confessions can then result in wrongful convictions—even when the confessions are contradicted by crime scene evidence. The case against four navy men for the rape and murder of Michelle Bosko began with the identification of Daniel Williams as a potential suspect. *Williams v. Brown*, 208 F. Supp. 3d 713, 719 (E.D. Va. 2016). After a witness told the police that Williams had been "bothering Bosko" before her death, Norfolk police asked Williams to come to the station to provide a statement. *Id.* Investigators administered a polygraph examination, which they falsely told Williams he had failed, and interrogated Williams for many hours until he finally confessed. *Id.* at 719–20. Williams's first confession did not match the crime scene evidence, however: he confessed to beating Bosko with his fist and shoe, while the subsequent autopsy revealed that she had in fact been strangled and stabbed. *Id.* at 720–21. Following the autopsy, police interrogated Williams again, and he gave a second confession consistent with the autopsy, this time stating that he had stabbed Bosko. *Id.* at 721. But DNA testing on semen recovered from the crime scene, attributed to a single source, later excluded Williams. *Id.*

In an apparent effort to explain this exclusion, the police decided the crime must have been a group rape and murder, and found three additional suspects: Joseph Dick, Eric Wilson, and Derek Tice. After hours of interrogation, each confessed, albeit to

changing, inconsistent narratives. *Id.* at 722–27. Dick, in particular, repeatedly changed his story under the pressure of police interrogation. *Id.* at 722–25.

The DNA evidence, however, also excluded these three men and showed that a solitary individual—Omar Ballard—had raped and murdered Bosko. *Id.* at 730. Only Ballard's DNA was found on the crime scene evidence. *Id.* Moreover, Ballard confessed to committing the crime by himself—telling the police he had never even spoken to Williams. *Id.* at 728. Yet Williams' pre-sentence motion to withdraw his plea, based on Ballard's confession, was denied. *Id.* at 728. Dick pled guilty to avoid capital punishment, and Wilson and Tice were both convicted at trial. *Id.* at 729.

After the district court held, following a *Schlup* hearing, that Williams and Dick were actually innocent and that "no sane human being could find them guilty," *id.* at 716–718, the court vacated their convictions. The Governor of Virginia eventually pardoned the "Norfolk Four." Priyanka Boghani, PBS, *Norfolk Four Pardoned 20 Years After False Confessions*, https://www.pbs.org/wgbh/frontline/article/norfolk-four-pardoned-20-years-after-false-confessions/ (Mar. 22, 2017).

Much like with the Norfolk Four, DNA evidence here proves that another man—not Barbour or Hester—committed the rape and murder, and that Barbour's confession to this crime is false. The resemblances do not stop there. Just like Williams and Dick, Barbour spent many hours in an interrogation room before first confessing. Barbour Br. at 7. Just like Williams, Barbour only confessed after being told he had failed a polygraph. *Id.* And just like Williams and Dick, there is evidence that the police

fed him crucial details about the crime scene, which he then incorporated into his confession. Each of these facts, as discussed below, are indicia of a false confession. *Id.*

## II. Decades of scientific research on false confessions support Barbour's innocence and the district court's findings below.

Barbour's admission to killing Mrs. Roberts immediately after *Hester* raped her cannot be squared with the DNA evidence revealing that *another individual's* seminal fluid—an individual with a proven history of committing strikingly similar crimes against women and with no connection whatsoever to Barbour—was found inside the victim. This fact, and this fact alone, vitiates the reliability and probative value of Barbour's confession. Application of modern scientific research on false confessions to the interrogation and confession in this case provides *additional* support for Barbour's claims and helps explain why an innocent man was compelled to implicate himself in a horrendous crime. This research explains how the police interrogation tactics used in this case likely induced Barbour's false confession, by identifying various false confession "risk factors" at issue. It also reveals myriad indicia of unreliability, providing additional reason to doubt the veracity of Barbour's statements to police.

### A. Certain police interrogation tactics, like those used against Barbour, place innocent people—especially innocent young people—at risk of falsely confessing.

Although psychologists have long been aware of the phenomenon of false confessions, they only began to systematically study false confessions after DNA exoneration cases demonstrated just how widespread they are. *See* Saul M. Kassin et al.

*Police-Induced Confessions: Risk Factors and Recommendations*, 34 L. & Hum. Behav. 3, 3–4 (2010) ("2010 Scientific Review Paper"). In the decades since Barbour's conviction, experts have identified various risk factors for false confessions, which are categorized broadly into the "situational" circumstances of the interrogation itself (such as the tactics used) and the "dispositional" characteristics of the confessor (such as youth or intellectual disability). *See* 2025 Scientific Review Paper at 19-21.

The current body of scientific literature on false confessions, which was in its infancy at the time of Barbour's trial, now includes "experimental research and meta-analyses, surveys of expert populations, observational and archival studies, and review papers authored by psychologists." Jeffrey Kaplan *et al.*, *Development of the Interview and Interrogation Assessment Instrument*, 29(1) Psychol., Pub. Pol'y, & L. 46, 46-47 (2022) (internal citations omitted). The findings from this body of research has led to the development of a scientific consensus regarding certain factors—many of which are implicated here—that increase the risk that an innocent person will falsely confess in response to police interrogation. The research supporting this consensus has been presented in peer-reviewed publications and has been backed by the American Psychological Association in at least 12 amicus briefs submitted in cases involving disputed confession evidence. *See* 2025 Scientific Review Paper at 12.

Due to officers' failure to record much of their interrogation of Barbour, we will never know precisely what occurred between the time when Barbour was first picked up by police on May 1, 1992, at around "lunch," State Appendix 8_111:6-16, and when

he began to provide his recorded statements to police at least seven hours later, State Appendix 8_142:20-22.[6] That said, as Dr. Richard Leo's testimony in the district court detailed,[7] the record shows that police used at least one powerfully coercive tactic that can—and has—elicited false confessions from the innocent. Police confronted Barbour with his purported "failure" of a polygraph examination, as if his failure was conclusive proof of guilt and deception, when in fact such results are highly fallible. *See e.g.*, Nat'l Research Council, *The Polygraph and Lie Detection* 2 (2003) (concluding that the polygraph is "intrinsically susceptible to producing erroneous results").

Deceiving a suspect about the incriminating evidence against them, a tactic known as the "false evidence ploy," increases the risk of false confessions. "Consistent with real-world cases, more than 100 years of behavioral science warns of the risk . . . that misinformation renders people vulnerable to manipulation." 2025 Scientific Review Paper at 16. After learning of the false or exaggerated evidence, suspects often

---

[6] References herein include: State's Appendix ("State's Appendix [Volume#]_[Page#]"); and Barbour's Supplemental Appendix ("Barbour's Supplemental Appendix[Volume#]_[Page#]").

[7] Dr. Richard Leo is one of the nation's leading experts in false confessions, and is a co-author of the only two Scientific Review Papers on the topic. *See* 2025 Scientific Review Paper; 2010 Scientific Review Paper. Although, as the State notes, some jurisdictions have precluded expert testimony on the subject, increasingly courts across the country are acknowledging the strong scientific foundation of the study of false confessions and admitting expert testimony—including testimony from Dr. Leo—to provide critical assistance to factfinders assessing confessions. *See e.g., United States v.* Ansari, No. 23-2703, 2024 WL 5231260, at *3 (9th Cir. Dec. 27, 2024); *Tekoh v. Cnty. of Los Angeles*, 75 F. 4th 1264, 1266 (9th Cir. 2023); *United States v. Hall*, 93 F. 3d 1337, 1346 (7th Cir. 1996); *Tigue v. Commonwealth*, 600 S.W.3d 140, 162 (Ky. 2018); *McCloud v. State*, 208 So. 3d 668, 680 (Fla. 2016); *State v. Perea*, 322 P.3d 624, 640 (Utah 2013).

feel "trapped" based on the perceived "inevitability" of evidence against them and, consequently, view compliance with officers' suggestions and admission of guilt as the only option. *Id.*

Presenting suspects with evidence that they "failed" a polygraph test as if it were scientific proof of guilt (rather than a highly unreliable proxy for truth-telling) is a particularly "potent" false evidence ploy. Richard A. Leo, *Police Interrogations and American Justice* 217 (2008); *accord* 2025 Scientific Review Paper at 16 (noting the risk of polygraph-induced false confessions and how "posttest 'failure' feedback . . . is often used to pressure suspects" (citations omitted)). In fact, as noted above, polygraph examinations have played a part in nearly *20 percent* of false confessions—and, as such, the wrongful convictions—of individuals now proven by post-conviction DNA testing to be innocent.[8]

By way of example, Frank Sterling falsely confessed to murder after being told he failed a polygraph examination, which he had volunteered to take, thinking it would clear his name. *See* Robert Kolker, *Why Do People Confess to Crimes they Didn't Commit?*, New York Magazine, Oct 1. 2010, https://nymag.com/news/crimelaw/68715/. Sterling, who was almost twenty-eight at the time of his false confession, was wrongfully convicted and spent more than seventeen years in prison until he was ultimately exonerated by DNA. *See* Innocence Project, *Cases: Frank Sterling*,

_____

[8] This statistic is derived from data on file with *amicus.*

https://innocenceproject.org/cases/frank-sterling/ (last visited Mar. 2, 2026). Like Barbour, Sterling's post-polygraph confession contained nonpublic facts that only the true perpetrator would have known, lending a false appearance of reliability to his confession. *See* DNA Exonerations Database, *Exoneree: Frank Sterling*, https://convictingtheinnocent.com/exoneree/frank-sterling/ (noting that Sterling's confession indicated, for, example, the correct, specific location of the murder, and that the victim was wearing purple) (last visited Mar. 2, 2026).[9]

Here, regardless of the officers' intent or whether they interpreted Barbour's polygraph results in good faith, Barbour's interrogating officers deceived him when they told him that the "failed" polygraph examination proved he was lying to them when he denied involvement in the offense. Although the State purports that Barbour in fact failed the polygraph test, he was only deemed to have "failed" because of the use of the highly fallible "spot scoring" method.[10] Moreover, *all* polygraph testing as a means of

---

[9] The true perpetrator of the murder, Mark Christie, was identified by the same DNA testing that exculpated Sterling. The State thereafter charged Christie, who pled guilty to the crime.

[10] At the *Schlup* hearing, Barbour presented expert testimony that the data from the polygraph examination administered to Barbour, when properly scored, "clearly showed that Mr. Barbour was being truthful." State's Appendix 29_114:10-115:21, 121:6-23. Moreover, the district court heard testimony from both Barbour's and the State's experts regarding the extraordinarily high rate of error when a particular method—the "spot scoring" method—is used to score a polygraph examination. This method, used to score Barbour's 1992 polygraph and by the State's expert in post-conviction proceedings, has been criticized as "a pernicious practice that is highly biased against the actually innocent and should be abandoned as having been scientifically demonstrated to be invalid." Charles R. Honts, *The Innocent at Risk: The Dark Side of*

deception detection is inherently unreliable. And here, of course, the DNA establishes that Barbour's assertions during the polygraph examination that he was *not* involved in the crime should have been credited as truthful. At any rate, any polygraph examiner's conclusion, using any scoring methodology, is prone to some degree of error and therefore cannot be used to *conclusively* determine the actual truth. Accordingly, regardless of the interrogating officers' good faith reliance on Barbour's "failure," their statement to Barbour that the polygraph results meant he was guilty amounted to a powerful false evidence ploy. As the Seventh Circuit has explained, when interrogators' misrepresentation of forensic evidence "foreclose[s] any other conclusion" but that the suspect committed the offense, the suspect's choice—and, potentially, perception of reality—may be "'seriously distort[ed.]'" *Aleman v. Village of Hanover Park*, 662 F. 3d 897, 906 (7th Cir. 2011) (quoting *United States v. Rutledge*, 900 F. 2d 1127, 1129–31 (7th Cir. 1990)). When such powerfully manipulative ploys are used during an interrogation, the "confession so induced is worthless as evidence." *Id.* at 907.

Further increasing Barbour's susceptibility to police coercion was the extended time he spent, isolated, in police custody.[11] *See* 2025 Scientific Review Paper at 15 (citing

---

*Certain Polygraph Practices,* 53 Polygraph and Forensic Credibility Assessment: J. of Sci. & Field Prac. 1 (2024).

[11] In addition to the polygraph ploy, Barbour has consistently maintained that he was slapped repeatedly by one of the interrogating officers, threatened that he would be "beaten within an inch of his life," and warned that if he did not confess, he would be subject to the death penalty. While these claims were disputed by the interrogating officers, they are corroborated by other evidence in the record, including the victim's

"prolonged [police] custody and isolation" as a risk factor for false confessions). As noted above, Barbour was taken into police custody at about lunchtime on May 1, 1992, in preparation for a 1:00 pm polygraph examination. His last recorded statement concluded more than *nine hours* later, at 10:30 pm.[12] As the United States Supreme Court has long recognized, "in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures" and stressors that "trade[] on the weakness of individuals" and may lead to false confessions. *Miranda v. Arizona*, 384 U.S. 436, 455 n.24(1966); *see also Corley v. United States*, 556 U.S. 303, 320–21 (2009) (""[C]ustodial police interrogation, by its very nature, isolates and pressures the individual', and there is mounting empirical evidence that these pressures can induce a frighteningly high percentage of people to confess to crimes they never committed." (internal citations and quotation marks omitted)). Within this inherently coercive and

---

husband's allegations of physical and verbal abuse by officers, Barbour's Supplemental Appendix 7_167:18-168:17; State's Appendix 35_14; Barbour's Supplemental Appendix 7_169:9-170:22; Barbour's grandfather's pre-trial hearing testimony, State's Appendix 8_200:3-201:15; and an interrogating officer's indication in his report that Barbour "scares real easy," State's Appendix 37_18; Barbour's Supplemental Appendix 1_78. Police violence and threats of violence place innocent people at serious risk of falsely confessing. Two-thirds of all known cases in which police misconduct led to false confessions involved threatened or actual violence during interrogations. Samuel Gross et al., *Government Misconduct and Convicting the Innocent: The Role of Prosecutors, Police and Other Law Enforcement*, Nat'l Registry of Exonerations 50 (2020), https://repository.law.umich.edu/other/165/ last visited Mar. 1, 2026). Further, an examination of wrongful conviction cases reveals that many innocent people who falsely confessed "later explained that they confessed in order to avoid threats of the death penalty." Brandon L. Garrett, *The Substance of False Confessions*, 62 Stanford L. Rev. 1051, 1065 (2010).

[12] Barbour's Supplemental Appendix 3_47 (video statement ending time 22:30 hours).

high-stress context of police interrogation, a suspect's "motive to escape"—and corresponding pressure to acquiesce to officers' demands for a confession—increases the longer the suspect is held in custody. 2025 Scientific Review Paper at 15.

The powerful impact of false evidence ploys and extended periods of interrogation is exacerbated when such tactics are used against adolescents and young adults like Barbour, who was twenty-two years old at the time. *See* Catherine Insel et al., *White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys, and Policy Makers* 32 (2022), https://clbb.mgh.harvard.edu/white-paper-on-the-science-of-late-adolescence/ (last visited Mar. 1, 2026). Although adults can and do falsely confess in the face of psychologically coercive or deceptive police tactics, people under twenty-five make up the majority of known false confessors. Modern neuroscience helps to explain the disproportionate number of young people who succumb to police pressure and falsely confess. The areas and systems of the brain that are responsible for future planning, judgment, and decision making—the prefrontal cortex and other regions that make up the "cognitive-control networks"—are not fully developed until a person's early to mid-twenties. *See id. at* 10, 27-35 (discussing the "dramatic" changes that occur in the prefrontal cortex until age 26).

Additionally, Barbour had suffered significant trauma in the months preceding his interrogation, which likely increased his vulnerability to coercive interrogation

tactics.[13] Recent scientific research has demonstrated that individuals who have experienced trauma—such, as here, the trauma resulting from the sudden death of a parent—are more likely to be susceptible to coercion and therefore are at increased risk of falsely incriminating themselves during police interrogation. *See, e.g.*, 2025 Scientific Review Paper at 20 ("[R]esearch shows that a history of trauma is indicative of a reduced resilience and ability to cope with interrogative pressure").

### B. False facts, inconsistencies, and contamination are all indicia of false confession.

In light of these situational and dispositional risk factors, it is perhaps not surprising that Barbour's confession is riddled with inconsistencies, inaccuracies, and bears the hallmarks of a false confession. Preliminarily, and significantly, the DNA evidence here proves conclusively that the crime did not happen in the manner Barbour told police it did, and did not happen in a manner consistent with the prosecutor's theory at trial. Instead, DNA implicates an entirely different person in the rape, with no known connection to Barbour. This, alone, renders the confession patently unreliable.

Barbour also provided police with demonstrably false facts about what happened in the moments before and after the crime. Barbour said he drank beer with the victim and his codefendants, yet the victim's blood tested negative for alcohol and no beer

---

[13] At the time of the interrogation, Barbour's mother had recently died by suicide and, after her death, Barbour lost access to reliable housing and developed an alcohol use disorder. State's Appendix 33_98. A psychologist who testified at trial described Barbour as a "22-year-old homeless, alcoholic," who was "in many ways like a juvenile." State's Appendix 33_106 .

cans were found on the scene. State's Appendix 33_94. Barbour told police he left the victim's smoke detector in the living room when, in fact, it was recovered in the kitchen. *Id.* And Barbour never stated that he nor anyone he was with attempted to strangle or suffocate the victim and never mentioned a plastic bag, despite evidence establishing that the victim had been strangled and was found with a plastic bag over her head. State's Appendix 33_92 (the medical examiner testified that Roberts had been manually strangled); *id* (Roberts was found with a plastic bag over her head). This last omission is especially notable because the plastic bag had been removed from Roberts's head in the crime scene photographs. *Id.* Each demonstrably false fact and inconsistency between Barbour's account and the physical evidence is properly understood as an indication that the confession is false or unreliable. *See e.g.*, Garrett, *The Substance of False Confessions*, *supra*, at 1086–90 (discussing numerous false confession cases in which statements were "inconsistent with facts of the crime" and "contradicted the physical evidence").

Barbour's statements also meaningfully differed from the account that his codefendant, Christopher Hester, provided at a plea colloquy. Indeed, Hester's narrative did not include rape. State's Appendix 26_77:17-78:22 (transcript of Hester's plea colloquy). Moreover, Hester did not mention Michael Mitchell—the teenager who Barbour said helped hold Roberts down while Hester raped her—and instead said that a different teenager, Angela Stikes, was involved. *Id.*

Such inconsistency between codefendants' statements is common in cases of group false confessions—cases in which multiple people utter false admissions of guilt, despite their factual innocence. For example, five teenagers later known as the "Dixmoor Five" were each convicted based on their confessions for the 1991 rape and murder of 14-year-old Cateresa Matthews in Dixmoor, Illinois. *See* Innocence Project, *Cases: James Harden*, https://innocenceproject.org/cases/james-harden/ (last visited Mar. 2, 2026). After the case went cold, police received information that one of the Dixmoor Five, Jonathan Barr, had mentioned seeing Cateresa getting into a car with other local teenagers—Robert Taylor and Robert Lee Veal. *Id.* Police then brought Veal in for questioning, where he was interrogated for approximately five hours. *Id.* In the days that followed, Taylor and Shainne Sharp, another teenager who had been implicated by Veal, were also interrogated. *Id.*

During the interrogations, officers used a variety of highly coercive, deceptive tactics that are known to elicit false confessions. Veal ultimately signed a "confession" that implicated himself, Taylor, Barr, Sharp, and James Harden in Cateresa's assault and murder. Later that same day, Taylor was interrogated and also signed a "confession," implicating himself and the other four teenagers in the crime. Two days later, Sharp signed a confession, likewise implicating himself and the other young boys. Although the confessions contained details about the crime-scene (which were known to police, but not the public, at the time), the confessions contradicted one another regarding critical facts, including which of the teenagers sexually assaulted Cateresa.

Armed with this (false) confession evidence, the State charged all five teenagers with the murder and rape. *Id.* Veal and Sharp (like Hester in Barbour's case) then entered a plea deal that, in exchange for a lesser sentence, required them to (falsely) testify against the other three boys. *Id.* At trial, Veal and Sharp's testimony contained additional discrepancies, including whether any of Cateresa's property was stolen. *Id.* The three teenagers who went to trial were all convicted in bench trials, based primarily on the evidence of the teenagers' "confessions." *Id.*

Nearly two decades later, DNA testing of biological material recovered from the victim's rape kit conclusively demonstrated that all five of the teenagers were innocent. *Id.* The true perpetrator was a thirty-three-year-old man with no connection to the victim, who had just been released on parole after having served time for rape, and who worked at a carwash near the bus stop where the victim should have boarded a bus home (but did not). *Id.* After the Dixmoor Five had served a collective 95 years of wrongful imprisonment, all five were exonerated and freed. *Id.*

Despite the exculpatory DNA evidence and the significant inconsistencies between Barbour's statements and the known crime scene evidence, as well as between Barbour's statements and Hester's colloquy, the State contends that Barbour's statements contain "shocking detail" about nonpublic information regarding the crime scene and how the offense occurred and therefore, is probative of Barbour's guilt. *See* State's Br. at 28. The State does not, however, reckon with the fact that police in this

case confronted suspects and witnesses with crime scene photos[14]—which appears to

be the basis of the "shocking detail" in Barbour's confession.[15]

In fact, the confession in almost all the proven false confession cases, as in

Barbour's, included non-public details known only to the police and the perpetrator—

details that must have been provided by police, however inadvertently, through a

process known as "confession contamination." A recent study of all DNA exonerations

to date found that 92 percent of the false confessions (95 out of 103) where the

"confessor's" innocence was later proven by DNA included "non-public facts that law

enforcement alleged the person had volunteered during the interrogation." Brandon L.

Garrett, *Confession Contamination and DNA Exoneration Cases, 1989–2025*, at 5,

https://convictingtheinnocent.com/wp-content/uploads/sites/7/2026/02/Garrett-

False-Confessions-Appendix-2026.pdf (last visited Mar. 1, 2026).  In the remaining

cases where "there was no contamination of the confession statement, persons could

---

[14] See e.g., State's Appendix 30_187:20-188:6 (James Mann, a witness at the *Schlup* hearing, testifying that an officer investigating the murder showed him a photograph of the victim at the crime scene while questioning him "aggressively").

[15] That Barbour appeared to "calmly, accurately" provide details to the police, *see* States Br. at 28, is not proof of truth. Research shows that external appearances do not necessarily reflect how an individual feels: "emotions do not have recognizable and reliable fingerprints. People vary wildly in their behavioral responses" to trauma and other high-stress environments. Jessica M. Salerno et al., *Failing to Express Emotion on 911 Calls Triggers Suspicion Through Violating Expectations and Moral Typecasting,* 128 J. of Personality & Soc. Psych., Attitudes and Soc. Cognition 4,781 (2025); *see also* Lisa Feldman Barrett, et al., *Emotional Expressions Reconsidered: Challenges to Inferring Emotion from Human Facial Movements,* 20(1) Psych. Sci. and Pub. Interest 1, 49 (2019) (concluding that "[i]t is not possible to confidently infer" an emotional state based on a person's facial expressions).

say nothing specific about the crime, and in effect, said 'I did it,' without being able to say what they ostensibly did." *Id.* Confession contamination, then, is a constant in false-confession cases.

Archival studies of known false confessions have revealed that police officers, intentionally or unintentionally, often "prompt the suspect on how the crime happened," thereby allowing an innocent suspect with no knowledge of the crime to "parrot back an accurate-sounding narrative." Garrett, *The Substance of False Confessions*, *supra*, at 1053. Since the proven false confession cases show that the details could not have originated with the demonstrably innocent man, they had to have been fed to the accused either deliberately or inadvertently by police, eager to secure a confession from a person they believed to be guilty. Indeed, in some cases of proven-false confessions, interrogating officers may not have even been conscious that they were leaking nonpublic facts, or contaminating, the confession. Yet such contamination is commonplace in false-confession cases. *See id.* at 1080-1082 (detailing instances in which suggestion by police was apparent in recordings of several analyzed false confessions). And when contaminated false confessions are admitted into evidence against an innocent person, police and prosecutors often erroneously "claim . . . that the special knowledge [of nonpublic facts] must have come from the defendant." Gisli H. Gudjonsson, *The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions*, 12 Frontiers in Psych. 1, 10 (2021). Much like the State claims here.

Police contamination of a custodial statement is, typically, "difficult to detect, and therefore may create a substantial risk of wrongful conviction that cannot be easily prevented *unless an interrogation is electronically recorded in its entirety*." Richard A. Leo et al., *Promoting Accuracy in the Use of Confession Evidence: An Argument for Pretrial Reliability Assessments to Prevent Wrongful Convictions*, 85 Temple L. Rev. 759, 770 (2013) (emphasis added). Accordingly, experts recommend that "in the absence of a full recording of the entire interrogation, any resulting confession should be presumed unreliable." *Id.* at 799. But Barbour was in police custody and questioned for hours without any contemporaneous record of what he was asked—or possibly told—by officers. And Barbour has alleged, consistent with other witnesses who were interrogated by the same investigating officers, that he was shown crime scene photographs. State's Appendix 30_13:12-19. Accordingly, the "shocking detail" that the State attributes to Barbour's guilty knowledge proves nothing.

* * *

The science on false confessions reveals that the police interrogation in this case, however inadvertently, induced a false confession from a young, vulnerable suspect, who made statements that are not only contradicted by DNA evidence, but also show other significant indicia of unreliability. Accordingly, the modern scientific consensus on false confessions casts further doubt on the reliability of Barbour's statements, and reinforces the district court's conclusion that Barbour is actually innocent.

# CONCLUSION

For the foregoing reasons, this Court should affirm the district court.

Respectfully submitted,

By: */s/ Elliot H. Scherker*

Peter J. Neufeld**
Lauren Gottesman
Matthew A. Wasserman*
The Innocence Project
40 Worth Street, Suite 701
New York, New York 10013
Telephone: 212-364-5340
pneufeld@innocenceproject.org
lgottesman@innocenceproject.org
mwasserman@innocenceproject.org

Elliot H. Scherker
Brigid F. Cech Samole
Katherine M. Clemente
Esteban Cardona
Greenberg Traurig, P.A.
333 S.E. Second Avenue, Suite 4400
Miami, Florida 33131
Telephone: 305.579.0500
scherkere@gtlaw.com
Brigid.CechSamole@gtlaw.com
Katherine.Clemente@gtlaw.com
Esteban.Cardona@gtlaw.com
miamiappellateservice@gtlaw.com

*Counsel for Amicus Curiae The Innocence Project*

**Application for admission
forthcoming
* Motion for admission pending

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the length limit of Fed. R. App. P. Rule 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 6497 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word 2010 in Garamond, 14-point font.

/s/ <i>Elliot H. Scherker</i>

## CERTIFICATE OF SERVICE

I certify that on March 2, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF and that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ <i>Elliot H. Scherker</i>