No. 25-13065-P

# In The United States Court of Appeals For the Eleventh Circuit

———————

CHRISTOPHER BARBOUR,
*Appellee,*

v.

JOHN Q. HAMM, COMMISSIONER, ALABAMA DEPARTMENT
OF CORRECTIONS,
*Appellant*

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA,
CASE NO. 2:01-CV-00612-EMC-CWB

## BRIEF OF AMICI CURIAE FORMER GOVERNMENT OFFICIALS IN SUPPORT OF APPELLEE CHRISTOPHER BARBOUR

BETH WILKINSON
KIERAN GOSTIN
JEREMY BARBER
MIKAELA F. MEYER
KELLEN MCCOY
WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005

*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:[1]

1. Akselrod, Olga, NAACP Legal Defense & Educational Fund, former counsel for Mr. Barbour in the federal habeas proceedings;

2. Allen, Richard, former Commissioner of the Alabama Department of Corrections;

3. Ball, Cameron, Assistant Attorney General in the federal habeas proceedings;

4. Barbour, Christopher, petitioner in federal habeas proceedings;

5. Barnett, Vernon, Commissioner of the Alabama Department of Revenue, former counsel with the Alabama Department of Corrections;

6. Bertsch, Tatiana, Equal Justice Initiative, counsel for Lola Roberts, William Roberts, and Lakeisha Hall;

7. Brasher, Andrew L., Eleventh Circuit Judge, former Alabama Solicitor General and Deputy Solicitor General during the pendency of Mr. Barbour's federal habeas proceedings;

8. Brooks, Ellen, former district attorney for the Fifteenth Judicial Circuit at trial, on direct appeal, and in postconviction proceedings;

9. Campbell, Donald, former Commissioner of the Alabama Department of Corrections;

10. Clark, David Richard, former Assistant Attorney General;

---

[1] The circuit judge who presided over Mr. Barbour's trial and initial postconviction proceedings, the Honorable William Gordon, is deceased. Likewise, former District Attorney Albert Sim Butler, who was the District Attorney for the Fifteenth District of Alabama when the case was initially at the District Attorney's office, is deceased. Robert Ward, a former assistant district attorney who assisted in prosecuting Mr. Barbour, and Frank Riggs, former trial counsel for Mr. Barbour, are deceased.

11.    Cohen, Nicola, Squire Patton Boggs, counsel for Mr. Barbour in the federal habeas proceedings;

12.    Coleman, Santino, NAACP Legal Defense & Educational Fund, counsel for Mr. Barbour in the federal habeas proceedings;

13.    Crenshaw, Clay, Chief Deputy Attorney General, former Assistant Attorney General during state postconviction and federal habeas proceedings;

14.    Daniel, Laurie Webb, Holland & Knight LLP, counsel for Mr. Barbour in federal civil suit;

15.    Daniel, Tracy, former Assistant Attorney General in direct appeal proceedings;

16.    Daniels, Alexandra, Squire Patton Boggs, counsel for Mr. Barbour in the federal habeas proceedings;

17.    Dunn, Jefferson, former Commissioner of the Alabama Department of Corrections;

18.    Espy, Joseph C., former counsel in Mr. Barbour's first postconviction Rule 32 proceedings;

19.    Evans, James H., former Attorney General of Alabama;

20.    Forrester, Nathan A., former Deputy Attorney General;

21.    Gohara, Miriam, Yale Law School, counsel representing Mr. Barbour during successive state postconviction and federal habeas proceedings;

22.    Gunter, William, former Assistant District Attorney that assisted in prosecuting Mr. Barbour;

23.    Haley, Michael, former Commissioner of the Alabama Department of Corrections;

24.    Hanlon, Stephen, Holland & Knight LLP, counsel for Mr. Barbour in federal civil suit;

25.    Heard, Clifford, former trial counsel for Mr. Barbour;

26. Houts, James, Assistant Attorney General, counsel for the State of Alabama in the successive postconviction proceedings;

27. Johnson, Henry M., Assistant Attorney General in the federal habeas proceedings;

28. Jones, Charlie E., former Commissioner of the Alabama Department of Corrections;

29. Jordan, Audrey, former Assistant Attorney General in the federal habeas proceedings;

30. Kendall, George H., Squire Patton Boggs, counsel representing Mr. Barbour during successive state postconviction and federal habeas proceedings;

31. Kenny, Polly S., Assistant Attorney General in the federal habeas proceedings;

32. King, Troy, former Attorney General of Alabama;

33. Lee, Jin Hee, NAACP Legal Defense & Educational Fund, counsel for Mr. Barbour in the federal habeas proceedings;

34. Loehr, Daniel Briggs, CUNY School of Law, counsel for Mr. Barbour in the federal habeas proceedings;

35. Marks, Emily C., United States District Judge for the Middle District of Alabama, presiding over federal habeas proceedings;

36. Marshall, Steve, Alabama Attorney General;

37. McCooey, Tracy, circuit judge during postconviction Rule 32 proceedings;

38. McNeill, Randall, prosecutor at Mr. Barbour's trial;

39. Neufeld, Peter, The Innocence Project, filed amicus brief in federal habeas proceedings;

40. Newsome, Kevin C., Eleventh Circuit Judge, former Solicitor General of the Alabama Attorney General's Office;

41. Nunnelley, Michael, former Assistant Attorney General in the federal habeas proceedings;

42. Nurse-Guilford, Jenay Aretha, Squire Patton Boggs, former counsel for Mr. Barbour in the federal habeas proceedings;

43. Overing, Robert M., Deputy Solicitor General in federal appellate proceedings;

44. Pool, Jimmy, former Montgomery County Circuit Judge, former counsel for co-defendant Christopher Hester;

45. Pryor, William H., Eleventh Circuit Judge, former Attorney General;

46. Roberts, Lola, daughter of victim Mrs. Thelma Roberts;

47. Roberts, Melvin, husband of victim Mrs. Thelma Roberts;

48. Roberts, William, son of victim Mrs. Thelma Roberts;

49. Setzer, Angela, Equal Justice Initiative, counsel for Mr. Barbour in federal civil suit;

50. Shaw, Theodore Michael, NAACP Legal Defense & Educational Fund, former counsel for Mr. Barbour in the federal habeas proceedings;

51. Spital, Samuel, NAACP Legal Defense & Educational Fund, counsel for Mr. Barbour in the federal habeas proceedings;

52. Stevenson, Bryan A., Equal Justice Initiative, counsel for Mr. Barbour in federal civil suit;

53. Taylor, Jon Carlton, District Court-appointed counsel for Jerry Tyrone Jackson;

54. Thomas, Holly, NAACP Legal Defense & Educational Fund, former counsel for Mr. Barbour in the federal habeas proceedings;

55. Thomas, Kim, former Commissioner of the Alabama Department of Corrections;

56. Thompson, Brenton, Assistant Attorney General in federal appellate proceedings;

57. Thompson, Myron H., former United States District Court Judge for the Middle District of Alabama in the habeas proceedings;

58. Walker, Susan R., retired United States Magistrate Judge for the Middle District of Alabama in the habeas proceedings;

59. Watkins, William Keith, former Chief United States District Judge in the Middle District of Alabama in the habeas proceedings;

60. Williams, Carine M., Squire Patton Boggs, counsel for Mr. Barbour in the federal habeas proceedings;

61. Williams, Gilda, former Assistant Attorney General in direct appeal proceedings;

62. Wu, Victorien, NAACP Legal Defense & Educational Fund, former counsel for Mr. Barbour in the federal habeas proceedings.

Undersigned also certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Date: March 2, 2026        */s/ Jeremy Barber*
                                     Attorney for *Amici Curiae*

# LIST OF *AMICI*

The *amici* listed below join this brief as individuals; institutional affiliation is noted for informational purposes only and does not indicate endorsement by institutional employers of the positions advocated in this brief.

**Kent Alexander** served as U.S. Attorney for the Northern District of Georgia. He has extensive experience in federal prosecution, crisis management, and complex criminal matters.

**Dan Bubar** served as Acting U.S. Attorney in both the Western District of Virginia and the Eastern District of North Carolina and has significant experience in federal criminal matters, government investigations, and complex litigation.

**Richard Cullen** served as U.S. Attorney for the Eastern District of Virginia and as Attorney General of the Commonwealth of Virginia. He has extensive experience in white-collar criminal defense and government investigations and recently served as Counselor to the Governor of Virginia, Governor Glenn Youngkin.

**Professor Jimmy Gurulé** served as Assistant Attorney General for the Office of Justice Programs at the U.S. Department of Justice and as Under Secretary for Enforcement at the U.S. Department of the Treasury. He is a recognized expert in anti-terrorism financing and international criminal law and founded Notre Dame Law School's Exoneration Justice Clinic.

**Peter Keisler** served as Acting Attorney General of the United States and as Assistant Attorney General for the Civil Division at the U.S. Department of Justice. He has argued numerous cases before the U.S. Supreme Court.

**Judge Timothy Lewis** served as a Judge on the U.S. Court of Appeals for the Third Circuit and previously served as a U.S. District Court Judge for the Western District of Pennsylvania. He also served as an Assistant U.S. Attorney.

**Judge Beverly Martin** served as a Judge on the U.S. Court of Appeals for the Eleventh Circuit and previously served as a U.S. District Court Judge for the Northern District of Georgia. She also served both as U.S. Attorney and an Assistant U.S. Attorney in the Middle District of Georgia.

**Bill Nettles** served as U.S. Attorney for the District of South Carolina. He has extensive experience in federal criminal prosecution and has handled complex

criminal matters involving public corruption, drug trafficking, and financial crimes.

**Michael Skinner** served as U.S. Attorney for the Western District of Louisiana and has extensive experience in federal criminal defense, internal investigations, and complex litigation matters.

**Larry Thompson** served as Deputy Attorney General at the U.S. Department of Justice and as U.S. Attorney for the Northern District of Georgia. He is known for his work on corporate fraud and governance matters.

**Dean William Michael Treanor** served as Dean of Georgetown University Law Center and is one of the nation's leading constitutional law scholars. He previously served as Deputy Assistant Attorney General in the Office of Legal Counsel at the U.S. Department of Justice.

**Donald Verrilli Jr.** served as Solicitor General of the United States and as Deputy Counsel to the President. He has argued dozens of cases before the U.S. Supreme Court on behalf of the United States.

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................1

INTERESTS OF AMICI...........................................................................3

STATEMENT OF THE ISSUES................................................................4

ARGUMENT ...........................................................................................4

    I.     DNA Evidence Is The Most Reliable Evidence For
           Determining Guilt Or Innocence...........................................4

    II.    The Government Should Consent To Vacate Convictions That
           Are Inconsistent With DNA Evidence...................................7

    III.   The Court Should Vacate Mr. Barbour's Conviction Because
           The State's Only Proof Was Inconsistent With Irrefutable DNA
           Evidence .............................................................................10

CONCLUSION ......................................................................................15

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Kansas v. Marsh*
   548 U.S. 163 (2006) ...........................................................................5

*Barbour v. Hamm*,
   746 F. Supp. 3d 1252 (M.D. Ala. 2024)............................................ 11, 12, 13, 14

*Barbour v. Hamm*,
   796 F. Supp. 3d 896 (M.D. Ala. 2025)......................................................... *passim*

*Berger v. United States*,
   295 U.S. 78 (1935) ...........................................................................10

*Brady v. Maryland*,
   373 U.S. 83 (1963) ...................................................................... 12, 13

*Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*,
   557 U.S. 52 (2009) ...........................................................................4

*Harvey v. Horan*,
   285 F.3d 298 (4th Cir. 2002) .............................................................4, 5

*In re Winship*,
   397 U.S. 358 (1970) ...........................................................................7

*Maryland v. King*,
   569 U.S. 435 (2013) ...........................................................................4

*Napue v. Illinois*,
   360 U.S. 264 (1959) ...........................................................................12

*Opper v. U.S.*,
   348 U.S. 84 (1954) ...........................................................................7

*Schlup v. Delo*,
   513 U.S. 298 (1995) ................................................................... 7, 10

*U.S. v. Johnson*,
   814 F. App'x 526 (11th Cir. 2020)........................................................7

**Rules**

Fed. R. App. P. 29(a)(2) ............................................................................3

**Other Authorities**

*Barry Scheck Lectures on Wrongful Convictions*,
    54 DRAKE L. REV. 597 (2006) ..............................................................5

Brandon L. Garrett, *False Confessions Appendix, Convicting the*
    *Innocent: DNA Exonerations Database* (2026),
    https://convictingtheinnocent.com/wp-
    content/uploads/sites/7/2026/02/Garrett-False-Confessions-
    Appendix-2026.pdf (last visited Feb. 26, 2026) ...................................6

National Research Council, *The Evaluation of Forensic DNA*
    *Evidence* 2 (1996) ...............................................................................4

Innocence Project, *Damon Thibodeaux*,
    https://innocenceproject.org/cases/damon-thibodeaux (last visited
    Feb. 26, 2026) ......................................................................................9

Innocence Project, *DNA Exonerations in the U.S.* (1989–2020),
    https://innocenceproject.org/dna-exonerations-in-the-united-states/
    (last visited Feb. 26, 2026) ...............................................................5, 6

Jay Hughes, *DNA Test Frees 2 Inmates*, CBS News (Apr. 15, 1999),
    https://www.cbsnews.com/news/dna-tests-free-2-inmates/ ...................9

John Seasly, *Walter Ogrod Walks Off Death Row*, Injustice Watch
    (June 5, 2020), https://www.injusticewatch.org/archive/2020/walter-
    ogrod-walks-off-death-row/ ...............................................................10

The Constitution Project, *Mandatory Justice: Eighteen Reforms to the*
    *Death Penalty* (2001)...........................................................................8

The Constitution Project, *Mandatory Justice: The Death Penalty*
    *Revisited Report* (2005) ...................................................................8, 9

William S. Sessions, *DNA: A Test for Justice*, Baltimore Sun (June 10, 2003)........8

**INTRODUCTION**

There is no greater threat to the legitimacy of the criminal justice system than the execution of an innocent person. To preserve that legitimacy, prosecutors must follow the evidence—even when it is exculpatory. Amici submit this brief in support of Christopher Barbour because as former government officials, including federal prosecutors and judges, they continue to feel the weight of that obligation. Mr. Barbour sits on death row because of a retracted confession that is irreconcilable with DNA evidence—evidence that no one, not even the State of Alabama, suggests could be inaccurate. Each day Mr. Barbour remains there undermines the integrity of the judicial system that Amici have devoted their professional careers to protecting.

Mr. Barbour has spent more than thirty years incarcerated in Alabama for the rape and murder of Thelma Bishop Roberts. His conviction rested solely on a confession he later recanted—one he has long maintained was physically and psychologically coerced by police—wherein he claimed that Christopher Hester raped Mrs. Roberts while he held her down. Decades later, in 2021, court-ordered DNA testing conclusively excluded Mr. Barbour and Mr. Hester as having raped Mrs. Roberts and implicated Jerry Tyrone Jackson, Mrs. Roberts's neighbor. Mr. Jackson, who has no known connection to Mr. Barbour, has a documented history of sexual violence and is currently incarcerated for an unrelated home-invasion

murder in which the victim rejected his sexual advances.

The State contorts itself to devise a theory of guilt that is somehow consistent with that DNA evidence. Below, it claimed that the confession could conceivably still be accurate because sixteen-year-old Mr. Jackson may have separately been having a consensual relationship with Mrs. Roberts, a church-going mother in her forties. Recognizing the facial implausibility of that tale, Alabama now claims that Mr. Barbour may have chosen not to implicate Mr. Jackson because he feared retribution from him. The problem with that theory—like the State's original theory—is that it has absolutely no support in the record. Any law student worth her salt can conjure up hypotheticals, but that is not how the criminal justice system is intended to work. Prosecutors must develop a theory of guilt, and then prove it.

Confessions are an important prosecutorial tool, and many of the Amici have relied on them to obtain convictions. But confession evidence is fallible in ways that properly collected and tested DNA evidence is not. Those differences mandate that confession evidence give way when it is irreconcilable with DNA evidence, as it is here.

The State should direct its efforts toward prosecuting Mr. Jackson for the rape and murder of Mrs. Roberts, rather than attempting to preserve Mr. Barbour's wrongful conviction. A system of justice that prioritizes a conviction's permanence over its accuracy fails to serve its purpose. Accordingly, Amici urge this Court to

affirm Judge Marks's order vacating Mr. Barbour's conviction.

## INTERESTS OF AMICI[2]

A criminal justice system only operates justly when it uses reliable, evidence-based facts to convict suspected criminals. The undersigned Amici are former government officials, including federal prosecutors and judges, who collectively possess decades of experience enforcing criminal law, seeking justice for victims, and upholding the integrity of the judicial system. Our interest in this matter stems from our professional commitment to ensuring that the U.S. criminal justice system lives up to those ideals.

We file this brief in support of Appellee to highlight three critical points relevant to our experience. First, DNA evidence is the most powerful and scientifically reliable tool for identifying perpetrators and excluding the innocent. Second, while we recognize that confessions can be vital evidence in securing proper convictions, they are not infallible and should yield when contradicted by DNA evidence. Finally, prosecutors have a fundamental duty to seek justice by presenting truthful, accurate evidence to the jury.

Amici file this brief solely as individuals; institutional affiliations are given for identification purposes only.

---

[2] No person other than amici, its members, or its counsel contributed money intended to fund preparing or submitting this brief. No party or party's counsel authored the brief in whole or in part, and all parties have consented to its filing, pursuant to Fed. R. App. P. 29(a)(2).

## STATEMENT OF THE ISSUES

Did the District Court properly find that Mr. Barbour satisfied *Schlup* and grant Mr. Barbour habeas relief after finding Due Process violations?

## ARGUMENT

## I. DNA Evidence Is The Most Reliable Evidence For Determining Guilt Or Innocence

DNA evidence revolutionized the criminal justice system with its "unparalleled ability both to exonerate the wrongly convicted and to identify the guilty." *Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 55 (2009). Since its introduction in the mid-1980s, DNA evidence has advanced to the point where investigators can now determine whether biological evidence matches a suspect "with near certainty." *Id.* at 62; *see also* NATIONAL RESEARCH COUNCIL, THE EVALUATION OF FORENSIC DNA EVIDENCE 2 (1996). As the Supreme Court has put it, DNA evidence provides "irrefutable" identification of a person. *Maryland v. King*, 569 U.S. 435, 451 (2013).

Indeed, there is "widespread agreement within the scientific community" that modern DNA testing "can distinguish between any two individuals on the planet, other than identical twins." *Harvey v. Horan*, 285 F.3d 298, 305 (4th Cir. 2002) (Luttig, J., concurring in the denial of rehearing). The statistical probabilities that two non-twin individuals would have matching DNA profiles range "in the hundreds of billions, if not trillions." *Id.* In other words, DNA tests can, "in certain

circumstances, establish to a virtual certainty whether a given individual did or did not commit a particular crime." *Id.* "These scientific advances, which have rendered it literally possible to confirm guilt or innocence beyond any question whatsoever . . . are no ordinary developments, even for science. And neither can they be treated as ordinary developments for law. . . ." *Id.*

DNA testing has the power to confirm a suspect's guilt, even years later. And it does so. The co-founder of the Innocence Project, Barry Scheck, reported in 2006 that sixty percent of the time that an incarcerated individual demanded DNA testing to prove their innocence, the DNA evidence was inculpatory. Barry C. Scheck, *Barry Scheck Lectures on Wrongful Convictions*, 54 DRAKE L. REV. 597, 601 (2006). Justice Scalia expressed a similar sentiment in *Kansas v. Marsh*: "The dissent makes much of the new-found capacity of DNA testing to establish innocence. But in every case of an executed defendant of which I am aware, the technology has *confirmed* guilt." 548 U.S. 163, 188 (2006) (Scalia, J., concurring).

Moreover, even when DNA evidence exculpates a convicted defendant (as in Mr. Barbour's case), it often also incriminates the true perpetrator. According to a database of exonerations, from 1989 to 2018, in fifty percent of cases in which individuals were exonerated by DNA evidence, the real perpetrator was ultimately identified. *See* Innocence Project, *DNA Exonerations in the United States (1989–2020)*, https://innocenceproject.org/dna-exonerations-in-the-united-states/ (last visited Feb.

26, 2026). This number is even higher in cases involving false confessions: of the 102 DNA exonerations that involved false confessions, the real perpetrator was identified seventy-five percent of the time. *Id.* Another exoneration database concluded that of the 103 DNA exoneration cases with false confessions they recorded, fifty-five percent involved a post-conviction hit to a DNA database; meaning that of those fifty-five percent of cases, the real perpetrator's DNA was already available to law enforcement. *See* Brandon L. Garrett, *False Confessions Appendix*, Convicting The Innocent: DNA Exonerations Database (2026), https://convictingtheinnocent.com/wp-content/uploads/sites/7/2026/02/Garrett-False-Confessions-Appendix-2026.pdf.

DNA evidence can be particularly inculpatory (or exculpatory) in sexual assault cases like this one. In other cases, DNA evidence merely places a person within a location—investigators find some hair or some skin in the room where the crime happened. Such DNA evidence could, theoretically, be explained away. But semenological DNA evidence found after collecting vaginal and anal swabs from a victim does more than simply place a potential perpetrator in a relevant location. It is irrefutable evidence of a specific sexual act.

Confessions, while useful, are not as reliable as objective DNA evidence. "In our country the doubt persists that the zeal of the agencies of prosecution to protect the peace, the self-interest of the accomplice, the maliciousness of an enemy or the

aberration or weakness of the accused under the strain of suspicion may tinge or warp the facts of the confession." *Opper v. U.S.*, 348 U.S. 84, 89–90 (1954). Recognizing this fallibility, courts have held that "[a] confession requires corroboration if it is to be used to support a conviction against the accused." *U.S. v. Johnson*, 814 F. App'x 526, 532 (11th Cir. 2020) (citing *Opper*, 348 U.S. at 92–93). DNA evidence can provide that corroboration, or it can undermine it.

Properly collected and tested DNA evidence is a powerful tool that can prove guilt beyond a reasonable doubt, as Amici know well. But the converse is also true: when DNA evidence excludes a defendant, less reliable evidence must give way.

## II. The Government Should Consent To Vacate Convictions That Are Inconsistent With DNA Evidence

"The quintessential miscarriage of justice is the execution of a person who is entirely innocent." *Schlup v. Delo*, 513 U.S. 298, 324–25 (1995) (Stevens, J.). "Indeed, concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system," and "is reflected . . . in the 'fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.'" *Id.* at 325 (citing *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)).

For that reason, in 2001, the Constitution Project created the Death Penalty Initiative, a committee to address "the deeply disturbing risk that Americans are being wrongfully convicted of capital crimes or wrongfully sentenced to death."

MANDATORY JUSTICE: EIGHTEEN REFORMS TO THE DEATH PENALTY ix (2001) [hereinafter MANDATORY JUSTICE 2001]. The committee included a former FBI director, former federal prosecutors, state attorneys general, defense lawyers, judges, and victims' advocates. *Id.* at ix, xx–xxi. While all members "believe[d] that individuals who commit violent crimes deserve swift and certain punishment," they shared differing views on capital punishment, and several members actively supported the death penalty. MANDATORY JUSTICE: THE DEATH PENALTY REVISITED REPORT xii (2005) [hereinafter MANDATORY JUSTICE 2005].

Despite these differing views, the Death Penalty Initiative collectively came to an inescapable conclusion: "Criminal trials and the ensuing convictions have unmistakably been shown to be fallible, even when our criminal justice system operates in good faith and apparent good order." MANDATORY JUSTICE 2001 33. As Judge William S. Sessions, a pro-death-penalty member of the committee, explained, this conclusion was informed in part by DNA evidence's capacity to exclude wrongly accused suspects. Judge Sessions was the FBI Director during the Bureau's early adoption of DNA testing as an investigative tool. William S. Sessions, *DNA: A Test for Justice*, BALTIMORE SUN, Jun. 10, 2003. When the results came in, he was "astonished" that, among the first 100 FBI tests, "[i]n 30 of them, the DNA did not match that of the person charged with the crime." *Id.*

Despite the power of DNA evidence, the Death Penalty Initiative recognized that procedural barriers often prevent prisoners from obtaining or presenting exculpatory DNA evidence. It therefore issued recommendations encouraging the use of DNA evidence to protect against wrongful capital convictions. One recommendation was directed to prosecutors: "Where the results of post-conviction DNA testing exclude the defendant or are inconsistent with the prosecution's theory, prosecutors should promptly consent to vacate the conviction, and should not retry (or threaten to retry) the defendant unless convinced that compelling evidence remains of the defendant's guilt beyond a reasonable doubt." MANDATORY JUSTICE 2005 43.

Many prosecutors have heeded that advice. For example:

- In Louisiana, Jefferson Parish District Attorney Paul Connick Jr. initiated a joint reinvestigation that ultimately proved Damon Thibodeaux's innocence and led the State to move for vacatur of his death sentence based on DNA and forensic evidence inconsistent with a flawed, coerced confession.[3]

- In Oklahoma, Pontotoc County District Attorney Bill Peterson declared a "moral, ethical, and legal obligation" to seek relief after DNA testing excluded Ron Williamson and Dennis Fritz and identified the State's own witness as the true perpetrator, resulting in reversal of their wrongful convictions and sentences.[4]

---

[3] Innocence Project, *Damon Thibodeaux*, https://innocenceproject.org/cases/damon-thibodeaux (last visited Feb. 26, 2026).

[4] Jay Hughes, *DNA Test Frees 2 Inmates*, CBS NEWS (Apr. 15, 1999), https://www.cbsnews.com/news/dna-tests-free-2-inmates/.

- In Pennsylvania, the Philadelphia District Attorney's Office petitioned to vacate Walter Ogrod's death sentence based on new DNA testing that conflicted with a 28-year-old, falsified confession.[5] In open court, Assistant District Attorney Carrie Wood told Mr. Ogrod: "I'm sorry it took 28 years for us to listen . . . That you are innocent, and that the words on your statement of confession came from Philadelphia police detectives and not you."[6]

These prosecutors should be commended. When DNA evidence provides a clear path to exoneration, a prosecutor's duty to seek justice must supersede any interest in maintaining a conviction. A prosecutor, after all, "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. U.S.*, 295 U.S. 78, 88 (1935).

## III. The Court Should Vacate Mr. Barbour's Conviction Because The State's Only Proof Was Inconsistent With Irrefutable DNA Evidence

Judge Marks's order below corrects a "quintessential miscarriage of justice." *Schlup*, 513 U.S. at 324. Like many of the cases described above, DNA evidence conclusively excludes Mr. Barbour and his co-defendant. The only roadblock to his release is the State's refusal to yield to DNA evidence that is entirely inconsistent with the only evidence—a recanted confession—on which his conviction rests.

---

[5] John Seasly, *Walter Ogrod walks off death row*, INJUSTICE WATCH (June 5, 2020), https://www.injusticewatch.org/archive/2020/walter-ogrod-walks-off-death-row/.

[6] *Id.*

After Mrs. Roberts's murder in 1992, Mr. Barbour became a focus of the investigation and ultimately confessed. *Barbour v. Hamm*, 796 F. Supp. 3d 896, 909 (M.D. Ala. Aug. 22, 2025) *("Barbour (Brady/Napue* Op.)")*. He stated that he and another man, Michael Mitchell, held Mrs. Roberts down while a third man, Christopher Hester, raped her, and that he then stabbed and killed Mrs. Roberts. *Id.* at 911. Shortly after, and well before trial, Mr. Barbour recanted that confession, asserting that it was coerced, a position he has maintained to this day. *Barbour v. Hamm*, 746 F. Supp. 3d 1252, 1258 (M.D. Ala. Aug. 16, 2024) ("*Barbour (Schlup* Op.)").

Despite Mr. Barbour's swift change in position, his confession stuck. At his trial, the prosecution relied almost exclusively on Mr. Barbour's coerced confession, repeatedly emphasizing to the jury that the crime happened exactly as Mr. Barbour described it. *Barbour (Brady/Napue* Op.), 796 F. Supp. 3d at 933, 939. The State presented no physical evidence linking Mr. Barbour—or any of the other alleged perpetrators—to the crime scene, and no lay witness corroborated the confession. *Barbour (Schlup* Op.), 746 F. Supp. 3d at 1268.

Before trial, the State had done a DNA test of vaginal and anal swabs containing semen taken from Mrs. Roberts's body. *Barbour (Brady/Napue* Op.), 796 F. Supp. 3d at 923-24. The Alabama Department of Forensic Sciences (ADFS) conducted the test, which was less precise than modern DNA standards, and

concluded that Hester, Mr. Barbour's alleged accomplice and the alleged rapist, was unlikely to be the source of the semen. *Id.* The report also concluded that Mr. Barbour could not be excluded as the source of the semen. *Id.*

But the State withheld underlying bench notes and worksheets from the ADFS reports that would have allowed the Mr. Barbour's counsel to "have elicited expert testimony that both Barbour and Hester were conclusively excluded as the semen's source and thus call into question the only direct evidence of Barbour's guilt: his confession." *Id.* at 967. Judge Marks concluded that by withholding this evidence, the State prevented Mr. Barbour from accessing material evidence that "would have seriously undermined" the State's case, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.*

Furthermore, prosecutors compounded the harm by relying on that confession—a confession that was known by "'the trial court, the prosecutor, and Barbour's lawyers (but not the jury) . . . [to be] inaccurate.'" *Id.* at 972 (citing *Barbour* (*Schlup* Op.), 746 F. Supp. 3d at 1297). By knowingly presenting material, false evidence to the jury, the State violated Mr. Barbour's rights pursuant to *Napue v. Illinois*, 360 U.S. 264 (1959). *Id.* at 973–74.

In 2021, pursuant to court order, DNA evidence collected at the time of Mrs. Roberts's murder was tested using modern technology. *Id.* at 949. The results confirmed conclusively that neither Mr. Barbour nor Mr. Hester contributed to the

DNA evidence recovered from Mrs. Roberts's body. *Id.* The DNA evidence not only excluded Mr. Barbour as the perpetrator of the sexual assault but also established that a central assertion of the confession—that Mr. Hester raped Mrs. Roberts—was false. *Id.* at 973.

Beyond exonerating Mr. Barbour, the testing implicated Mrs. Roberts's neighbor, Jerry Tyrone Jackson. *Id.* at 909; *Barbour* (*Schlup* Op.), 746 F. Supp. 3d at 1272. Mr. Jackson was known to the police at the time of the investigation, and several witnesses identified him as a person near the crime scene on the night in question. *Barbour* (*Brady/Napue* Op.), 796 F. Supp. 3d at 913. Despite this, he was never connected to Mr. Barbour at the time of the murder, never investigated by police, and was never mentioned as part of the prosecution's theory of the case. Mr. Jackson has since been convicted of the murder of another woman in her home after she rejected Mr. Jackson's sexual advances. *Id.* at 948 n.22; *Barbour* (*Schlup* Op.), 746 F. Supp. 3d at 1270. *See also Jerry Tyrone Jackson v. State,* 02-cr-2280 (Ala. Crim. App. Nov 19, 2004).

Judge Mark's findings establish that the prosecutors in this case committed significant constitutional violations that resulted in Mr. Barbour's conviction. Unfortunately, the State continues to compound those mistakes in its attempt to make Mr. Barbour's conviction stick.

Below, the State argued that Mr. Barbour's confession was not undermined by the DNA evidence because it was possible that Mr. Jackson was having a separate, consensual sexual relationship with Mrs. Roberts. *Barbour* (*Schlup* Op.), 746 F. Supp. 3d at 1299 (citing Resps. Post-Hearing Br. at 147 (Dkt. No. 450)). The problem with this inventive theory, however, was that it had no support in the record and, in fact, was contradicted by it. As Judge Marks explained,

> As a threshold matter, any reasonable jury would doubt the veracity of the claim that Mrs. Roberts, a forty-year-old churchgoing woman, had consensual sex with Jackson, her sixteen-year-old neighbor who was a year younger than her own son. And besides the amount of sperm collected at the autopsy, the State proffers no evidence to support the theory that Mrs. Roberts had consensual sex with Jackson up to three days before she died. By contrast, William and Lola, who were living with Mrs. Roberts when she died, both testified at the *Schlup* hearing that Mrs. Roberts did not have a relationship with Jackson.

*Id.* at 1300. The State has now thankfully abandoned this implausible explanation.

But its new theory fares no better. The State's brief on appeal seeks to maintain Mr. Barbour's conviction and claims that there are "plenty of other explanations" for why the DNA evidence flatly contradicts Mr. Barbour's coerced confession—and thus the State's whole theory of the case. Appellant Br. at 30. Perhaps, the State reasons, Mr. Barbour "was afraid of Jackson," Mr. Barbour's *true* confederate, and that is why his confession implicates a completely different rapist. *Id.* Of course, the State abdicates its responsibility to provide any evidence in support of this theory. For good reason: there is none. Mr. Jackson has testified, under oath,

that he does not know and has never met Mr. Barbour. *See* Tr. at 10:19-22; 18:16-21, *Barbour v. Hamm*, 2:01-cv-00612 (M.D. Ala. Jul. 12, 2023), Dkt. No. 437-1.

While prosecutors must sometimes make their cases with imperfect evidence, they have a duty to support their cases with evidence sufficient for a jury to find guilt beyond a reasonable doubt. As former federal government officials, Amici have no difficulty determining that the theories presented by the State here do not pass that test. When, like here, the evidence points elsewhere, prosecutors must follow that evidence—not maintain theories without evidentiary support that "def[y] logic and common sense." *Barbour* (*Brady/Napue* Op.), 796 F. Supp. 3d at 973.

Based on all the evidence in Mrs. Roberts's case, the State should not focus its efforts on opposing vacatur of Mr. Barbour's conviction, but instead, should spend its resources on determining whether the evidence supports prosecution of Mr. Jackson.

## CONCLUSION

DNA evidence is an indispensable tool for both incrimination and exoneration, and in Mr. Barbour's case, DNA did just that: it identified Mr. Jackson as the most likely perpetrator in Mrs. Roberts's murder while exonerating Mr. Barbour. Accordingly, we urge this Court to affirm Judge Marks's order vacating Mr. Barbour's conviction.

Dated: March 2, 2026

Respectfully Submitted,

Beth Wilkinson
Kieran Gostin
Jeremy Barber
Mikaela F. Meyer
Kellen McCoy
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

I hereby certify in accordance with Federal Rule of Appellate Procedure 32(g)(1) that this brief complies with the applicable type-volume limitation under Federal Rule of Appellate Procedure 29(a)(5). According to the word-processing software's word count, there are 4,030 words in the applicable sections of this brief. I also certify that this brief complies with the applicable type-style requirements under Federal Rules of Appellate Procedure 32(a)(5) and (6). The brief was prepared in 14-point, Times New Roman font.

*/s/ Jeremy Barber*
Attorney for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2026, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the attorneys of record who are registered participants in the Court's electronic notice and filing system.

*/s/ Jeremy Barber*
Attorney for *Amici Curiae*